**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGOANS FOR AN END TO THE | ) | |
| GANG DATABASE: BLACK YOUTH | ) | |
| PROJECT 100 CHICAGO, BLOCKS | ) | |
| TOGETHER, BRIGHTON PARK | ) | |
| NEIGHBORHOOD COUNCIL, LATINO | ) | Case No. |
| UNION, MIJENTE, and ORGANIZED | ) | (Class Action) |
| COMMUNITIES AGAINST DEPORTATION, | ) | |
| as well as DONTA LUCAS, JONATHAN | ) | |
| WARNER, LESTER COOPER, and LUIS | ) | |
| PEDROTE-SALINAS, on behalf of themselves | ) | |
| and a class of similarly situated persons, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, SUPERINTENDENT | ) | |
| EDDIE JOHNSON, and CHICAGO POLICE | ) | |
| OFFICERS MICHAEL TOMASO (#6404), | ) | |
| MICHAEL GOLDEN (#15478), PETER | ) | |
| TOLEDO (#2105), JOHN DOES 1-4, and | ) | |
| JANE DOES 1-2, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Organizational Plaintiffs CHICAGOANS FOR AN END TO THE GANG DATABASE:

BLACK YOUTH PROJECT 100 CHICAGO, BLOCKS TOGETHER, BRIGHTON PARK

NEIGHBORHOOD COUNCIL, LATINO UNION, MIJENTE, and ORGANIZED

COMMUNITIES AGAINST DEPORTATION, as well as Plaintiffs DONTA LUCAS,

JONATHAN WARNER, LESTER COOPER, and LUIS PEDROTE-SALINAS, individually

and on behalf of a class of similarly situated individuals in the City of Chicago who have been or

in the future will be listed as a gang member in the Gang Database by Chicago Police

Department (the "CPD" or "Chicago Police" or "Department") officers, file this Complaint for declaratory and injunctive relief against the CITY OF CHICAGO and CPD SUPERINTENDENT EDDIE JOHNSON in his official capacity, as well as CPD OFFICERS MICHAEL TOMASO, MICHAEL GOLDEN, PETER TOLEDO, JOHN DOES 1-4, and JANE DOES 1-2 in their individual capacities, and allege as follows:

## INTRODUCTION

1.     The Chicago Police Department uses, maintains, publishes, and shares a Gang Database of all suspected gang members in the City of Chicago that is arbitrary, discriminatory, over-inclusive, and error-ridden.  The CPD disproportionately targets Black and Latinx people for inclusion in the Gang Database.  The Gang Database includes approximately 11 percent of Chicago's Black population, 4 percent of its Latinx population, and only 0.6 percent of its white population.

2.     Of the over 128,000 adults in the Gang Database, 70 percent are Black, 25 percent are Latinx, and less than 5 percent are white.  This means that 95 percent of the people in the Gang Database are Black or Latinx.

3.     CPD officers are afforded unlimited discretion to include someone in the Gang Database.  They wield this discretion in a discriminatory manner, often falsely labeling people gang members based solely on their race and neighborhood.

4.     Individuals who are labeled gang members by CPD officers are not provided any due process protections, including notice or an opportunity to contest the gang designation.  And once an individual is included in the Gang Database, he is in the database forever—there are no mechanisms by which he can request to be removed, nor does the CPD conduct any internal audits to guarantee that the information in the Database is accurate.

5.     The CPD knowingly relies on its own wrongful gang designations to harass, falsely arrest, and falsely imprison class members.  Furthermore, the CPD shares its Gang Database with numerous third party agencies, causing significant known and unknown harm to class members, including deprivations of employment, licensures, bond, immigration relief, and more.  The CPD's policies and practices relating to the use and maintenance of its Gang Database therefore violate the constitutional rights of class members.

6.     The CPD confirmed that as of May 2018, there are over 128,000 adults in the Gang Database.  While the number of juveniles (people under 18 years old) in the Gang Database is unconfirmed by the CPD, based on available data, it is estimated that there are between 28,000 and 68,000 juveniles in the Gang Database.  Therefore, the overall total number of people currently in the Gang Database is estimated to be between 155,000 and 195,000.

7.     This is an action seeking injunctive relief filed on behalf of a putative class of all persons who currently are or in the future will be included in CPD's Gang Database.  The individual named Plaintiffs also seek relief on behalf of a subclass consisting of the Black and Latinx members of the larger class.  This lawsuit is brought against the City of Chicago and Superintendent Eddie Johnson in his official capacity for violations of the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, and Illinois state law, including the Illinois Civil Rights Act of 2003, 740 ILCS 23/5.  All Plaintiffs seek declaratory and injunctive relief on behalf of the entire city-wide class so as to put an end to the CPD's unconstitutional policies and practices relating to its Gang Database.  The individual named Plaintiffs also seek monetary damages against the City of Chicago and individual CPD officers for the harm they incurred as a result of the City's policies and practices.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law, including the Illinois Civil Rights Act.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

### *Plaintiffs*

10.     CHICAGOANS FOR AN END TO THE GANG DATABASE is a coalition comprised of Chicago-based organizations dedicated to urging the City of Chicago to expand what it means to be a "Sanctuary City" to protect immigrants and U.S. born people of color, particularly those who are targeted by local police.  The coalition includes the following organizational Plaintiffs:

11.     Plaintiff BLACK YOUTH PROJECT 100 ("BYP 100") is a national member-based organization of Black 18- to 35-year-old activists and organizers, with an active Chicago chapter.  BYP100 Chicago is dedicated to creating justice and freedom for all Black people.  BYP100 Chicago does this work through building a network focused on transformative leadership development, direct action organizing, advocacy, and political education using a Black queer feminist lens.  Individual members of BYP100 Chicago live in or regularly travel through Chicago, and have been or are likely to be subjected to wrongful inclusion in the CPD's Gang Database.  As a result, BYP100 Chicago is forced to spend additional time and money addressing the devastating consequences suffered by its members and the communities it represents as a result of CPD's unconstitutional use of its Gang Database, diverting resources

4

away from BYP100 Chicago's mission of creating justice and freedom for all Black people. BYP100 Chicago brings this action on its own behalf and as an organizational representative for its members. BYP100 Chicago participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

12.     Plaintiff BLOCKS TOGETHER ("BT") is a membership-based community organizing group in the West Humboldt Park neighborhood on Chicago's West Side. BT empowers residents to work together for systemic changes that bring concrete improvement to their lives. BT tackles social justice issues relating to education, housing, economic justice, and the criminalization of youth. Discriminatory policing is an area of concern for BT. Individual members of BT live in or regularly travel through Chicago, especially the West Humboldt Park neighborhood, and have been or are likely to be subjected to wrongful inclusion in the CPD's Gang Database. Individual members are particularly likely to be affected given the level of discriminatory policing in that neighborhood. As a result, BT is forced to spend additional time and money addressing the devastating consequences suffered by its members and the communities it represents as a result of CPD's unconstitutional use of its Gang Database, diverting resources away from the organization's focus on other social justice issues critical to its mission, including education, housing, and economic justice. BT brings this action on its own behalf and as an organizational representative for its members. BT participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

13.     Plaintiff BRIGHTON PARK NEIGHBORHOOD COUNCIL ("BPNC") is a community-based, nonprofit organization serving a working-class neighborhood on Chicago's Southwest Side. BPNC's mission is to create a safer community, improve the learning environment at public schools, preserve affordable housing, provide a voice for youth, protect

immigrant rights, promote gender equality, and end all forms of violence, including police violence. Individual members of the BPNC live in or regularly travel through Chicago, particularly the Brighton Park neighborhood, and have been or are likely to be subjected to wrongful inclusion in the CPD's Gang Database. As a result, the BPNC is forced to spend additional time and money addressing the devastating consequences suffered by its members and the communities it represents as a result of the CPD's unconstitutional use of its Gang Database, diverting resources away from the organization's focus on other social justice issues critical to its mission, including education, housing, immigration, and gender issues. The BPNC brings this action on its own behalf and as an organizational representative. The BPNC participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

14. Plaintiff LATINO UNION is a membership-based, nonprofit organization that collaborates with low-income immigrant and U.S.-born workers to develop the tools necessary to collectively improve social and economic conditions. Latino Union accomplishes its mission by developing leadership from within the immigrant and low-wage worker communities, creating feasible alternatives to the injustices workers face, and building the larger movement for immigrants' and workers' rights. Individual members of Latino Union live in or regularly travel through Chicago, and have been or are likely to be subjected to wrongful inclusion in the CPD's Gang Database. As a result, Latino Union is forced to spend additional time and money addressing the devastating consequences suffered by its members and the communities it represents as a result of the CPD's unconstitutional use of its Gang Database, diverting resources away from the organization's focus on other social justice issues critical to its mission, including immigrants' and workers' rights. Latino Union brings this action on its own behalf and as an

organizational representative. Latino Union participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

15.     Plaintiff MIJENTE is a national digital and grassroots hub for Latinx and Chicanx movement building and organizing that seeks to increase the profile of policy issues that matter to its communities and increase the participation of Latinx and Chicanx people in the broader movements for racial, economic, climate, and gender justice. Individual members of Mijente live in or regularly travel through Chicago, and have been or are likely to be subjected to wrongful inclusion in the CPD's Gang Database. As a result, Mijente is forced to spend additional time and money addressing the devastating consequences suffered by its members and the communities it represents as a result of the CPD's unconstitutional use of its Gang Database, diverting resources away from the organization's focus on other social justice issues critical to its mission, including racial, economic, climate, and gender justice. Mijente brings this action on its own behalf and as an organizational representative. Mijente participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

16.     Plaintiff ORGANIZED COMMUNITIES AGAINST DEPORTATION ("OCAD") is an undocumented-led group that organizes against deportations, detention, criminalization, and incarceration, of Black, brown, and immigrant communities in Chicago and surrounding areas. Through grassroots organizing, legal and policy work, direct action and civil disobedience, and cross-movement building, OCAD aims to defend its communities, challenge the institutions that target and dehumanize its communities, and build collective power. OCAD fights alongside families and individuals challenging these systems to create an environment for its communities to thrive, work, and organize with happiness and without fear. Individual members of OCAD live in or regularly travel through Chicago, and have been or are likely to be

7

subjected to wrongful inclusion in the CPD's Gang Database. As a result, OCAD is forced to spend additional time and money addressing the devastating consequences suffered by its members and the communities it represents as a result of the CPD's unconstitutional use of its Gang Database, diverting resources away from the organization's focus on other social justice issues critical to its mission, including immigration, racial, economic, and gender justice. OCAD brings this action on its own behalf and as an organizational representative. OCAD participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

17. Plaintiff DONTA LUCAS is a 34-year-old Black man who resides in Chicago. On January 7, 2012, CPD Officers John Does 1-2 wrongfully labeled Mr. Lucas a Gangster Disciple gang member and included him in the Gang Database. This false gang label has resulted in Mr. Lucas being denied an Illinois Concealed Carry License and thereby has stunted his employment opportunities. Mr. Lucas is likely to be subjected to future unconstitutional actions by the CPD, under the policies and practices described herein. Mr. Lucas brings this action on behalf of himself and a class of similarly situated individuals who are subjected to the CPD's unconstitutional actions connected to the Gang Database, and seeks injunctive and declaratory relief. Mr. Lucas also seeks monetary damages on behalf of himself.

18. Plaintiff JONATHAN WARNER is a 22-year-old Black man who resides in Des Plaines, Illinois. He recently moved to Des Plaines from Chicago, and regularly returns to Chicago, where his family resides. Mr. Warner was wrongfully placed in the Gang Database as a member of the Four Corner Hustlers when he was 19 years old on February 3, 2015, by Defendant Officers Michael Tomaso and Michael Golden. This false gang label has resulted in Mr. Warner being repeatedly stop and harassed by CPD officers. On May 3, 2017, Defendant Officer Toledo falsely arrested Mr. Warner for allegedly soliciting unlawful business because he

8

believed Mr. Warner was a gang member—the charge was dismissed by the State nearly seven months later.  Mr. Warner is likely to be subjected to future unconstitutional actions by the CPD, under the policies and practices described herein.  Mr. Warner brings this action on behalf of himself and a class of similarly situated individuals who are subjected to the CPD's unconstitutional actions connected to the Gang Database, and seeks injunctive and declaratory relief.  Mr. Warner also seeks monetary damages on behalf of himself.

19.     Plaintiff LESTER COOPER is a 29-year-old Black man who resides in Chicago.  Mr. Cooper was wrongfully included in the Gang Database as a member of the Conservative Vice Lords by CPD Officers John Does 3-4.  This false gang label resulted in Mr. Cooper being denied an I-Bond and placed on house arrest and electronic monitoring for ten days for minor traffic violations.  Mr. Cooper is likely to be subjected to future unconstitutional actions by the CPD, under the policies and practices described herein.  Mr. Cooper brings this action on behalf of himself and a class of similarly situated individuals who are subjected to the CPD's unconstitutional actions connected to the Gang Database, and seeks injunctive and declaratory relief.  Mr. Cooper also seeks monetary damages on behalf of himself.

20.     Plaintiff LUIS PEDROTE-SALINAS is a 26-year-old immigrant of Mexican descent who resides in Chicago.  Mr. Pedrote was wrongfully included in the Gang Database as a member of the Latin Kings when he was 19 years old on January 9, 2011.  This false gang label resulted in Mr. Pedrote being targeted by immigration authorities, placed in deportation proceedings, and denied forms of discretionary immigration relief for which he was eligible.  This false gang label also resulted in Mr. Pedrote being subjected to an unreasonable search and seizure by Defendant Officers Jane Does 1-2 on February 16, 2018.  Mr. Pedrote is likely to be subjected to future unconstitutional actions by the CPD, under the policies and practices

9

described herein.  Mr. Pedrote brings this action on behalf of himself and a class of similarly situated individuals who are subjected to the CPD's unconstitutional actions connected to the Gang Database, and seeks injunctive and declaratory relief.  Mr. Pedrote also seeks monetary damages on behalf of himself.

### Defendants

21.     Defendant CITY OF CHICAGO is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois.  It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible.  Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

22.     Defendant EDDIE JOHNSON is the Superintendent of the Chicago Police Department.  At all times relevant to the events at issue in this case, Defendant Johnson was employed by the Chicago Police Department.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Johnson promulgated rules, regulations, polices, and procedures at the Chicago Police Department.  Defendant Johnson is responsible for supervising all CPD officers and managing all operations at the CPD.  He is sued here in his official capacity.

23.     Defendants CPD OFFICERS MICHAEL TOMASO, MICHAEL GOLDEN, PETER TOLEDO, JOHN DOES 1-4, and JANE DOES 1-2 are City of Chicago employees with the CPD.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD.  Each is sued in his

or her individual capacity for violating the constitutional rights of the individual named

Plaintiffs. They are referred to collectively herein as the "Defendant Officers."

## FACTUAL ALLEGATIONS

I. **History of the CPD's Gang Database and CPD's Current Policies and Practices Governing the Gang Database**

24. The current rendition of what is commonly known as the CPD's Gang Database is housed within the CPD's Citizen and Law Enforcement Analysis and Reporting ("CLEAR") electronic system.

25. Information in the modern-day CLEAR Gang Database traces back to at least the 1980s, when the CPD maintained a paper-based gang database using pictures and handwritten cards. In the late 1990's, the CPD entered the digital age, creating its first electronic gang database within its Criminal History Record Inventory System ("CHRIS"). The CPD entered information from the paper gang database into CHRIS, thus today's Gang Database includes people initially identified as gang members over 30 years ago.

26. In or around 2001, the CPD transitioned its electronic Gang Database from CHRIS to CLEAR, a menu-driven, web-enabled information system that is searchable.

27. CPD officers typically document encounters with alleged gang members in two categories of records, which are housed digitally in CLEAR: (1) gang arrest cards, which are used to designate an arrested person as a gang member; and (2) gang contact cards, which are used to designate a non-arrested person after an investigatory stop as a gang member. The Gang Database within CLEAR includes information compiled from these two categories of records. CLEAR's search and filter features make it easy for users to generate gang listings for an individual, which incorporate all records in that individual's gang profile, including gang arrest cards and gang contact cards.

28. Despite knowledge that the Gang Database is riddled with errors and that people are wrongly labeled as gang members, the CPD has failed to implement any policy or practice to ensure the accuracy of gang designations, either when they are entered into the Gang Database, or before they are shared with third parties.

29. The CPD's policies and practices for including individuals in the Gang Database grant police officers wide discretion with little oversight, leading to false designations.

30. Any CPD officer, including but not limited to patrol officers and School Resource Officers, may designate an individual as a gang member. Officers do not need to be a member of a gang unit to place someone in the Gang Database.

31. According to CPD policies and practices, an officer can designate an individual as a gang member if that individual either self-admitted or the officer can "substantiate" gang membership through specific criteria.

32. Criteria an officer may use to substantiate gang membership include but are not limited to: (1) wearing distinctive emblems, tattoos, or similar markings indicative of a specific street gang; (2) the use of signals or symbols, distinctive of a specific street gang; (3) information provided from a "reliable" third party or another CPD officer; (4) or identification of gang membership through any database or information contained in CLEAR. In addition, CPD has a practice of using social media, such as posts to Facebook, Twitter, Instagram, and YouTube, to substantiate gang membership.

33. Upon information and belief, the CPD has a practice of falsely indicating that individuals self-admitted to gang membership when entering them into the Gang Database, particularly when the officer cannot substantiate the individual's gang membership.

34.     The criteria that CPD officers use to determine gang affiliation is almost entirely unrelated to actual criminal conduct or active participation in gang activities.

35.     In practice, CPD officers include individuals in the Gang Database without any justification or evidence proving that they are in fact members of street gangs.

36.     Pursuant to policies and practices, the CPD does not provide notice to individuals of their inclusion in the Gang Database.  The CPD also does not allow individuals to challenge their inclusion in the Gang Database or appeal their gang designation.  If a person somehow discovers they have been wrongfully included in the database, there is no mechanism by which they can request to be removed from the Database.

37.     The CPD does not have any sort of process by which the information contained in the Gang Database is analyzed for accuracy.  The CPD does not conduct any internal audits of its Gang Database to ensure that the information is accurate and up-to-date.  The CPD also does not conduct its own evaluation over any period of time to determine whether people should continue to be designated as gang members in the Database.

## II.     The CPD Began Engaging in Discriminatory Policing Practices and Rapidly Expanding the Gang Database as a Response to Public Pressure to Combat Violence

38.     Beginning in the late 1980's and early 1990's, City policymakers responded to sensationalized media coverage of gang violence by prioritizing the suppression of gang activity.

39.     One such policy designed to suppress gang violence was an anti-gang loitering ordinance, which allowed police to order the dispersal of loiterers when they reasonably believed that at least one person in the group was a criminal street gang member.  *See City of Chicago v. Morales*, 527 U.S. 41, 47, 60 (1999) (holding that the Chicago anti-gang ordinance was unconstitutionally vague).

13

40.     Policymakers responded to the *Morales* decision by drafting more specific ordinances directing police to target "hot spots" of criminal activity, usually in poorer neighborhoods comprised predominantly of racial minorities.

41.     The first major uptick in usage of the Gang Database occurred during CPD Superintendent Philip Cline's tenure, from 2003 to 2007.  Superintendent Cline was known for attacking "gangs, guns, and dugs" by increasing police presence in high-crime areas.  Between 2005 and 2007, over 17,000 people were added to the Gang Database.

42.     The second major uptick began during CPD Superintendent Garry McCarthy's tenure, and continues today.  McCarthy was hired as Superintendent in 2011, after spending most of his career as a police officer in New York City, where unconstitutional, race-based stop-and-frisk tactics were common.  In 2014, the U.S. Department of Justice found that there was a "pattern and practice of unconstitutional policing" during McCarthy's tenure as the Director of the Newark Police Department, a position he held prior to serving as Chicago's police superintendent.

43.     Just months after McCarthy began his tenure as Superintendent of CPD, the homicide rate rose sharply in Chicago.  McCarthy responded by initiating a process to identify and document gang members throughout the City to keep up with changing gang boundaries and provide police officers with up-to-date information via a new electronic system.

44.     Under McCarthy's leadership, the CPD escalated its practice of labeling Black and Latinx people as members of gangs that CPD mapped to the particular neighborhood or block where they encountered the individual (for purposes of this Complaint, Plaintiffs will refer to this practice as "block-labelling").

45.     As a result of these discriminatory practices, nearly 75,000 adults have been added to the Gang Database since 2012, more than doubling its size.

46.     Although McCarthy's tenure as Superintendent ended in 2015, the CPD maintains the same policies and practices, placing more Black and Latinx people in the Gang Database through block-labelling each year.  More than 15,000 adults were added to the Gang Database in 2017 alone.

47.     As a result of these policies and practices, not only are Black and Latinx people more likely to be placed in the Gang Database, but they are more likely to receive a specific gang designation.  Approximately 99 percent of Black people in the Gang Database have at least one specific gang designation.  In contrast, white people are much less likely to have a specified gang designation than Black and Latinx people.  Although they make up less than 5 percent of the Gang Database, white people comprise 17 percent of those in the Gang Database without a specific gang label.  Upon information and belief, this is because people are more likely to be block-labelled in Black and Latinx neighborhoods than in predominately white areas.

48.     The rapid expansion of the Gang Database demonstrates the CPD's discriminatory practices as well as its overreliance on a flawed investigatory tool.  Research shows that gang databases nationwide are not effective law enforcement tools and offer little to no benefit in reducing crime.  *See* Rebecca R. Brown, *The Gang's All Here: Evaluating the Need for National Gang Database*, 42 Colum. J.L. & Soc. Probs. 293, 300-02 (2009) (discussing the lack of value in gang databases as a tool for crime suppression, in part because "it is not clear that documented gang members commit more crimes, or more serious crimes, than their non-documented counterparts"); Joshua D. Wright, *The Constitutional Failure of Gang Databases*, 2 Stan. J.C.R. & C.L. 115, 119-20 (2005) (discussing the unreliability of gang databases, stating

that "research suggests gang databases are of little incremental value in reducing gang crime," and arguing that procedural protections would further the State's interest by increasing accuracy).

49.     Recognizing the limited if any value gang databases add to law enforcement, states and cities across the country are either doing away with their gang database completely (i.e., Portland, Oregon), or have implemented serious reforms related to their databases to protect people's constitutional rights (i.e., California and Providence, Rhode Island).

**III.     The CPD Maintains a Racially Discriminatory Gang Database, Riddled with Errors, in Which It Falsely and Permanently Labels Individuals as Gang Members**

50.     CPD's Gang Database currently includes more than 128,000 adults and an unknown number of juveniles.  Based on available data, it is estimated that the Gang Database includes between 28,000 and 68,000 juveniles, making the total number of individuals in the Gang Database somewhere between 155,000 and 195,000.  In contrast, the entire state of California includes less than 100,000 people in its gang database, and the New York City Police Department claims to include approximately 17,500 people in its gang database.

**A.  The Gang Database unlawfully discriminates because of the disparate impact it imposes on Black and Latinx people**

51.     The CPD identifies a substantially higher percentage of Black and Latinx people as gang members than the national average, as reported by other law enforcement agencies.  As of May 2018, approximately 95 percent of people included in CPD's Gang Database are Black or Latinx (70 percent are Black and 25 percent are Latinx).  In contrast, the most recent statistics from the National Gang Center reflect that 81.5 percent of gang members are Black or Latinx. *National Youth Gang Survey Analysis*, National Gang Center (last visited May 30, 2018), https://www.nationalgangcenter.gov/Survey-Analysis/Demographics.

52.     Correspondingly, the CPD identifies a substantially lower percentage of white people as gang members than the national average.  According to the most recent statistics from the National Gang Center, 11.5 percent of gang members nationally are white.  In contrast, less than 5 percent of identified gang members in the CPD Gang Database are white.

53.     As a result of CPD's racially discriminatory practices, Chicago's gang database includes approximately 11 percent of Chicago's Black population, 4 percent of the Latinx population, and only 0.6 percent of the white population.

54.     Upon information and belief, the CPD over-counts Black and Latinx people as gang members by targeting minority neighborhoods and block-labelling only Black and Latinx people encountered in those neighborhoods.  In several predominately Black neighborhoods, the CPD has included more than 10 percent of the total population in the gang database: North Lawndale, Englewood, West Englewood, East Garfield Park, West Garfield Park, and Pullman.  At the same time, less than 0.2 percent of the population in wealthy white neighborhoods such as Lincoln Park and Lakeview are in the Gang Database.

55.     The Gang Database also under-counts white gang members.  Less than 1,100 people are listed as members of historically white gangs such as the Gaylords, the Insane Popes, the Simon City Royals, the C-Notes, and the 12th Street Players.  And many of the people listed as members of these gangs are people of color.  The Gang Database does not even include certain exclusively or predominately white gangs.  For example, the Gang Database does not include the Chicago Outfit, ab Italian-American organized crime syndicate, and categorically excludes all biker gangs, such as the Outlaws.  Upon information and belief, there are many white supremacists in Chicago, and they belong to specific white supremacy groups.  However,

only 23 people are listed in the Gang Database as members of white supremacist organizations, under the generic label of "white supremist [sic]."

56. Upon information and belief, the CPD's under-counting of white gang members begins with juveniles. Surveys indicate that approximately 40 percent of youth that identify as gang members are white, but that "police tend to undercount them and overcount Black and Hispanic members." Donna Ladd, *Dangerous, growing, yet unnoticed: the rise of America's white gangs*, The Guardian (April 5, 2018),
https://www.theguardian.com/society/2018/apr/05/white-gangs-rise-simon-city-royals-mississippi-chicago. Although youth data from the CPD is not currently available, the racial disparity in adult gang members demonstrates that the CPD does not permanently label young white gang members in the same manner as young Black and Latinx gang members. Upon information and belief, this disparity also reflects the CPD's "boys will be boys" attitude towards white juveniles with instances of delinquency, as opposed to its criminalization of Black and Latinx youth.

57. While juvenile data is not available, the data available for adults suggests that more than 700 people who are currently adults were added to the Gang Database before they turned 15, including 52 who were only 11 or 12 at the time. All but one of the individuals who were added when they were 11 or 12 are Black or Latinx (the one other individual is Asian).

58. A comparison of the racial demographics of people who were stopped by the police (taken from contact cards) and people who were entered into the Gang Database in 2014 and 2015, demonstrates that Black and Latinx people are more likely than white people to be added to the Gang Database when they are stopped by CPD officers. In 2014 and 2015, white people made up 9.9 percent of the people who were stopped, but only 2.4 percent of those placed

18

in the Database. In contrast, Black people made up 71.9 percent of the people who were stopped, but 76 percent of those added to the Database. And Latinx people made up 16.9 percent of those stopped, but 21.3 percent of those added to the Database.

59.     Data for each neighborhood suggests that white people were less likely to end up on the Database when they were stopped by police in 2014 and 2015 in almost every neighborhood in the City (74 of the 77 neighborhoods).

60.     Even in neighborhoods where white people were stopped by police at relatively high rates, they were less likely to be added to the Database. White people received more than 30 percent of contact cards in 17 neighborhoods, but made up 30 percent of people added to the Database in only 6 of those neighborhoods. Similarly, white people received more than 40 percent of contact cards in 11 neighborhoods, but made up 40 percent of people added to the Database in only one of those neighborhoods (that neighborhood was Mount Greenwood, where only 8 people were added to the Database in 2014-2015 and 5 of them were white). The following is 2014-2015 data from specific neighborhoods:

       a.  In Lincoln Park, 40.7 percent of people stopped were white, but only 11.8 percent of people added to the Database were white.

       b.  In Rogers Park, 17.8 percent of people stopped were White, but only 1.6 percent of people added to the Database were white.

       c.  In West Garfield Park, 8.9 percent of the people stopped were white, but only 0.4 percent of the people added to the Database were white.

       d.  In Edison Park, 25.2 percent of the people stopped were Latinx, but 65.2 percent of the people added to the Database were Latinx.

e.  In the Near South Side, 65 percent of the people stopped were Black, but 98.6 percent of the people added to the Database were Black.

f.  In the Near North Side, 24.2 percent of the people stopped were white, but only 0.05 percent of the people added to the Database were white. In contrast, 63.4 percent of the people stopped were Black, but 98.6 percent of the people added to the Database were Black.

g.  In Lincoln Square, 40.7 percent of the people stopped were white, but only 18.8 percent of the people added to the Database were white. In contrast, 32.6 percent of the people stopped were Latinx, but 58.6 percent of the people added to the Database were Latinx.

h.  In Edgewater, 33.6 percent of the people stopped were white, but only 7.6 percent of the people entered into the Database were white. In contrast, 41 percent of the people stopped were Black, but 61.6 percent of the people added to the Database were black. And 18.6 percent of the people stopped were Latinx, but 29.3 percent of the people added to the Database were Latinx.

i.  In West Ridge, more white people (31.2 percent) were stopped than Black people (27.5 percent) or Latinx people (27.6 percent). But only 13.6 percent of the people added to the Database were white, whereas 44.5 percent were Black and 37.4 percent were Latinx.

**B. The CPD's targeting of Black and Latinx people for inclusion in the Gang Database is motivated by racial and ethnic animus**

61.  In 2016, the city-established Police Accountability Task Force ("Task Force") documented the CPD's animus towards people of color, particularly Black and Latinx people. The Task Force asserts: "(It) over and over again from a range of voices, particularly from

20

African-Americans, that some CPD officers are racist, have no respect for the lives and experiences of people of color and approach every encounter with people of color as if the person, regardless of age, gender or circumstance, is a criminal."  The Task Force further writes that "there is substantial evidence that people of color— particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today . . . CPD is not doing enough to combat racial bias."

62.     The Task Force further documents how, historically, the CPD's gang suppression efforts have been marred by racial animus.  As explained above, in the 1990s, the City of Chicago enacted a gang loitering ordinance that was "predominately enforced against people of color."  Eventually, the U.S. Supreme Court in *Morales* overturned that ordinance on due process grounds and the city amended its gang loitering ordinance.  But it is still predominately enforced against people of color.

63.     In analyzing the data related to the CPD's racial animus, the Task Force states: "Racial bias is not a thing of the past.  Rather, data established that CPD's use of force disproportionately affects people of color.  The same is true for foot and traffic stops.  These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color."

64.     Indeed Mayor Rahm Emmanuel himself acknowledged that racism infests the CPD.  Emanuel acknowledges racism in Chicago Police Department, Chicago Tribune, http://www.chicagotribune.com/news/local/politics/ct-rahm-emanuel-police-task-force-met-20160413-story.html.  Defendant Johnson also admitted that racism exists inside the CPD.

http://chicago.cbslocal.com/2017/01/21/supt-eddie-johnson-makes-a-bold-statement-at-community-meeting/.

65.     The CPD's deeply embedded racial animus was confirmed by the United States Department of Justice's investigation of the Chicago Police Department.  In its January 2017 report, DOJ documents pervasive racism in the department as follows:

a.   CPD officers regularly use racially charged and abusive language.  Black youth are routinely called "nigger," "animal," or "pieces of shit" by CPD officers. These statements were confirmed by CPD officers.  One officer interviewed by the DOJ stated that "he personally has heard coworkers and supervisors refer to black individuals as monkeys, animals, savages, and 'pieces of shit.'"

b.   CPD officers frequently express discriminatory views on social media.  One officer recently posted two graphic photos of slain black men with the caption: "Hopefully one of these pictures will make the black lives matter activist organization feel a whole lot better!"  Other CPD officers posted discriminatory remarks about Muslims, referring to them as "ragtop" and stating, "the only good Muslim is a fucking dead one."  Supervisors were responsible for many of these statements.  A sergeant posted 25 anti-Muslim statements and at least 43 other discriminatory posts.  A lieutenant posted at least five anti-immigrant and anti-Latinx statements.  The DOJ pointed to derogatory, racist comments made anonymously on popular CPD Internet forums as further evidence of the scope of the problem.

66.     People regularly complain about the CPD's racial animus, but the City has taken no steps to put an end to such racist behavior.  From 2011 to March 2016, the CPD complaint

database contained 980 police misconduct complaints coded as discriminatory verbal abuse on the basis of race or ethnicity, including 354 complaints for use of the word "nigger." Just 13 of these 980 complaints were sustained, and only then in the face of irrefutable evidence, such as an audio or video recording, or when the victim took extraordinary steps to document the incident.

67. This systemic racial and ethnic animus is a mainstay of the CPD, is known and acknowledged by the final policy makers for the City and the CPD and is the animating force behind the Defendants Gang Database related actions and inactions.

### C. The Gang Database is error-ridden

68. Upon information and belief, the Gang Database identifies at least thousands of people as gang members who were never, or are no longer, gang members.

69. Upon information and belief, as discussed above, CPD officers frequently falsely identify individuals as "self-admitted" gang members, particularly Black and Latinx individuals.

70. The Gang Database contains two people who are listed as currently 132 years old, and 13 people who are listed as currently 118 years old. These are not outdated entries but rather clear errors as all of these people were added to the Database after 2006.

71. The CLEAR Gang Database identifies some people as members of more than one gang, when those people could not in fact be members of two rival gangs.

72. Additionally, the Gang Database identifies at least 8 people as the only member of their supposed gang.

73. The CPD knows that its Gang Database contains many errors, but it relies on the information for its own policing purposes, continues to share the information with third-parties, and has taken no action to verify the accuracy of the Gang Database.

### D. Labels in the Gang Database are permanent and impose harm

74.     The CPD has a policy and practice of never deleting gang labels from the Gang Database.  Upon information and belief, eight hours after entry into the CLEAR Gang Database, the label is permanent—the gang arrest card and/or gang contact card becomes a locked record in CLEAR after eight hours and can no longer be edited or deleted.

75.     Even as individuals age, they are not removed or considered for removal from the Gang Database.  Thus, the Gang Database currently contains: more than 14,800 people over 50 years old; more than 2,800 people over 60 years old; and 163 people in their seventies or eighties.

76.     Despite the consequences of being permanently labelled a gang member, the CPD has not enacted any policies or practices to protect children from being placed in the Gang Database for life.  The number of juveniles currently in the Gang Database is unknown.  However, 15.7 percent of adults currently in the Gang Database were added before they turned 20 years old.  At least 8 adults were first added to the Gang Database at the age of 11; 44 adults were first added at the age of 12; 150 adults were first added at the age of 13; and 519 adults were first added at the age of 14 years old.  For those first added at ages 15 to 17 years old, the numbers jump to the thousands.  Upon information and belief, the CPD has only increased the placement of juveniles in the Gang Database in recent years, and statistics including current juveniles would be much higher.

77.     In addition to the constitutional violations suffered by class members as further described below, the Defendants' Gang Database related actions and inactions subject class members to significant harm, including public humiliation and the risk of being targeted by law enforcement for enhanced surveillance.

IV.     **The CPD Knowingly Shares False Gang Designations with Third Parties and Relies on Its Own False Designations, Resulting in Violations of Class Members' Constitutional Rights**

78.     The CPD's policies and practices regarding entry into the Gang Database are more egregious given the development of the CLEAR Gang Database as a tool intended to be shared.

79.     The CPD's primary goal with CLEAR was to build "an enterprise information system – customized for the CPD, but adaptable for others – to fundamentally change the way criminal justice agencies conduct business." Wesley G. Skogan et al., Institute for Policy Research at Northwestern University, *Learning from Chicago's Citizen and Law Enforcement Analysis and Reporting (CLEAR) System* 1, 4 (2003), http://www.ipr.northwestern.edu/faculty-experts/docs/policing_papers/Policing_Smarter.CLEAR.pdf.

80.     The CLEAR database was designed to be far-reaching, with the idea early on that it would include "other law enforcement agencies, prosecutors, the court system, the corrections system and other interventions, perhaps including non-criminal justice partnerships." *Id.*

81.     Today, the CPD invites other agencies to become "data sharing partners" for CLEAR, stating on its website that CLEAR allows users to "quickly search a database of over 3 million arrests with as little as a suspect's nickname, tattoo, street name or any other data variable on file." *CLEAR Application for Law Enforcement*, Chicago Police (last visited May 25, 2018), https://home.chicagopolice.org/online-services/i-clear-application-for-law-enforcement/.

82.     As of February 7, 2018, the CPD grants at least 539 data-sharing partners direct-access to CLEAR, including the Gang Database. The list of data-sharing partners includes federal and local government agencies, courts and prosecutors' offices, municipalities, and many

police departments in the Midwestern United States, including university police departments and park police.

83.    Additionally, upon information and belief, the CPD shares the identities of people in the Gang Database with other third parties, voluntarily and/or upon request, including but not limited to licensing review boards such as the Illinois Concealed Carry Licensing Review Board and government agencies that are not data-sharing partners.

84.    Many class members have suffered violations of their constitutional rights due to their wrongful inclusion in the Gang Database.  Upon information and belief, many people suffer the below described harms without ever learning that they are in the Gang Database, that this designation is being shared, or that it is causing them harm.

85.    The following is a list of known harms stemming from inclusion in the CPD Gang Database:

a.    **Employment**: As a result of the CPD's sharing of its Gang Database with third-parties, individuals who are wrongfully included in the gang database have been denied their right to work in their chosen field.

b.    **Licensures**: As a result of the CPD's sharing of its Gang Database with third-parties, individuals have been made ineligible for various types of licenses, including the Illinois Concealed Carry License.

c.    **Immigration**: As a result of the CPD's sharing of its Gang Database with federal immigration authorities, including Immigration and Customs Enforcement ("ICE"), U.S. Customs and Immigration ("USCI"), and Homeland Security, individuals who were wrongfully placed in the Gang Database have been prioritized for deportation, and have been made ineligible for immigration relief.

26

d.   **Education**: Wrongful inclusion in the Gang Database can deprive young class members of their right to public education without due process.

e.   **Police harassment**: Upon information and belief, when police officers scan license plates and/or run names, they see CLEAR information regarding the person to whom the vehicle is registered, including any gang designation. This results in the ongoing harassment by law enforcement of persons wrongfully included in the Gang Database.

f.   **Unreasonable search and seizure**: Wrongful gang designation can result in individuals being subjected to unreasonable searches and seizures.

g.   **False arrest/false imprisonment**: Wrongful gang designation can also result in false arrest and false imprisonment.

h.   **Bail/Bond**: Wrongful inclusion in the Gang Database can negatively impact bond decisions, including by being denied bond, increasing the bail amount, and by causing someone to be placed under house arrest rather than be released on their own recognizance. CPD directives specify that district commanders must ensure that I-Bonds are not issued for verified gang members that are charged with jailable offenses.

i.   **Parole**: Upon information and belief, wrongful inclusion in the Gang Database can negatively impact a parolee in a parole revocation hearing.

j.   **Parental Rights**: Upon information and belief, wrongful inclusion in the Gang Database can negatively impact Department of Child and Family Services cases, implicating an individual's parental rights.

k. **Housing**: Upon information and belief, wrongful inclusion in the Gang Database can negatively impact an individual's access to public housing.

86. Putative class members have and will continue to suffer these harms for so long as the Defendants continue to operate the Gang Database in the manner described in this Complaint. Examples of harm endured by putative class members include:

a. **Jose Maldonado**: In 2014, Mr. Maldonado was fired from the Cook County Sheriff's Office for violating the Office's rules of conduct by allegedly being a known gang member. The Sheriff's Office based this termination decision on a CLEAR contact card indicating that in April 2006, a CPD officer encountered Mr. Maldonado yelling gang slogans at a passing vehicle and self-admitted to being a Latin King. This gang card was false. Mr. Maldonado is not a gang member and in fact never was stopped by any police officer on the day of the contact card; the contact card was attached to his name in error. However, Mr. Maldonado had no way of contesting his Gang Database entry or getting it removed.

b. **Tomas "Nico" Gaete**: Mr. Gaete is a 19-year-old Latino from the North Lawndale neighborhood, and has never been gang involved. However, when he was a juvenile, he was falsely labelled as a Two Six, based on his race and the neighborhood where he attended high school. He did not learn of his gang designation until after he was wrongfully accused of a gang-related shooting when he was 17 years old. Mr. Gaete was arrested, pulled out of high school, and detained in jail for a week, while his teachers and community members fought for his release. Although the case against him was dismissed, Mr. Gaete is still wrongfully included in the gang database.

28

c. **Wilmer Catalan-Ramirez**: Mr. Catalan-Ramirez, a Latino undocumented immigrant, was wrongfully designated as a member of two rival gangs in the Gang Database based on block-labelling.  The CPD shared these designations with immigration authorities, and Mr. Catalan-Ramirez was then targeted in a gang suppression operation and prioritized for deportation.  Additionally, but-for the CPD's sharing of the false gang allegations with immigration authorities, Mr. Catalan-Ramirez would have been eligible for immigration relief, in the form of a UVisa.  The CPD admitted in writing that despite the records in the Gang Database, the CPD cannot verify that Mr. Catalan-Ramirez is a gang member.

d. **Lawrence Vaile**: Mr. Vaile was wrongfully placed in the Gang Database as a "self-admitted" Latin King when he was a teenager.  Now 48 years old, he continues to suffer police harassment based on the false designation.  Several times, officers have pulled him over and drawn their weapons because they believe he is a gang member.  On one occasion, he was driving his wife and children to the Wisconsin Dells for vacation when an Illinois State Trooper ran his plates and saw the gang designation.  The officer pulled him over and asked in front of his family, "Are you still a Latin King?"

e. **Angel Rosado**: Mr. Rosado is 42 years old and has not been gang involved for over 20 years, but still suffers police harassment based on this designation.  Convicted of a gang-related murder as a 19-year-old, Mr. Rosado has since served his time and turned his life around, including by beginning his own property management company.  However, a search of his license plates falsely indicates

he is a current gang member. When he was pulled over because his brake light was out, Mr. Rosado was surrounded by three cop cars.

87.     Class members will continue to suffer the above listed and other yet unknown consequences until CPD ends its unconstitutional policies and practices related to the Gang Database.

88.     Black and Latinx class members are even more likely to suffer many of these harms than white class members, including police harassment and escalated police encounters, unreasonable searches and seizures, false arrest and imprisonment, and bail/bond and parole consequences. This is because Black and Latinx people are more likely to be stopped by police after their initial placement in the Gang Database, and to become re-involved in the criminal justice system.

89.     According to the most recent report on stop and frisk practices in Chicago, published in March 2018, over 70 percent of people stopped by CPD officers were Black, approximately 21 percent were Hispanic, and only 8 percent of people stopped were white. Black and Latinx people are almost twice as likely as white people to be frisked by Chicago police.

90.     Thus, the harm of being erroneously included in the Gang Database is and will continue to be disproportionately felt by Black and Latinx people.

**V.      Violations of the Individual Plaintiffs' Rights by the Defendants**

91.     The rights of the individual named Plaintiffs were violated by the Defendants as part of the CPD's pattern and practice of discriminatory policing and unconstitutional use and maintenance of the Gang Database, as outlined above. The City of Chicago's policies and practices were the moving force behind the alleged misconduct by the Defendant Officers.

### A. Plaintiff Donta Lucas

92.     In the evening on January 7, 2012, Mr. Lucas was celebrating his birthday with his girlfriend and family at Diversey River Bowl, a bowling alley located in the Bucktown neighborhood.  While there, Mr. Lucas got into an altercation with another patron who had bumped into his girlfriend.  As a result, CPD officers arrested Mr. Lucas for battery; he ultimately pleaded guilty to the charge and received a sentence of public service and supervision.

93.     In the arrest report for this incident, Defendant Officers John Does 1-2 indicate that Mr. Lucas self-admitted to being a member of the Gangster Disciple Street Gang.  This report is a fabrication—Mr. Lucas did not admit to being a gang member.  Mr. Lucas is not a member of any gang and has never been a gang member.

94.     Upon information and belief, the Defendant Officers assumed Mr. Lucas was a gang member because of a small tattoo he has on his right ankle which the arresting officers interpreted as a Gangster Disciple tattoo.  Mr. Lucas received this tattoo when he was 12 years old.  He was not then nor has he ever been a member of the Gangster Disciples.

95.     Mr. Lucas lived through a difficult childhood and after overcoming many obstacles, he dedicated his life to helping at risk youth.  At the time of the January 7, 2012 incident, he was working as a social worker.

96.     During this arrest, the Defendant Officers never asked Mr. Lucas about his tattoo.  They never gave him an opportunity to explain his tattoo.  They never asked him if he was a gang member.  And they never told him that they assumed he was a gang member.  There was simply no discussion about gang involvement at all.

97.     The Defendant Officers John Does 1-2 entered Mr. Lucas' information into the Gang Database and labeled him as a Gangster Disciple.

31

98.    Neither the Defendant Officers nor any other member of the CPD ever informed Mr. Lucas of his inclusion in the Gang Database.  Therefore, Mr. Lucas never had the opportunity to challenge his inclusion in the Gang Database.

99.    In the years following this incident, Mr. Lucas transitioned from working as a social worker to working in the field of security.  His ultimate goal is to work as a parole officer.  In order to advance in the security field, however, he required an Illinois Concealed Carry License.

100.    Mr. Lucas met all the eligibility requirements to obtain a Concealed Carry License.  So after completing all the necessary prerequisites, he submitted his application along with the application fee for a Concealed Carry License.

101.    On September 9, 2016, the Illinois Concealed Carry Licensing Review Board communicated to Mr. Lucas in writing that they would not provide him with a Concealed Carry License because the Chicago Police Department had labeled him a gang member.

102.    It was through this letter from the Illinois Concealed Carry Licensing Review Board that Mr. Lucas first learned about his wrongful entry in the Gang Database.  After receiving the letter, he went to the police station to inquire about his false gang label, and a CPD officer confirmed that he was in the Database because of the January 7, 2012 incident.  Mr. Lucas asked the officer how he could get off the Database and the officer told him to hire a lawyer.  Absent this lawsuit, Mr. Lucas has no way of challenging his inclusion in the Gang Database.

103.    As long as Mr. Lucas remains in the Gang Database, he can never receive a Concealed Carry License and advance in his career within the security field.

104.    Mr. Lucas' false gang label will also likely prevent him from achieving his ultimate goal of becoming a parole officer.

### B. Plaintiff Jonathan Warner

105.    On February 3, 2015, Mr. Warner, who was 19 years old at the time, was waiting for the bus at North Avenue and Harlem.  It was cold and snowing outside, so Mr. Warner went inside the department store Sears, located on the corner, to wait for the bus.

106.    While inside Sears, Mr. Warner went to the cologne section, which was located close to the entrance.  He picked up a bottle of cologne and sprayed to smell it.  He kept the bottle in his hand, and walked back to the entrance door to see if the bus was coming.  Mr. Warner never exited the door and had no intention of taking the bottle of cologne outside the store.

107.    A store employee assumed Mr. Warner was going to steal the bottle of cologne and so he called the police.  Mr. Warner tried to explain to the store employee that he had no intention of stealing the cologne and had money to pay for the cologne, but the employee would not listen.

108.    Defendant Officers Michael Tomaso and Michael Golden arrived at the Sears and arrested Mr. Warner for retail theft.

109.    As a result of this arrest, Defendant Officers Tomaso and Golden included Mr. Warner in the Gang Database as a member of the Division and Lockwood faction of the Four Corner Hustlers street gang.  The Defendant Officers indicated in the gang arrest card that Mr. Warner self-admitted to being a member of the Four Corner Hustlers.  This is false as Mr. Warner never admitted to being a member of any gang.  Mr. Warner is not a gang member and has never been a gang member.

110.     The topic of gang membership did not came up during his arrest.  The Defendant

Officers never asked Mr. Warner if he was a gang member, nor did they confront him with any

evidence to suggest that he was a gang member.  The Defendant Officers also did not inform Mr.

Warner that they were designating him as a gang member in the Gang Database.  Therefore, Mr.

Warner did not have the opportunity to challenge his inclusion in the Gang Database.

111.     At the time of this arrest, Mr. Warner lived near Division and Lockwood in the

Austin neighborhood, which CPD considered Four Corner Hustler territory.  The Defendant

Officers labeled Mr. Warner a Four Corner Hustler simply because he was a young, black man

who lived in what they considered Four Corner Hustler territory.

112.      Since that arrest, Mr. Warner has been frequently stopped and harassed by CPD

officers in or around the Austin neighborhood because of his false gang label.

113.     On the afternoon of May 3, 2017, Mr. Warner left his home, located on Hirsch

and Lockwood, to go pick up his younger brother from school; his mother and grandmother were

at the hospital and so he was the only one available to pick up his brother.

114.     Shortly thereafter, Defendant Officer Toledo began following Mr. Warner in an

unmarked car.  Defendant Officer Toledo rolled down his car window and called out to Mr.

Warner.  Mr. Warner did not respond and kept walking.

115.     Defendant Officer Toledo proceeded to exist his vehicle, approach Mr. Warner,

and grab his arm.  At that point, Mr. Warner started to record Defendant Officer Toledo with his

cell phone.  Mr. Warner informed Defendant Officer Toledo that he needed to pick his little

brother up from school.  Eventually, Defendant Officer Toledo let Mr. Warner's arm go and Mr.

Warner continued walking.

116. Defendant Officer Toledo then started following Mr. Warner again and after responding officers arrived, Defendant Officer Toledo arrested Mr. Warner. Mr. Warner asked why he was being detained, but the officers refused to respond to his question, simply stating that he was going to jail.

117. Mr. Warner was then taken to the police station where he was held in an interrogation room for a number of hours.

118. Mr. Warner was arrested for soliciting unlawful business, a violation of the Chicago Municipal Code. Defendant Officer Toledo had no probable cause to arrest Mr. Warner for this violation.

119. In the arrest report, Defendant Officer Toledo falsely indicated that he observed Mr. Warner "yelling weed & impeding the W/B flow of vehicle traffic." Defendant Officer Toledo also included in the arrest report that Mr. Warner is a Four Corner Hustler from Division and Lockwood.

120. Upon information and belief, Defendant Officer Toledo arrested Mr. Warner because he believed he was a gang member.

121. Mr. Warner was transported from the police station to Cook County Jail, where he remained from May 3, 2017, until May 5, 2017. Upon information and belief, Mr. Warner's false gang designation was the primary reason he was detained at Cook County Jail, as ordinance violations do not typically result in detention.

122. On May 5, 2017, Mr. Warner received an I-Bond at his bond hearing and was released from custody.

123.    At his preliminary hearing, the prosecutor requested an order from the court prohibiting Mr. Warner from being in the Division and Lockwood area based on his gang status. The judge denied this request.

124.    On November 22, 2017, after requesting a number of continuances and on the day trial was set to begin, the State voluntarily dismissed Mr. Warner's case, nearly seven months after his arrest.

125.    As long as Mr. Warner remains in the Gang Database, he is likely to be subjected to future false arrests, unwarranted stops, and unnecessary harassment by CPD officers and other law enforcement officials who have access to CLEAR.

### C. Plaintiff Lester Cooper

126.    Mr. Cooper does not know exactly when or how he was first placed in the Gang Database.  However, upon information and belief, Defendant Officers John Does 3-4 included Mr. Cooper in the Gang Database as a member of Holy City/Millard Mob faction of the Traveling Vice Lords when he was a juvenile.  Mr. Cooper grew up in the North Lawndale neighborhood, which the CPD considers Traveling Vice Lords territory, but he is not and has never been a gang member.

127.    On June 18, 2017, Mr. Cooper got in a fender bender while driving home from a family event.  Mr. Cooper was subsequently arrested by CPD officers for driving with a suspended license, driving without insurance, failing to reduce speed, and following too closely. Instead of being released on his own recognizance at the police station (*i.e.*, receiving an I-Bond), which is common for routine traffic violations, Mr. Cooper was taken to Cook County Jail.  Mr. Cooper was denied an I-Bond pursuant to CPD policy that states that I-Bonds are not to

be issued for verified gang members. Thus, Mr. Cooper was detained at Cook County Jail because of the false gang label.

128.    At his bond hearing on June 20, 2017, relying on the CPD's representations, the judge ordered that Mr. Cooper be put on house arrest and electronic monitoring because of his gang designation.

129.    Ten days later on June 30, 2017, Mr. Cooper went to traffic court to deal with his traffic tickets. The traffic court judge, surprised that Mr. Cooper was on house arrest, looked up his case and then explained to Mr. Cooper that he was on house arrest and electronic monitoring because of the gang label. This was the first time Mr. Cooper learned he was in the Gang Database. Mr. Cooper asked the judge how he could get off the Database, and the judged replied that he did not know but suggested going to the police station. Finding the gang label not credible, the traffic court judge released Mr. Cooper from house arrest and electronic monitoring.

130.    That same day, Mr. Cooper went to the police station on Kedzie and Harrison and asked officers how he could get off the Gang Database. The officers said they did not know and refused to help him.

131.    All traffic violations were eventually dismissed in October 2017.

132.    As long as Mr. Cooper remains on the Gang Database, he is likely to be subjected to future harm. Mr. Cooper has started the process of applying for a barber license, and upon information and belief, the gang designation will negatively impact his ability to get this license.

### D. Plaintiff Luis Pedrote-Salinas

133.    On January 9, 2011, Mr. Pedrote, who was 19 years old, was spending time with family on the Southwest side of Chicago in between Brighton Park and Gage Park—a primarily Latinx neighborhood. Mr. Pedrote had just exited his cousin's family member's apartment and

entered his vehicle when CPD Officers Joseph Fitzgerald and K. M. McLean spotted him and pulled up behind him in the parking lot. The officers walked up to Mr. Pedrote's driver-side window—his vehicle was still turned off—and Mr. Pedrote asked the officers what they wanted. The officers saw an unopened can of beer in the cup holder of Mr. Pedrote's vehicle and proceeded to arrest him for purchase/possession of liquor as a minor. The charges against Mr. Pedrote were subsequently dismissed.

134. The officers indicated in the police report that they were assigned to the area where they stopped Mr. Pedrote for a "gang suppression mission." They also indicated that during their arrest of Mr. Pedrote, he self-admitted to being a Latin Kings gang member. This report is a fabrication—Mr. Pedrote did not admit to being a gang member. Mr. Pedrote is not and has never been a gang member.

135. The topic of gang membership did not came up during his arrest. The officers never asked Mr. Pedrote if he was a gang member, nor did they confront him with any evidence to suggest that he was a gang member. The officers simply wrongly assumed Mr. Pedrote was a gang member because he was a young Latino exiting a house in known Latin Kings territory.

136. The officers entered Mr. Pedrote's information into the Gang Database, labeling him a Latin King.

137. Neither the officers nor any other member of the CPD ever informed Mr. Pedrote of his inclusion in the Gang Database. Therefore, Mr. Pedrote never had the opportunity to challenge his inclusion in the Gang Database.

138. The CPD subsequently shared Mr. Pedrote's false gang label with immigration authorities, who prioritized him for deportation as part of their ongoing nationwide initiative in which they target foreign born members of violent street gangs. As long as Mr. Pedrote remains

in the Gang Database, he will not be able to obtain immigration relief and will likely be deported.

139.    The CPD officers racially discriminated against Mr. Pedrote when they initially included him in the Database, and as long as the CPD continues to maintain its Database, Mr. Pedrote will continue to suffer from racial discrimination.

140.    At around 11:00 PM on February 16, 2018, Mr. Pedrote was in his vehicle with the blinkers on parked at a bus stop at the corner of 50th Street and Damen in the Back of the Yards neighborhood, waiting to pick up his friend. Mr. Pedrote's vehicle was registered in his name.

141.    Upon information and belief, Defendant Officers Jane Does 1-2, two white female officers, saw Mr. Pedrote in his vehicle, ran his plates, and learned that Mr. Pedrote was designated as a gang member.

142.    Defendant Officers Jane Does 1-2, who were in uniform and driving a marked police car, then pulled up right next to Mr. Pedrote's vehicle and asked him what he was doing. He informed the officers that he was waiting for a friend. The officers threatened to write him a $1000 ticket for being parked at the bus stop.

143.    Defendant Jane Doe 1 got out of the police car and asked to see his license and insurance, which Mr. Pedrote provided.

144.    Defendant Jane Doe 1 then ordered Mr. Pedrote to get out of his car. Mr. Pedrote replied that she did not have his consent to search his car.

145.    Mr. Pedrote pulled out his cell phone to begin recording his interaction with the officers, and Defendant Jane Doe 1 grabbed his phone out of his hand and threw it on the hood of his vehicle.

146.     She demanded that he get out of his car again, stating that he was in a bad neighborhood, and he complied.  Mr. Pedrote was scared and felt like he had no choice but to comply and exit his vehicle.

147.     Defendant Jane Doe 1 then began searching the entire inside of his vehicle without his consent.

148.     While the officer was searching his vehicle, Mr. Pedrote's friend arrived. Defendant Jane Doe 2 searched Mr. Pedrote's friend's backpack without his consent.

149.     After the officers finished searching Mr. Pedrote's car and his friend's backpack, they got back into their police car and drove away.

150.     As long as Mr. Pedrote remains in the Gang Database, he is likely to be subjected to future unwarranted stops, unlawful search and seizures, and harassment by CPD officers and other law enforcement officials who have access to CLEAR.

## CLASS ACTION ALLEGATIONS

151.     Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual named Plaintiffs bring this action on behalf of themselves and a class consisting of all persons who currently are or will in the future be included in CPD's Gang Database.  Plaintiffs also seek relief on behalf of a sub-class of the Black and Latinx members of the larger class.  The Plaintiffs seek declaratory and injunctive relief against the Defendants on behalf of the class.

152.     Plaintiffs and the class members are similarly situated for the purpose of asserting the claims alleged in this Complaint on a common basis.

153.     A class action is the only practicable means by which the individual named Plaintiffs and the class members can challenge the CPD's unconstitutional policies and practices

related to its Gang Database. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

154. The class and subclass are so numerous that joinder of all members is impractical. Over 128,000 adults are currently in the Gang Database. Plaintiffs estimate that the total number of individuals in the Database, including juveniles, is between 155,000 and 195,000. 95 percent of adults in the Gang Database are Black and Latinx. The class also includes a large number of future class members, because new individuals are added to the Database on a daily basis.

155. There are questions of law and fact common to all class members and the subclass, including but not limited to whether the Defendants' policies and practices related to the maintenance and use of CPD's Gang Database and the sharing of the Gang Database with third parties violates the due process rights of all class members, and whether the Defendants' targeting of racial minorities for inclusion in the Gang Database violates the Equal Protection Clause.

156. Because the practices and procedures challenged in this Complaint apply with equal force to the individual named Plaintiffs and the other members of the class, the claims of the individual named Plaintiffs are typical of the class and subclass.

157. The individual named Plaintiffs will fairly and adequately represent the interests of the class and subclass. They each possess a strong personal interest in subject matter of the lawsuit and are represented by experienced counsel with expertise in complex civil rights litigation. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

158. The Defendants have acted on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

## CLASS AND ORGANIZATIONAL LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment – Denial of Due Process
### (Plaintiffs Lucas, Warner, and Cooper on Behalf of the Class and Organizational Plaintiffs on Behalf of their Organizations and Members Against City of Chicago and Superintendent Johnson)

159. Each paragraph of this Complaint is incorporated as if restated fully herein.

160. Count I is alleged against Defendants City of Chicago and Superintendent Johnson in his official capacity.

161. The City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated *de facto* policies, practices, and customs which included, inter alia:

    a. maintaining a Gang Database consisting of names and identifying information of individuals suspected of being members of Chicago street gangs;

    b. arbitrarily including individuals in the Gang Database and labeling them as gang members;

    c. failing to inform individuals when their information is inputted into the Gang Database;

    d. failing to have a process by which individuals can challenge their inclusion in the Gang Database;

    e. failing to have any sort of process by which the information contained in the Gang Database is analyzed for accuracy;

f. refusing to remove individuals from the Gang Database who have been wrongfully included;

g. sharing information contained in the Gang Database with third parties, including but not limited to federal and local government agencies, courts and prosecutors' offices, municipalities, other police departments in the Midwestern United States, including university police departments and park police, and licensing review boards;

h. failing to train and supervise CPD officers on how to use and administer the Gang Database in a manner that does not violate individuals' constitutional rights under the Fourth and Fourteenth Amendments.

162. The interrelated policies, practices, and customs alleged above are or should be well-known within the CPD.

163. The CPD knows that the Gang Database is riddled with errors, and that many people are wrongfully included in the Gang Database.

164. The CPD knows that labeling someone a gang member is stigmatizing and harmful to their reputation.

165. The CPD is aware of the harms suffered by class members as a result of their wrongful inclusion in the Gang Database, including deprivations of employment, licensures, bond, education, immigration relief, housing, and more.

166. The City has implemented, enforced, encouraged, and sanctioned CPD's policy, practice, and custom of using and maintaining a Gang Database in a manner that violates the due process rights of the Plaintiff class in violation of the Fourteenth Amendment.

167.    The City has acted with deliberate indifference to the Fourteenth Amendment rights of the individual named Plaintiffs, putative class members, and the Organizational Plaintiffs and their members.  As a direct and proximate result of the acts and omissions of the City and CPD, the Fourteenth Amendment rights of the Plaintiffs and other class members have been violated.

168.    Unless restrained by order of this Court, a real and immediate threat exists that the Fourteenth Amendment rights of the Plaintiffs will be violated by CPD officers in the future. Plaintiffs seek injunctive and declaratory relief against the City and Superintendent Johnson in his official capacity to prevent the continued violation of their constitutional rights.

**COUNT II – 42 U.S.C. § 1983**
**Violation of the Equal Protection Clause of the Fourteenth Amendment**
**(All Individual Plaintiffs on Behalf of the Sub-Class and Organizational Plaintiffs on Behalf of their Organizations and Members Against City of Chicago and Superintendent Johnson)**

169.    Each paragraph of this Complaint is incorporated as if restated fully herein.

170.    Count II is alleged against Defendants City of Chicago and Superintendent Johnson in his official capacity.

171.    The City, through its Police Department, has implemented, enforced, encouraged, and sanctioned a policy, practice, and custom of using discriminatory policing tactics to target the named Plaintiffs and members of the Plaintiff class for inclusion in the Gang Database based solely on their race and national origin, in violation of the Fourteenth Amendment.  The CPD intentionally applies a facially neutral policy in a discriminatory manner.  As a result, the CPD's policy, practice, and/or custom of maintaining the Gang Database violates the Equal Protection Clause of the Fourteenth Amendment.

44

172.    Data indicates that the CPD's Gang Database related policies and practices have a discriminatory effect on Black and Latinx communities and that Black and Lantix people are included in the Gang Database at far higher rates than are similarly situated white people. Approximately 95 percent of people included in CPD's Gang Database are Black or Latinx (70 percent are Black and 25 percent are Latinx).  National data suggests that 81% of gang members are Black or Latinx.

173.    CPD identifies a substantially lower percentage of white people as gang members than the national average.  According to the most recent statistics from the National Gang Center, 11.5 percent of gang members nationally are white.  In contrast, less than 5 percent of identified gang members in the CPD Gang Database are white.

174.    As a result of CPD's racially discriminatory practices, Chicago's Gang Database includes approximately 11 percent of Chicago's Black population, 4 percent of the Latinx population, and only 0.6 percent of the white population.

175.    By its acts and omissions, the City has acted under color of state law to deprive the Plaintiffs of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

176.    The CPD intends to discriminate against people when it violates peoples' rights through placement in the Gang Database.  Defendants pursued this policy precisely because of the adverse effects it has on Black and Latinx individuals.

177.    This discriminatory purpose is evidenced by the CPD's repeated use of racially charged and abusive language.  CPD officers routinely call Black people the n-word, and direct other racial epithets at both Blacks and Latinxs, including "monkey," "animal," and "savage." Citizens regularly complain about the use of such language by the CPD.  As noted above, for the period from 2011 to March 2016, the CPD complaint database contained 980 police misconduct

complaints coded as discriminatory verbal abuse on the basis of race or ethnicity—354 of these complaints were for the use of the n-word. CPD officers also regularly express their discriminatory views on social media, including posting racist statements and graphic pictures with derogatory captions.

178.     The City was and remains deliberately indifferent to the harm created by CPD officers through the implementation of the Gang Database. Subordinates of the City have carried out this policy at least in part because of the adverse effects it has had on Black and Latinx individuals, and a reasonable inference can be drawn that supervisors have intended those effects to occur. Despite notice of racial disparities in the Gang Database, the City's policies and practices concerning the Gang Database remain unchanged.

179.     The City has implemented, enforced, encouraged, and sanctioned CPD's policy, practice, and custom of using and maintaining a Gang Database in a manner that constitutes racial and/or ethic discrimination against the Plaintiff class in violation of the Fourteenth Amendment. As a direct and proximate result of the aforesaid acts and omissions of the City of Chicago, the Fourteenth Amendment rights of the Plaintiffs have been violated.

180.     Unless restrained by order of this Court, a real and immediate threat exists that the Fourteenth Amendment rights of the Plaintiffs will be violated by CPD officers in the future. Plaintiffs seek injunctive and declaratory relief against the City and Superintendent Johnson in his official capacity to prevent the continued violation of their constitutional rights.

**COUNT III – 42 U.S.C. § 1983**
**Violation of the Fourth Amendment – Unlawful Search and Seizure**
**(All Individual Plaintiffs on Behalf of the Class and Organizational Plaintiffs on Behalf of their Organizations and Members Against City of Chicago and Superintendent Johnson)**

181.     Each paragraph of this Complaint is incorporated as if restated fully herein.

182.     Count III is alleged against Defendants City of Chicago and Superintendent Johnson in his official capacity.

183.     The City, through its Police Department, has implemented, enforced, encouraged, and sanctioned a policy, practice, and custom of relying on the Gang Database to target the named Plaintiffs and members of the Plaintiff class for unreasonable searches and seizures in violation of the Fourth Amendment.

184.     CPD officers falsely manufacture reasonable suspicion for these searches and seizures based on guilt by association.  Specifically, CPD officers engage in unlawful searches and seizures relying solely on the fact that CPD has identified the individual as a gang member.

185.     The City has acted with deliberate indifference to the Fourth Amendment rights of the individual named Plaintiffs, putative class members, and the Organizational Plaintiffs and their members.  As a direct and proximate result of the acts and omissions of the City and CPD, the Fourth Amendment rights of the Plaintiffs and class members have been violated.

186.     Unless restrained by order of this Court, a real and immediate threat exists that the Fourth Amendment rights of the Plaintiffs will be violated by CPD officers in the future. Plaintiffs seek injunctive and declaratory relief against the City and Superintendent Johnson in his official capacity to prevent the continued violation of their constitutional rights

**COUNT IV – State Law Claim**
**Violation of the Illinois Civil Rights Act of 2003, ILCS 23/5**
**(All Individual Plaintiffs on Behalf of the Sub-Class and Organization Plaintiffs on Behalf of their Organizations and Members Against City of Chicago and Superintendent Johnson)**

187.     Each paragraph of this Complaint is incorporated as if restated fully herein.

188.      Count IV is alleged against Defendants City of Chicago and Superintendent Johnson in his official capacity.

189. The Illinois Civil Rights Act ("ICRA") states, in relevant part, that no unit of State, county, or local government shall "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2).

190. The CPD has a policy and practice of including Black and Latinx individuals who have not participated in any gang activity in the Gang Database for no justifiable reason other than their race and national origin.

191. The criteria and methods that the CPD applies with respect to its use and maintenance of the Gang Database has resulted in the inclusion of a disproportionate number of Black and Latinx in the Gang Database.

192. The CPD's discriminatory law enforcement practices with respect to its Gang Database constitute criteria and methods of administration that create a disparate impact on Black and Latinx people, in violation of the ICRA.

**INDIVIDUAL NAMED PLAINTIFFS' LEGAL CLAIMS**

**COUNT V – 42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment – Denial of Due Process**
**(Plaintiffs Lucas, Warner, and Cooper Against Relevant Defendant Officers as well as City of Chicago and Superintendent Johnson)**

193. Each paragraph of this Complaint is incorporated as if restated fully herein.

194. Count V is alleged against Defendant Officers Tomaso, Golden, and John Does 1-4, as well as the City and Superintendent Johnson in his official capacity.

195. As explained above, the CPD uses and maintains a Gang Database consisting of the names and identifying information of individuals who are suspected to be members of street gangs.

196.     The Defendant Officers falsely labeled Plaintiffs as members of Chicago street gangs and included their identifying information in the CPD's Gang Database without justification.

197.     Plaintiffs are not and have never been members of any Chicago street gang.

198.     Plaintiffs were never notified by the CPD that they were included in the Gang Database.  The CPD never confronted them with evidence that they were gang-affiliated before including them in the Gang Database.  There is no procedure by which Plaintiffs can contest their inclusion in the Gang Database.

199.     The Defendants were aware that labeling Plaintiffs as gang members would be stigmatizing and harmful to their reputations.

200.     The CPD has a policy and practice of sharing information contained in its Gang Database with third parties.  Pursuant to these policies and practices, the CPD shared Plaintiffs' false gang labels with third parties.

201.     The Plaintiffs suffered harm, as detailed more fully above, as a result of CPD's own use of the false gang information as well as the CPD's sharing of the false gang information with third parties.

202.     The actions of the Defendants described herein violated the Plaintiffs' Fourteenth Amendment due process rights.

203.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

204.    As a result of the unjustified and unconstitutional conduct of the Defendants, Plaintiffs suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, emotional distress, and attorneys' fees.

205.    Plaintiffs also seek injunctive and declaratory relief against Defendants City of Chicago and Superintendent Johnson in his official capacity to prevent the continued violation of their constitutional rights.

### COUNT VI – 42 U.S.C. § 1983
### Violation of the Equal Protection Clause of the Fourteenth Amendment
### (All Individual Named Plaintiffs Against City of Chicago and Superintendent Johnson)

206.    Each paragraph of this Complaint is incorporated as if restated fully herein.

207.    Count VI is alleged against the Defendants City of Chicago and Superintendent Johnson in his official capacity.

208.    Plaintiffs specifically incorporate all paragraphs included in Count II here and further state that each suffered harm, including but not limited to humiliation, enhanced surveillance by law enforcement, false arrests, false imprisonment, inability to secure employment and denial of immigration relief as a result of the CPD intentionally applying facially neutral policies related to the Gang Database in a discriminatory manner. As a result, the CPD's policy, practice, and/or custom of maintaining the Gang Database violates the Equal Protection Clause of the Fourteenth Amendment. The City has implemented, enforced, encouraged, and sanctioned CPD's policy, practice, and custom of using and maintaining a Gang Database in a manner that constitutes racial and/or ethnic discrimination against the Plaintiffs.

209.    As a result of the unjustified and unconstitutional conduct of the Defendants, Plaintiffs suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, emotional distress, and attorneys' fees.

210.    Plaintiffs also seek injunctive and declaratory relief against Defendants City of Chicago and Superintendent Johnson in his official capacity to prevent the continued violation of their constitutional rights.

## COUNT VII – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – False Arrest
### (Plaintiff Warner Against Defendant Officer Toledo)

211.    Each paragraph of this Complaint is incorporated as if restated fully herein.

212.    Count VII is alleged against Defendant Officer Toledo.

213.    The actions by Defendant Officer Toledo in falsely detaining, arresting, and imprisoning Plaintiff Warner without reasonable suspicion or probable cause violated Plaintiff's Fourth Amendment rights to be free from unreasonable search and seizure.

214.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

215.    The actions of the Defendant Officer Toledo were the direct and proximate cause of the violations of Plaintiff's Fourth Amendments right, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses.

## COUNT VIII – 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment – Denial of Due Process
### (Plaintiff Cooper Against Defendant Superintendent Johnson)

216.    Each paragraph of this Complaint is incorporated as if restated fully herein.

217.    Count VII is alleged against Defendant Superintendent Johnson in his official capacity.

218.    Plaintiff Cooper has a right to due process before he is deprived of his liberty under the Fourteenth Amendment.

219.    CPD policy states that I-Bonds will not be authorized to individuals who are verified gang members.  Pursuant to this policy, Plaintiff Cooper was denied an I-Bond, taken to Cook County Jail, and then placed on house arrest and electric monitoring after his arrest for a minor traffic violation because he was wrongfully included in CPD's Gang Database.

220.    The CPD deprived Plaintiff Cooper of his liberty without due process by ensuring that he was denied an I-Bond for a minor traffic violation and instead placed on house arrest and electronic monitoring, in violation of Plaintiff Cooper's Fourteenth Amendment rights.

221.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff Cooper's clearly established constitutional rights.

222.    As a result and proximate result of the Defendants' misconduct, Plaintiff Cooper suffered damages, including pain, suffering, mental distress, anguish, humiliation, degradation, loss of liberty, and loss of income.

### COUNT IX – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Unlawful Search and Seizure
### (Plaintiff Pedrote Against Defendant Officers Jane Does 1-2)

223.    Each paragraph of this Complaint is incorporated as if restated fully herein.

224.    Count IX is alleged against Defendant Officers Jane Does 1-2.

225.    Defendant Officers Jane Does 1-2 knowingly seized and searched Plaintiff Pedrote's car during the events described in this Complaint, without a warrant, consent, probable cause, or legal justification.

226.    The Defendant Officers' conduct violated Plaintiff Pedrote's Fourth Amendment rights under the United States Constitution.

227.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

228.    As a result and proximate result of the Defendants' misconduct, Plaintiff Pedrote suffered damages, including pain, suffering, mental distress, anguish, humiliation, and degradation.

**COUNT X – State Law Claim**
**Violation of the Illinois Civil Rights Act of 2003, ILCS 23/5**
**(All Individual Named Plaintiffs Against City of Chicago and Superintendent Johnson)**

229.    Each paragraph of this Complaint is incorporated as if restated fully herein.

230.    Count X is alleged against Defendants City of Chicago and Superintendent Johnson in his official capacity.

231.    The Illinois Civil Rights Act ("ICRA") states, in relevant part, that no unit of State, county, or local government shall "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2).

232.    The CPD has a policy and practice of including Black and Latinx individuals who have not participated in any gang activity in the Gang Database for no justifiable reason other than their race and national origin.

233.    The criteria and methods that the CPD applies with respect to its use and maintenance of the Gang Database has resulted in the inclusion of a disproportionate number of Black and Latinx in the Gang Database.

234.    The CPD's discriminatory law enforcement practices with respect to its Gang Database constitute criteria and methods of administration that create a disparate impact on Black and Latinx people, in violation of the ICRA.

235.    Plaintiffs are not gang members and the Defendant Officers only labeled them as gang members because of their race and national origin.  The Defendants treated Plaintiffs differently because of their race and national origin, in violation of ICRA.

236.    As a result of the Defendants' actions, Plaintiffs suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, and emotional distress.

**COUNT XI- State Law Claim**
**Malicious Prosecution**
**(Plaintiff Warner Against Defendant Officer Toledo)**

237.    Each paragraph of this Complaint is incorporated as if restated fully herein.

238.    Count XI is alleged against Defendant Officer Toledo.

239.    Defendant Office Toledo pressed charges against Plaintiff Warner, knowing them to be without genuine probable cause.  Defendant Officer Toledo made statements to prosecutors with the intent of exerting influence, and to institute and continue the judicial proceedings against Plaintiff Warner.

240.    Defendant Officer Toledo caused Plaintiff Warner to be improperly subjected to judicial proceedings for which there was no probable cause.  These proceedings were instituted and continued maliciously, resulting in jury to Plaintiff Warner.

241.    Statements of Defendant Officer Toledo, including police reports, regarding Plaintiff Warner's alleged culpability were made with knowledge that said statements were false.  Defendant Officer Toledo fabricated police reports so as to bring charges against Plaintiff Warner.

54

242.     The misconduct in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to Plaintiff Warner's rights.

243.     In November 2017, the prosecution was terminated in Plaintiff Warner's favor, and in a manner indicative of innocence.

244.     As a direct and proximate result of this misconduct, Plaintiff Warner sustained, and continue to sustain, injuries, including emotional distress.

<strong>COUNT XII – State Law Claim<br>Respondeat Superior<br>(All Individual Named Plaintiffs Against City of Chicago)</strong>

245.     Each paragraph of this Complaint is incorporated as if restated fully herein.

246.     Count XII is alleged against Defendant City of Chicago.

247.     In committing the acts alleged in this Complaint, each of the individual Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

248.     Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

<strong>COUNT XIII – Indemnification<br>(All Individual Named Plaintiffs Against City of Chicago)</strong>

249.     Each paragraph of this Complaint is incorporated as if restated fully herein.

250.     Count XIII is alleged against the Defendant City of Chicago.

251.     In Illinois, pursuant to 735 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

252.     The individual Defendant Officers acted within the scope of their employment in committing the misconduct described herein.  Therefore, Defendant City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

**REQUEST FOR RELIEF**

Wherefore, the Individual Plaintiffs on behalf of themselves and the putative class they seek to represent, request that this Court grant the following relief:

a.  Issue an Order certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2); and

b.  Issue a class-wide judgment declaring that the policies, practices, and conduct of the City of Chicago, through the CPD and as described in this Complaint, constitute violations of the rights of Plaintiffs and the class they represent under the U.S. Constitution and Illinois state law.

In addition, the individual named Plaintiffs, on behalf of the class, as well as Organizational Plaintiffs request that this Court:

c.  Issue an order enjoining the CPD from its policy, practice and/or custom of maintaining an unlawfully discriminatory Gang Database in violation of the Equal Protection and Due Process Clauses through an order that includes, but is not limited to the following provisions:

 i.  **Criteria for entry into Gang Database.**  An individual may only be designated a gang member upon a sworn declaration from two or more detectives setting forth the basis the detectives believe that there is proof beyond a reasonable doubt that the individual is a gang member.  All entries into the database must be approved by the Superintendent and by CPD general counsel.  The CPD may not designate

any person a gang member based solely on the following: race/ethnicity/country of origin/immigration status; law enforcement action occurring in alleged "gang territory"; attire; tattoos; residence; relations and/or known associates; type of conviction; school/school location; surveillance of social media; a statement that an individual "self-reported" gang membership, unless admission of gang membership was provided under penalty of perjury and with the advice of counsel.

ii.  **Notice of Gang Designation.**  The CPD will provide written notice to every individual who is currently or who has within the last 20 years been designated a gang member in one or more of the CPD's databases.  The notice will state the following: 1) the date the individual was designated a gang member; 2) the gang(s) with which the individual is alleged to be have been affiliated; 3) the basis for the designation; 4) the name of the officer(s) who made the initial designation; 5) any external agencies that have access to that designation, and the dates on which any external agency accessed that designation; and 6) the most recent date of any audit or assessment of the accuracy of that designation.  On a quarterly basis, the CPD will provide written notice containing the same information to every individual who has been designated as gang affiliated and remains in a CPD database.

iii.  **Opportunity to contest Gang Designation.**  Any person who contests their designation as a gang member shall have the right to an administrative hearing presided over by a neutral, non-law enforcement affiliated fact finder for the purposes of determining whether the CPD can prove, beyond a reasonable doubt,

that the individual is a gang member.  If the CPD cannot meet its burden, the individuals shall be stricken from the Database and provided with documentation certifying that the CPD lacked sufficient evidence to impose the gang designation.

    iv.  **Data Sharing.**  The CPD is prohibited from providing gang designations to any third party entity.  On a quarterly basis, the CPD will publish data about the individuals designated as gang affiliated, disaggregated by:  Race/ethnicity; Gender; Age; Alleged gang affiliation(s); Basis for identifying alleged affiliation(s); Location of police interaction that lead to designation(s); Date of first designation and; Number of arrests for serious or violent crime.

d.  Issue an order and judgment granting reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988;

e.  Grant such other relief as this Court deems just and proper.

The individual named Plaintiffs also seek compensatory damages against all Defendants for the violations alleged in this Complaint.  They similarly seek punitive damages against the individual Defendant Officers for these violations.

Dated: June 19, 2018

Respectfully submitted,

/s/ Vanessa del Valle
One of the Attorneys for the Plaintiffs

Sheila A. Bedi
Vanessa del Valle
MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue
Chicago, IL 60611

Brendan Shiller
Chris Bergin
Tia Haywood
Shiller Preyar LLC
601 S. California Avenue
Chicago, IL 60612

(312) 503-2492                                        (312) 226-4590

Elizabeth A. Homsy                                    Joey L. Mogul
The Law Officers of Elizabeth A. Homsy                People's Law Office
2506 N. Clark Street                                  1180 N. Milwaukee Ave.
Suite 286                                             Chicago, IL 60622
Chicago, IL 60614                                     (773) 235-0070
(773) 988-3486

***Counsel for the Plaintiffs and the Plaintiff class***