**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| CHICAGOANS FOR AN END TO THE GANG DATABASE: BLACK YOUTH PROJECT 100 CHICAGO, BLOCKS TOGETHER, BRIGHTON PARK NEIGHBORHOOD COUNCIL, LATINO UNION, MIJENTE, and ORGANIZED COMMUNITIES AGAINST DEPORTATION, as well as DONTA LUCAS, JONATHAN WARNER, LESTER COOPER, and LUIS PEDROTE-SALINAS, on behalf of themselves and a class of similarly situated persons, | |
| Plaintiffs, | Case No. 18-cv-04242 |
| | Hon. Andrea R. Wood |
| v. | |
| CITY OF CHICAGO, SUPERINTENDENT EDDIE JOHNSON, and CHICAGO POLICE OFFICERS MICHAEL TOMASO (#6404), MICHAEL GOLDEN (#15478), PETER TOLEDO (#2105), JOHN DOES 1-4, and JANE DOES 1-2, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

**ARGUMENT** ................................................................................................................ 3

I.   Plaintiffs Lack Standing For Injunctive Relief Against The City. ...................... 3

II.  The Organization Plaintiffs Lack Standing. ..................................................... 10

III. Plaintiffs Fail To State A Due Process Claim. ................................................ 13

    A.  Maintaining gang membership information does not deprive Plaintiffs of a constitutionally-protected interest. ......................................................... 14

    B.  The harms that allegedly stemmed from Plaintiffs' designations did not deprive Plaintiffs of a protected interest without due process. ........................................... 15

    C.  Due process does not require Plaintiffs' demanded procedures. ......................... 19

IV.  Plaintiffs' Equal Protection Claims Should Be Dismissed. ............................. 21

    A.  Plaintiffs fail to allege a discriminatory purpose. ................................. 22

    B.  Plaintiffs fail to allege discriminatory impact. ..................................... 24

V.   Plaintiffs Fail To State A Fourth Amendment Claim ....................................... 26

VI.  Plaintiffs Fail To State A Basis For Liability Against The City. ...................... 28

VII. Qualified Immunity Bars Warner's Claims Against Defendants Golden, Toledo, and Tomaso. .................................................................................................. 30

VIII. Plaintiffs Fail To State An ICRA Claim. ........................................................ 32

IX.  Warner Fails To State A Claim For Malicious Prosecution. ............................ 35

X.   Plaintiffs' Respondeat Superior and Indemnification Claims Should Be Dismissed. .... 36

**CONCLUSION** ........................................................................................................ 36

# TABLE OF AUTHORITIES

**Cases**

A.J. ex rel. Dixon v. Tanksley, 94 F. Supp. 3d 1061 (E.D. Mo. 2015) ......................................... 14

Adebiyi v. Felgenhauer, 2010 WL 1644255 (N.D. Ill. 2010)...................................................... 35

Albright v. Oliver, 510 U.S. 266 (1994) ................................................................................... 17

Alexander v. McKinney, 692 F.3d 553 (7th Cir. 2012)................................................................ 17

Palmer v. Marion Cnty., 327 F.3d 588 (7th Cir. 2003)................................................................ 29

Alston v. City of Madison, 853 F.3d 901 (7th Cir. 2017).......................................... 16, 21, 24, 26

Ashcroft v. al-Kidd, 563 U.S. 731 (2011)................................................................................. 31

Ashcroft v. Iqbal, 556 U.S. 662 (2009)............................................................................. passim

Baskin v. City of Des Plaines, 138 F.3d 701 (7th Cir. 1998) ....................................................... 28

Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397 (1997) ...................................... 30

Berron v. Illinois Concealed Carry Licensing Review Board, 2015 WL 1275834 (N.D. Ill. Mar.
16, 2015) ........................................................................................................................... 17

Brown v. City of Michigan City, 462 F.3d 720 (7th Cir. 2006) .................................................... 14

Buckley v. Fitzsimmons, 20 F.3d 789 (7th Cir. 1994) ............................................................... 19

Carpenter v. Bd. of Regents of Univ. of Wis. Sys., 728 F.2d 911 (7th Cir. 1984)....................... 34

Chatham v. Davis, 839 F.3d 679 (7th Cir. 2016)....................................................................... 29

Chavez v. Illinois State Police, 251 F.3d 612 (7th Cir. 2001) .......................................... 23, 25, 26

Choiceparts, LLC v. Gen. Motors Corp., 203 F. Supp. 2d 905 (N.D. Ill. 2002) ........................... 5

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) .............................................................. 5, 6, 7

Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013) ............................................................. 5, 8, 9

CSX Transp., Inc. v. McBride, 564 U.S. 685 (2011) ................................................................ 30

Devenpeck v. Alford, 543 U.S. 146 (2004) .............................................................................. 27

Duncan v. Fapso, 216 Fed. Appx. 588 (7th Cir. 2007) ............................................................ 27

Estate of Moreland v. Dieter, 395 F.3d 747 (7th Cir. 2005) .................................................... 29

Ewell v. Toney, 853 F.3d 911 (7th Cir. 2017) ......................................................................... 30

Farrell v. Butler Univ., 421 F.3d 609 (7th Cir. 2005) .............................................................. 34

Feit v. Ward, 886 F.2d 848 (7th Cir. 1989) ............................................................................. 10

Graham v. Med. Mut. of Ohio, 130 F.3d 293 (7th Cir. 1997) .................................................... 5

Hendrickson v. Cooper, 589 F.3d 887 (7th Cir. 2009) ............................................................. 32

Herschel v. Dyra, 365 F.2d 17 (7th Cir. 1966) ........................................................................ 14

Hinkle v. White, 793 F.3d 764 (7th Cir. 2015) ........................................................................ 16

Holly v. Boudreau, No. 03 C 8867, 2004 WL 609282 (N.D. Ill. Mar. 24, 2004) ....................... 14

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977) ............................................ 12

Ill. Native Am. Bar Ass'n v. Univ. of Ill., 856 N.E.2d 460 (1st Dist. 2006) ............................. 32

Jackson v. Cerpa, 696 F. Supp. 2d 962 (N.D. Ill. 2010) ..................................................... 26, 32

Jacobs v. City of Chicago, 215 F.3d 758 (7th Cir. 2000) ......................................................... 31

Kaehn v. Margolis, No. 90 C 5714, 1991 WL 47357 (N.D. Ill. Apr. 1, 1991) ........................... 14

Kartman v. State Farm Mut. Auto. Ins. Co., 634 F.3d 883 (7th Cir. 2011) .................................. 5

Katz-Crank v. Haskett, 843 F.3d 641 (7th Cir. 2016) ............................................................... 15

Kentucky v. Graham, 473 U.S. 159 (1985) .................................................................. 3

Khan v. Bland, 630 F.3d 519 (7th Cir. 2010) ............................................................. 16

Latuszkin v. City of Chicago, 250 F.3d 502 (7th Cir. 2001) ...................................... 29

Lawrence v. City of St. Paul, 740 F. Supp. 2d 1026 (D. Minn. 2010) ........................ 14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ................................................ 10

Mannoia v. Farrow, 476 F.3d 453 (7th Cir. 2007) ..................................................... 30

Manuel v. City of Joliet, 137 S. Ct. 911 (2017) ................................................... 17, 18

Margoles v. Tormey, 643 F.2d 1292 (7th Cir. 1981) .................................................. 15

Mathews v. Eldridge, 424 U.S. 319 (1976) ................................................................ 20

McCauley v. City of Chicago, 671 F.3d 611 (7th Cir. 2011) ...................................... 29

McCleskey v. Kemp, 481 U.S. 279 (1987) .................................................................. 23

McKinney v. George, 726 F.2d 1183 (7th Cir. 1984) ................................................. 18

Milwaukee Police Ass'n v. Flynn, 863 F.3d 636 (7th Cir. 2017) ................................ 11

Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) ................................................. 28

Morales v. Daley, 116 F.Supp.2d 801 (S.D. Tex. 2000) ............................................ 22

Moustakas v. Margolis, 154 F. Supp. 3d 719 (N.D. Ill. 2016) ................................... 16

Mustafa v. City of Chicago, 442 F.3d 544 (7th Cir. 2006) ......................................... 27

O'Shea v. Littleton, 414 U.S. 488 (1974) .................................................................... 9

Paul v. Davis, 424 U.S. 693 (1976) ..................................................................... 15, 16

Pearson v. Callahan, 555 U.S. 223 (2009) ................................................................ 31

Pembaur v. Cincinnati, 475 U.S. 469 (1986) ............................................................ 28

Plotkin v. Ryan, 239 F.3d 882 (7th Cir. 2001) .................................................. 10, 11

Puffer v. Allstate Ins. Co., 675 F.3d 709 (7th Cir. 2012) .................................... 33

Rehberg v. Paulk, 611 F.3d 828 (11th Cir. 2010) ...................................................... 19

Robinson v. City of Chicago, 868 F.3d 959 (7th Cir. 1989) ....................................... 7

Safar v. Tingle, 859 F.3d 241 (4th Cir. 2017) ................................................... 17, 21

Saucier v. Katz, 533 U.S. 194 (2001) ........................................................................ 31

Sierakowski v. Ryan, 223 F.3d 440 (7th Cir. 2000) ................................................. 10

Simic v. City of Chicago, 851 F.3d 734 (7th Cir. 2017) ......................................... 5, 9

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) ....................................... 11

Smith v. Wade, 461 U.S. 30 (1983) ........................................................................... 32

Soderbeck v. Burnett Cnty., Wis., 752 F.2d 285 (7th Cir. 1985) .............................. 32

Strautins v. Trustwave Holdings, Inc., 27 F. Supp. 3d 871 (N.D. Ill. 2014) ............... 10

Summers v. Earth Island Inst., 555 U.S. 488 (2009) .............................................. 12

Sussman v. Tanoue, 39 F. Supp. 2d 13 (D.D.C. 1999) ............................................ 22

Swan v. Bd. of Educ. of City of Chicago, No. 13 C 3623, 2013 WL 4401439 (N.D. Ill. Aug. 15, 2013) ..................................................................................................... 33, 34

Swanigan v. City of Chicago, 881 F.3d 577 (7th Cir. 2018) ........................... 5, 8, 9, 15

Swick v. Liautaud, 169 Ill. 2d 504 (1996) ............................................................... 35

Tully v. Barada, 599 F.3d 591 (7th Cir. 2010) ........................................................ 35

United States v. Barnett, 505 F.3d 637 (7th Cir. 2007) ........................................... 27

United States v. Morrison, 529 U.S. 598 (2000) .......................................................... 4

United States v. Nichols, 512 F.3d 789 (6th Cir. 2008)............................................... 25

United States v. State of New Hampshire, 539 F.2d 277 (1st Cir. 1976) .................... 22

Uptown Tent City Organizers v. City of Chicago Dep't of Admin. Hearings, 17 C 4518, 2018
    WL 2709431 (N.D. Ill. June 5, 2018) ................................................................... 12

Washington v. Summerville, 127 F.3d 552 (7th Cir. 1997) ......................................... 35

Welch v. Eli Lilly & Co., 585 F. App'x 911 (7th Cir. 2014)........................................ 33

Welton v. Anderson, 770 F.3d 670 (7th Cir. 2014) ..................................................... 35

White v. City of Chicago, 149 F. Supp. 3d 974 (N.D. Ill. 2016)................................. 18

White v. Pauly, 137 S. Ct. 548 (2017) ........................................................................ 31

Williams v. Rodriguez, 509 F.3d 392 (7th Cir. 2007) ................................................. 27

YHWHnewBN v. Leak, No. 11 C 5653, 2012 WL 5936285 (N.D. Ill. Nov. 27, 2012) ............. 14

Ziglar v. Abbasi, 137 S. Ct. 1843 (2017)..................................................................... 30

**Statutes**

20 Ill. Admin. Code §§ 1231.70, 2900.14, 2900.140, 2900.150, 2900.160 ................................ 17

430 ILCS 66/87............................................................................................................ 17

740 ILCS 23/5......................................................................................................... 32, 34

**INTRODUCTION**

In Chicago, a city riven by gang shootings, police officers take note of information indicative of gang membership. It may be relevant to the immediate encounter, or it may prove useful in future efforts to stop gang violence before it starts. And keeping that information in the Chicago Police Department's ("CPD") CLEAR database – a repository that houses crime-related information of many kinds – allows other officers to access it when investigating crimes or planning anti-violence tactics.[1]

Despite this, Plaintiffs – four individuals and seven organizations – seek a sweeping injunction that would upend how CPD gathers, manages, and uses gang membership information. Plaintiffs contend that this intrusion into local crime-fighting prerogative is necessary because they or their members have been wrongly designated as gang members. But even if true, that does not justify their suit. Critically, the law recognizes that the collection of data does not, by itself, cause injury or violate rights. Rather, a claim arises only when information is used in a way that causes a tangible injury recognized under the law. From this, Plaintiffs' lack of standing to seek injunctive relief, and the failure of their claims on the merits, is readily apparent.

As to standing, Plaintiffs allege that their gang designations caused them to be harmed in past interactions they had with law enforcement. But even taken as true, these isolated instances of past injury do not create a case or controversy sufficient to confer standing for forward-looking injunctive relief, because Plaintiffs cannot show that it is certain, or even that there is a

---

[1] As explained in an article referenced in Paragraph 79 of the Complaint, the CLEAR database contains a variety of types of data, and, among other benefits, provides a "comprehensive picture of offender activity," and allows for "predictive resource allocation to deploy officers when and where needed." Wesley G. Skogan, et al., Institute for Policy Research, Northwestern University, Learning from Chicago's Citizen and Law Enforcement Analysis and Reporting (CLEAR) System, 1-2 (2003).

substantial risk, that their designations will be used against them in the future. Indeed, Plaintiffs'
own allegations show that alleged injury stemming from a gang designation is extremely rare,
and that whether a designation ends up being used against a person rests upon multiple layers of
happenstance and discretionary choice – both as to each Plaintiff's conduct and that of a law
enforcement officer encountering him – that may never come to pass. At best, Plaintiffs merely
speculate about future injury. The remedy for that is an action for damages if and when an injury
occurs; it does not justify a top-to-bottom broadside against present efforts to gather gang
membership information that helps the police fight crime every day.

Plaintiffs' claims also fail on the merits. Due process is not violated simply because gang
membership information is recorded without the opportunity to contest it, even if the information
is inaccurate or might prove stigmatizing. Rather, Plaintiffs must show that their gang
designations were used in the course of making a specific decision that denied them a
constitutionally-protected interest without due process. No Plaintiff does this; each either had
ample opportunity to challenge the use of a designation against them, or asserts claims that are
not even cognizable under due process in the first place. Similarly, Plaintiffs' equal protection
claims fail because they do not show that decisions to use gang designations are motivated by an
intent to discriminate based on race or ethnicity, nor that their use produces a disparate impact.
Plaintiffs' claims of discrimination focus on the decisions to make gang designations in the first
place, but Plaintiffs themselves plead that gang activity tends to be concentrated in
predominantly minority neighborhoods, which explains why gang designation statistics may
reflect disproportionate numbers of minorities. As to the Fourth Amendment, even if Plaintiffs
are correct that officers use gang designation information when making arrest or search
decisions, that does not mean that the actions are unlawful; so long as probable cause or other

lawful basis exists supporting the action, an officer's subjective motivations are irrelevant. Yet Plaintiffs do not plead that the relevant arrests or searches lacked any lawful basis. And even if Plaintiffs did state claims for violation of their rights by individual officers, they come up short in pointing to a basis for holding the City liable.

Plaintiffs' state law claims fare no better. Plaintiffs' claim under the Illinois Civil Rights Act fails because Plaintiffs do not identify, as they must, a specific City practice that causes a disparate impact in the use of gang designations. And Plaintiff Warner's malicious prosecution claim fails because he does not show that the case against him was terminated in a way indicative of his innocence, or that the arresting officer maliciously initiated the charge against him. For all of these reasons, Counts I, II, III, IV, VI, VII, VIII, X, XI, XII, and XIII should be dismissed in their entirety, and Count V should be dismissed as against the named defendants.[2]

## ARGUMENT

### I.     Plaintiffs Lack Standing For Injunctive Relief Against The City.

In Counts I-III, V, and VI, and in their request for relief, Plaintiffs seek injunctive relief that would overhaul how gang membership information is recorded by the police.[3] Under Plaintiffs' proposal, an experienced beat officer encountering gang members operating openly on their turf could not designate a person as a gang member. Instead, the officer would need to get two detectives to investigate the matter and then conclude, and attest under oath, that the

---

[2]  In Count V, Plaintiffs Lucas, Warner, and Cooper sue the named defendants, as well as four unidentified individual police officers, for violations of due process. And in Count IX, Plaintiff Pedrote brings an individual Fourth Amendment claim against two unidentified officers. Because those unidentified officers have not yet been named or served, and, consequently, counsel does not represent them at this point, dismissal of Count V to the extent that it sues the unidentified officers, and dismissal of Count IX, is not sought at this time.

[3]  In addition to being brought against the City, these counts are brought against Superintendent Johnson in his official capacity, see Compl. ¶¶ 160, 170, 182, 194, 207, and are therefore treated as redundant of the claims against the City, see Kentucky v. Graham, 473 U.S. 159, 166 (1985).

designation is supported by proof beyond a reasonable doubt.  Compl., Request for Relief,

§ (c)(i).  Then, before that designation could be recorded in CLEAR, both the Superintendent and

CPD's general counsel would need to approve.  See id.  All the while, the bases for designating a

person would also be severely limited.  A designation could not be based solely on gang tattoos,

criminal activity taking place in gang territory, social media posts, or the person's own self-

identification to a police officer, unless the statement was made "under penalty of perjury and

with the advice of counsel."  See id.  And all of these restrictions would apply even though the

designations would be solely for CPD's internal use, as Plaintiffs demand that CPD be prohibited

from sharing designations with "any third party entity."  Id. § (c)(iv).  On top of this (and even

though CPD could not share designations), CPD would need to notify every person designated as

a gang member over the past 20 years, and provide administrative hearings where, if challenged,

CPD must prove beyond a reasonable doubt that the person is a gang member; and if CPD

cannot meet that bar, then CPD must certify that it lacked sufficient evidence to impose the

designation.  See id. § (c)(ii)-(iii).

       This injunctive relief – which essentially engrafts upon routine investigatory

recordkeeping the full panoply of procedures attendant to a criminal trial, and then some – would

severely intrude upon CPD's prerogative to gather information it deems important to public

safety, and should be rejected for that reason alone.  Cf. United States v. Morrison, 529 U.S. 598,

618 (2000) ("[W]e can think of no better example of the police power, which the Founders

denied the National Government and reposed in the States, than the suppression of violent crime

and vindication of its victims.").[4]  Regardless, Plaintiffs' claim for injunctive relief should be dismissed because Plaintiffs lack Article III standing to seek it.

Even if a plaintiff has been injured in the past, and therefore has standing to sue for damages, that alone does not give her standing to sue for forward-looking injunctive relief.  See Swanigan v. City of Chicago, 881 F.3d 577, 583 (7th Cir. 2018); Simic v. City of Chicago, 851 F.3d 734, 738 (7th Cir. 2017).  Rather, to have standing for an injunction, the plaintiff must show that she will suffer an injury in the future that is "certainly impending," or that there is a "substantial risk" that future harm will occur; an injury that is merely "conjectural or hypothetical" is not enough.  Swanigan, 881 F.3d at 583 (citations omitted).  These stringent gatekeeping requirements are, like all Article III case or controversy requirements, designed to ensure the judiciary's "proper role in our system of government," one in which the courts do not "usurp the powers of the political branches."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  When it comes to management of local policing, federal courts are to be particularly mindful of their limited role:  The "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law" means that courts must show "restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate."  City of Los Angeles v. Lyons, 461 U.S. 95, 112 (1983) (citations omitted).

---

[4] Plaintiffs' request amounts to a mandatory injunction.  Unlike prohibitory injunctions, which bar a party from acting, mandatory injunctions impose affirmative burdens on a party, see Kartman v. State Farm Mut. Auto. Ins. Co., 634 F.3d 883, 892 (7th Cir. 2011), and can "either involuntarily and fundamentally change the way that [defendants] do business or remove their ability to make certain substantive business decisions autonomously."  Choiceparts, LLC v. Gen. Motors Corp., 203 F. Supp. 2d 905, 924-25 (N.D. Ill. 2002).  And their affirmative mandates force courts to continuously monitor the "enjoined party's compliance with the court's order."  Kartman, 634 F.3d at 892.  They are therefore "sparingly issued" and justified only "upon the clearest equitable grounds."  Graham v. Med. Mut. of Ohio, 130 F.3d 293, 295 (7th Cir. 1997) (citations omitted).

Plaintiffs lack injunctive standing because future injury is not "certainly impending" or a "substantial risk" from being designated a gang member.[5] Three of the four Individual Plaintiffs describe only a single specific past instance where an injury allegedly resulted from their designation, and the fourth (Pedrote) alleges only two instances. See Compl. ¶¶ 17-20. And Plaintiffs identify only five other specific incidents where someone was allegedly injured by a designation. See id. ¶ 86.[6]

These one-off instances of past injury are, as a matter of law, insufficient to show a substantial risk or certainty that any Plaintiff will be injured again in the future. The Supreme Court's decision in Lyons is dispositive. There, Lyons had been stopped by the police for a traffic violation and put in a chokehold even though he did not present any threat. In addition to seeking damages, he sought an injunction barring the police from using chokeholds in such instances in the future. The Supreme Court held that Lyons lacked standing for an injunction. The Court emphasized that Lyon's lone, past instance of injury "does nothing to establish a real and immediate threat that he would again be stopped" by officers who would then decide to apply a chokehold. 461 U.S. at 105. This was so even though Lyons alleged that it was a "routine[]" practice of the police to apply chokeholds. Id. The Court recognized that it was

---

[5] Indeed, Plaintiffs do not even allege that it is. The Individual Plaintiffs allege only that they are "likely" to suffer adverse consequences in the future from being in the database. Compl. ¶¶ 17-20; 104, 125, 132, 150. And the Organization Plaintiffs do not even claim that; they merely claim that some members are "likely" to be *included in* the database in the first instance, not that later injury is likely to result. Compl. ¶¶ 11-16.

[6] As to the Organization Plaintiffs, they do not identify any actual members who have been adversely affected in the past, much less claim that they will suffer future injury. Further, while Plaintiffs allege that class members are subjected "to significant harm, including public humiliation and the risk of being targeted by law enforcement for enhanced surveillance," Compl. ¶ 77, they provide no support for this conclusory allegation, nor do they identify any instance where a person (whether identified in the Complaint or not) has suffered public humiliation as a result of a gang designation.

possible that "among the countless encounters between the police and the citizens of a great city such as Los Angeles," an officer could again apply a chokehold to someone, but it was "no more than speculation" for Lyons to claim that he himself would face another chokehold. Id. at 108. See also, e.g., Robinson v. City of Chicago, 868 F.3d 959, 966 (7th Cir. 1989) ("even if the police were to continue to detain others for investigation" under allegedly unlawful detention policy, the possibility that plaintiff himself "would suffer an injury as a result of that practice is too speculative").

The same is true here. The Individual Plaintiffs leap to the conclusion that they will be injured in the future due to their designations simply because they have allegedly been injured in past isolated instances. There is no basis for this conclusion in the Complaint. Indeed, far from showing that future injury is a substantial risk, the Complaint shows that it is quite rare. According to Plaintiffs, CPD has been maintaining gang designations in its CLEAR database for nearly 20 years, see Compl. ¶¶ 24-26, and the database includes at least 155,000 people, see id. ¶ 6. Yet across those decades and thousands of entries, Plaintiffs identify only 9 specific instances where someone was allegedly harmed as a result of their gang designation. See supra at 6. Indeed, even on just an annual basis (rather than being discounted across 20 years), these 9 instances are less than one-tenth of one percent of the 155,000 people allegedly in the database.

Plaintiffs' failure is not just one of low numbers. The harm they complain of is inherently speculative because it is preceded by a number of contingencies that all must break a certain way before an injury occurs. The harms alleged by Plaintiffs – for example, being arrested without justification, or being denied a concealed carry license – do not result simply because an officer previously designated a person as a gang member; creating an internal record, by itself, injures no one. Rather, the alleged injury stems from the later decision of a second

actor – whether another CPD officer or law enforcement agency – to access that information during a future encounter with the plaintiff and to then decide upon a particular course of action based upon it. See Compl. ¶ 101 (decision by Illinois Concealed Carry Licensing Review Board to deny Lucas a concealed carry license); id. ¶ 120 (decision by police officer to arrest Warner for soliciting unlawful business); id. ¶¶ 127-28 (decision by police to deny I-Bond and decision by judge to place Cooper under house arrest); id. ¶¶ 138-41 (decision by federal immigration officials to prioritize Pedrote for deportation, and decision by other police officers to stop Pedrote and search vehicle).[7]

Thus, there are a number of links in the chain before a Plaintiff is injured by a prior gang designation: (1) the Plaintiff must choose to do a particular thing that (2) comes to the attention of a law enforcement officer, who then (3) learns of the earlier gang designation, and then (4) decides to use the designation as a basis for taking action against the Plaintiff. Plaintiffs provide no basis for thinking that this "highly attenuated chain of possibilities" will happen to them in the future. Clapper, 568 U.S. at 410. As to the first link, Plaintiffs' allegations indicate that they came to the attention of authorities when they applied for a concealed carry license (Lucas), got into a fender bender (Cooper), or were engaged in unlawful conduct (Warner and Pedrote). There is no basis to conclude that there is a substantial risk that Plaintiffs would do these things again in the future, particularly when the activity at issue is something that would break the law. See Swanigan, 881 F.3d at 583 (in assessing future injury, courts assume that plaintiffs "will conform [their] conduct to the requirements of the law and avoid arrest altogether") (citing

---

[7] This is also true for the five other individuals identified in the Complaint who are not plaintiffs. See Compl. ¶ 86(a) (decision by Cook County Sherriff's Office to fire employee); id. ¶ 86(b) (decision by prosecutor to accuse person of gang-related shooting); ¶ 86(c) (decision by federal officials to seek deportation); ¶ 86(d) (decision by Illinois state trooper to run license plate of car); ¶ 86(e) (decision by police officers to surround car).

O'Shea v. Littleton, 414 U.S. 488, 497 (1974)).  As to the second link, even when a person breaks the law, law enforcement does not always notice or choose to enforce it.  See Simic, 851 F.3d at 738 (no standing for injunctive relief where future injury was contingent on plaintiff both violating the law "and receiving a citation").  Then, as to the third link, it is hardly a foregone conclusion that a law enforcement officer encountering a Plaintiff would necessarily learn of the gang designation; even Plaintiffs recognize that this is not always the case.  See Compl. ¶ 86(e) (alleging that gang designation *could* be learned via a license plate check).  And as to the last link – whether the officer would take a prior gang designation into account after learning of it – the Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgement."  Clapper, 568 U.S. at 413.

Plaintiffs' claim is no different than that rejected in Swanigan.  There, a CPD case file wrongly labeled the plaintiff as a criminal, and the plaintiff feared that "if he is stopped by the police, even for a routine traffic matter, the officer might use the misleading case report against him."  881 F.3d at 584.  The Seventh Circuit held that, even so, injunctive standing did not exist because it was "entirely speculative to suggest that a police officer might use the [file] to violate [plaintiff's] rights in some unknown way in some hypothetical future traffic stop."  Id.  The claim of future injury was "layered with hypothetical and nowhere near certain."  Id. at 583. Likewise, in Clapper, the Supreme Court held that standing did not exist to enjoin a surveillance program that plaintiffs feared could access their communications because the decision to target particular communications was a discretionary decision by government officials, which then had to be separately approved by a court, which, too, would exercise its discretion in deciding whether to approve the surveillance.  See 568 U.S. at 412-13. The plaintiffs' claim of future injury "was dependent on a variety of events and actions by independent third parties that might

never come to pass." Strautins v. Trustwave Holdings, Inc., 27 F. Supp. 3d 871, 876 (N.D. Ill.
2014) (discussing Clapper). See also Sierakowski v. Ryan, 223 F.3d 440, 445 (7th Cir. 2000)
(holding that plaintiff could not show sufficient threat of future medical testing where the
decision to test was "in the hands of individual physicians, to be made on a case-by-case basis");
Strautins, 27 F. Supp. 3d at 876 (plaintiffs lacked standing in data breach case because "whether
[plaintiffs] actually become victims of identity theft as a result of the data breach depends on a
number of variables, such as whether their data was actually taken during the breach, whether it
was subsequently sold or otherwise transferred, whether anyone who obtained the data attempted
to use it, and whether or not they succeeded").  The same is true here:  Even if a Plaintiff were to
encounter a law enforcement officer in the future who would learn of a prior gang designation, it
is speculative to assume that the designation would form a basis of their discretionary decision to
take some adverse action against the plaintiff.

For all these reasons, Plaintiffs lack standing to seek injunctive relief against the City.
And that means they also lack standing to seek declaratory relief.  See, e.g., Feit v. Ward, 886
F.2d 848, 857 n.11 (7th Cir. 1989).  Accordingly, Counts I, II, and III should be dismissed in
their entirety, and Counts V and VI should be dismissed to the extent that they seek injunctive
relief.

## II.     The Organization Plaintiffs Lack Standing.

The Organization Plaintiffs are parties to Counts I, II, III, and IV, where they assert
claims on their own behalf and on behalf of their members.  They lack standing to do either.

To have standing to sue on its own behalf, an organization must show (among other
things) that it has suffered an injury in fact.  See Plotkin v. Ryan, 239 F.3d 882, 884 (7th Cir.
2001) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  Here, the only
injury alleged by the Organization Plaintiffs is that each was "forced to spend additional time

and money addressing the devastating consequences suffered by its members and the communities it represents as a result of CPD's unconstitutional use of its Gang Database," which allegedly caused each organization to divert resources away from its mission. See Compl. ¶¶ 11-16. The Organization Plaintiffs provide no specifics as to how the City's conduct caused them to divert resources away from their usual missions. That detail is important, because if it is part of the organization's ordinary purpose to spend time or resources responding to issues posed by CPD's gang designations, then they do not have standing. See Plotkin, 239 F.3d at 886 ("ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing"). Relatedly, an organization does not have standing merely because it pursues laudable goals or sincerely believes in an issue. See Milwaukee Police Ass'n v. Flynn, 863 F.3d 636, 639 (7th Cir. 2017) ("an interest in the underlying law does not equal an injury"); Plotkin, 239 F.3d at 886 ("[G]ood intentions are not enough for federal standing."). The Organization Plaintiffs' boilerplate allegations that funds were diverted from their missions are thus insufficient. See Plotkin, 239 F.3d at 884 ("[U]nadorned speculation will not suffice to invoke the federal judicial power.") (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 44 (1976)); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (explaining that a complaint must do more than make "naked assertions devoid of further factual enhancement") (internal quotation marks and citations omitted).

The Organization Plaintiffs fare no better in showing standing to sue on behalf of their members. That standing exists only when: (a) an organization's members would otherwise have standing to sue in their own right; (b) the interests the organization seeks to protect in the lawsuit are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. See Hunt v. Wash.

State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). Plaintiffs fail to establish any of these requirements.

First, as to the standing of their members, the Organization Plaintiffs must "identify members who have suffered the requisite harm[.]" Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009). But the Complaint does not identify any member of any organization, much less describe any particular scenario in which a member – even if unnamed – has been harmed. Notably, none of the Individual Plaintiffs assert that they are a member of any of the Organization Plaintiffs. The Complaint's only mention of organizational members is the identical allegation by each organization that their members "live in or regularly travel through Chicago, and have been or are likely to be subjected to wrongful inclusion in the CPD's Gang Database." See Compl. ¶¶ 11-16. This is insufficient: "It is not enough to establish organizational standing with 'speculation' of a 'statistical probability that some of [its] members are threatened with injury'; rather, plaintiff organizations must 'make specific allegations establishing that at least one identified member had suffered or would suffer harm.'" Uptown Tent City Organizers v. City of Chicago Dep't of Admin. Hearings, 17 C 4518, 2018 WL 2709431, at *6 (N.D. Ill. June 5, 2018) (quoting Summers, 555 U.S. at 497-99).

Second, the Complaint fails to establish that the interests the Organization Plaintiffs seek to protect are "germane" to their purpose. The Complaint provides almost no information as to the purposes or activities of the Organization Plaintiffs other than brief, high-level descriptions of broad goals they support. See Compl. ¶¶ 11-16.[8] These general mission statements do not

---

[8] As an example, Plaintiff Black Youth Project states that it works towards "justice and freedom for all Black people" by "building a network focused on transformative leadership development, direct action organizing, advocacy, and political education using a Black queer feminist lens." Compl. ¶ 11. Plaintiff Blocks Together alleges that it "empowers residents [of Humboldt Park] to work together for systemic changes that bring concrete improvement to their lives" and

establish that the organizational purposes are related to the specific matters at issue here. Further, the Organization Plaintiffs' claim that they had to divert funds away from their ordinary activities in order to combat Defendants' actions undermines any claim that CPD's gang designation practices are germane to their ordinary purposes.

Finally, the Organization Plaintiffs do not establish that the case can be litigated without the participation of their individual members. As explained above, see supra at 7-10, Plaintiffs themselves depict the alleged harms stemming from gang designations as depending on numerous facts specific to a particular encounter between a person and the police. Thus, litigating claims on behalf of the organizations' members would require them to establish that particular members are included in CPD's database, that their gang membership information is inaccurate, and that the information was used adversely against them in some future encounter. These fact-specific inquiries would undoubtedly require the individual members themselves to participate and be subject to discovery. For all of these reasons, the Organization Plaintiffs cannot assert organizational or associational standing for Counts I-IV.

## III.    Plaintiffs Fail To State A Due Process Claim.

In Count I, the Organization Plaintiffs, as well as Plaintiffs Lucas, Warner, and Cooper as purported class representatives, bring a due process challenge to CPD's maintenance of gang information in its database. Plaintiffs contend that CPD officers erroneously designate persons as gang members and include those designations in CLEAR, that CPD does not notify people of this or allow them to challenge it, and that CPD shares the designations with other law

---

"tackles social justice issues relating to education, housing, economic justice, and the criminalization of youth" but provides no further details as to how it works towards these goals. Compl. ¶ 12. The allegations of the other Organization Plaintiffs are similar. While these missions are admirable, they do not support organizational or associational standing in this case.

enforcement or government agencies. See Compl. ¶ 161. In Count V, Lucas, Warner, and Cooper bring individual due process claims based on the alleged use of their gang designations against them. And in Count VIII, Cooper brings an individual due process claim based on CPD's alleged policy of denying pre-arraignment release on an I-Bond for verified gang members.

To state a due process claim, Plaintiffs must show that they were deprived of an interest that is protected by the Constitution, and that that deprivation occurred without adequate procedures. See Brown v. City of Michigan City, 462 F.3d 720, 728 (7th Cir. 2006). Plaintiffs fail on both fronts.

### A. Maintaining gang membership information does not deprive Plaintiffs of a constitutionally-protected interest.

Even though CPD strives for accuracy in its reports and understands the import of police records, inaccurately designating someone as a gang member, without more, does not implicate a due process interest: "[T]he Constitution does not . . . give Plaintiff[s] an enforceable interest in . . . the accuracy of police reports." YHWHnewBN v. Leak, No. 11 C 5653, 2012 WL 5936285, at *2 (N.D. Ill. Nov. 27, 2012). See also, e.g., Holly v. Boudreau, No. 03 C 8867, 2004 WL 609282, at *3 (N.D. Ill. Mar. 24, 2004), aff'd, 103 F. App'x 36 (7th Cir. 2004) ("[T]here is no right to accurate police reports."); Lawrence v. City of St. Paul, 740 F. Supp. 2d 1026, 1038-39 (D. Minn. 2010) ("even if the police defendants knowingly inserted false information in their reports, [plaintiff] was not deprived of a constitutionally protected interest because of that false information"); A.J. ex rel. Dixon v. Tanksley, 94 F. Supp. 3d 1061, 1071 (E.D. Mo. 2015) (collecting cases). Indeed, there is no right to have arrest and criminal records expunged, even if an individual has been acquitted or charges dropped. See Herschel v. Dyra, 365 F.2d 17, 20 (7th Cir. 1966); Kaehn v. Margolis, No. 90 C 5714, 1991 WL 47357, at *2 (N.D. Ill. Apr. 1, 1991)

("[P]laintiffs have stated no viable constitutional claim for the right to expungement of the records retained by the Illinois State Police."). Nor does sharing gang designations with other law enforcement agencies violate due process. See Margoles v. Tormey, 643 F.2d 1292, 1299 (7th Cir. 1981) (no due process violation where Wisconsin authorities provided false information to licensing officials in Illinois). Therefore, even if Plaintiffs are correct that they are incorrectly designated as gang members in CPD's records, that alone does not violate due process.

   **B.      The harms that allegedly stemmed from Plaintiffs' designations did not
            deprive Plaintiffs of a protected interest without due process.**

      To be sure, the Individual Plaintiffs allege that they suffered an injury, apart from merely being designated as gang members, because their designations hurt their reputations and were later used by law enforcement as a basis for taking action against them. But this does not save their claim.

      As explained in Paul v. Davis, 424 U.S. 693 (1976), the fact that a government document injures a person's reputation because it contains incorrect information is not enough to state a claim. In Paul, for example, the plaintiff was erroneously branded a criminal when he was identified as an "active shoplifter" on a police flyer, but the Supreme Court rejected his claim, even though the erroneous designation could have "deleterious" consequences. Paul, 424 U.S. at 711-12. See also id. at 734 (Brennan, J., dissenting). Likewise, in Swanigan, the Seventh Circuit found "no legal anchor" for a claim that a plaintiff was injured merely because police records wrongly suggested that he had committed a series of armed robberies. 881 F.3d at 584. See also Katz-Crank v. Haskett, 843 F.3d 641, 649-50 (7th Cir. 2016) (no due process claim where government officials issued inflammatory press releases announcing plaintiff's arrest and told her clients she was under investigation).

15

Rather, reputational harm gives rise to a due process claim only when it "alter[s] a previously recognized legal status or right." Alston v. City of Madison, 853 F.3d 901, 909 (7th Cir. 2017). It is this "plus" factor that Plaintiffs must show in addition to their allegations of stigma. Paul, 424 U.S. at 708-09. See also, e.g., Hinkle v. White, 793 F.3d 764, 767-68 (7th Cir. 2015); Khan v. Bland, 630 F.3d 519, 534 (7th Cir. 2010). This is known as the "stigma-plus" test. Alston, 853 F.3d at 909.

Plaintiffs show neither stigma nor a "plus" deprivation resulting from it. As to stigma, Plaintiffs do not point to any specific way in which their gang designations harmed their reputations among the public; rather, they contend that their designations were accessed and used by law enforcement personnel to make law enforcement decisions.

And even if Plaintiffs had suffered stigma, they do not identify a separate "plus" deprivation of a constitutionally-protected interest without due process. Lucas contends that he was harmed by his gang designation when the Illinois Concealed Carry Licensing Review Board used it as the basis for denying him a concealed carry license. See Compl. ¶ 101. Even if denial of the license deprived Lucas of a constitutionally-protected interest (a point that Defendants assume for purposes of this motion, but do not concede), the denial did not violate his due process rights. The core of due process is "the opportunity to be heard at a meaningful time and in a meaningful manner," and the procedures available to concealed carry applicants under Illinois law provide both. See Moustakas v. Margolis, 154 F. Supp. 3d 719, 730-32 (N.D. Ill. 2016) (citation omitted) (holding that procedures afforded for challenging denial of Illinois concealed carry license satisfy due process); Berron v. Illinois Concealed Carry Licensing

16

Review Board, 2015 WL 1275834, at *4-6 (N.D. Ill. Mar. 16, 2015) (same), aff'd in rel. part, 825 F.3d 843 (7th Cir. 2016).[9]

       Warner and Cooper's alleged "plus" deprivations fail for a different reason: They simply are not cognizable in due process. Warner contends that his gang designation harmed him when he was arrested for unlawful solicitation of business and held in jail for two days before being released on bond. Compl. ¶¶ 118, 121-22. According to Warner, the arrest was unlawful because there was no probable cause to arrest him for the charge, and he was arrested only because of his prior gang designation. Id. ¶ 120. This is not a due process claim; rather, "[t]he Fourth Amendment, not the due process clause, is the proper basis for challenging the lawfulness of an arrest." Alexander v. McKinney, 692 F.3d 553, 558 (7th Cir. 2012). See also Manuel v. City of Joliet, 137 S. Ct. 911, 920 (2017) (holding that "the Fourth Amendment governs a claim for unlawful pretrial detention"); Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment . . . must be the guide for analyzing these claims.") (internal quotation marks omitted)); id. at 281 (Kennedy, J., concurring in the judgment) (agreeing that "an allegation of arrest without probable cause must be analyzed under the Fourth Amendment without reference to more general considerations of due process"); Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017) ("we are mindful of the Supreme Court's

---

[9]  As Lucas himself alleges, he received a written notice from the Illinois Concealed Carry Licensing Board stating the reason for the denial of license application. See Compl. ¶ 101. And under the applicable state procedures, Lucas had the opportunity to respond in writing and seek a hearing. See 20 Ill. Admin. Code §§ 2900.140, 2900.150. In both, Lucas was free to argue that his gang designation was incorrect or that, in any event, it does not warrant denial of his license. See id. § 2900.14(e)(1) & (2) (stating that applicant may submit "any" additional material that he wants the board to consider, and that board "will consider" such information). And if unsatisfied with the board's resolution, Lucas could have sought review in Illinois court. See 430 ILCS 66/87; 20 Ill. Admin. Code §§ 1231.70(d), 2900.160(d).

injunction that the Due Process Clause is not the proper lens through which to evaluate law enforcement's pretrial missteps"); McKinney v. George, 726 F.2d 1183, 1187 (7th Cir. 1984) (explaining that if arrest is upheld under the "detailed rules that the courts have developed for determining the lawfulness of an arrest under the Fourth Amendment, the arrested person will not succeed . . . . by recasting his challenge in the language of due process rather than search and seizure"). Indeed, in Count VII, Warner brings a Fourth Amendment claim based on his arrest. Warner therefore has no claim under due process based on his false arrest.[10]

So too for Cooper. He claims that after he was arrested for various offenses in connection with a car accident – an arrest he does not challenge – he was not released on an I-Bond, due to a CPD policy requiring denial of I-Bonds to verified gang members. See Compl. ¶ 127. Instead, he was held for two days until his bond hearing, at which point the judge decided he be put under house arrest and electronic monitoring based on CPD's representations of Cooper's gang status. See id. ¶¶ 127, 128. Ten days later, a second judge ordered that Cooper be freed from house arrest and electronic monitoring after "[f]inding the gang label not credible." Id. ¶ 129. None of this amounts to a due process violation. Again, it is the Fourth Amendment, and not due process, that governs a claim of unlawful detention – even where the detention persists beyond an initial appearance before a judge, and even if the reason for the continued detention is a determination by a judge that is allegedly based on faulty evidence. See Manuel, 137 S. Ct. at 918-20 (explaining that the Fourth Amendment governs detentions beyond the

---

[10] And even if Warner's claim were cognizable under due process, the claim would still fail, because Illinois law affords an adequate remedy (though a claim for malicious prosecution) for an unlawful arrest, which means that Warner was afforded appropriate process. See, e.g., White v. City of Chicago, 149 F. Supp. 3d 974, 977-78 (N.D. Ill. 2016) (discussing pertinent Supreme Court and Seventh Circuit due process doctrine). And, indeed, Warner brings a state-law malicious prosecution claim in Count XI.

commencement of legal process against a person, such as where "a judge's probable-cause determination is predicated solely on a police officer's false statements").[11] Since no Plaintiff states a "plus" deprivation stemming from his gang designation, their due process claims should be dismissed.

### C. Due process does not require Plaintiffs' demanded procedures.

As the above makes clear, the legal mechanisms and doctrines that currently exist are sufficient to protect Plaintiffs' rights if, in fact, a gang designation has been improperly used against a Plaintiff. Due process requires no more. The Court may therefore reject out of hand the litany of additional procedures demanded by Plaintiffs before gang designations can be made. Further, even if examined in their own right, Plaintiffs' additional procedures are not constitutionally required. Indeed, the proposed process is unworkable and would undermine CPD's ability to gather important information.

To determine the process due in a particular situation, courts assess four factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used;" (3) "the probable value, if any, of additional or substitute procedural safeguards;" and (4) "the Government's interest, including the

---

[11] Even if analyzed under due process, a plaintiff's prosecution does not establish a "plus" injury when the prosecution would not in itself constitute a constitutional violation. See Buckley v. Fitzsimmons, 20 F.3d 789, 797-98 (7th Cir. 1994). That is the case here, as Cooper does not dispute that his arrest was lawful or that he committed the underlying crimes for which he was arrested. Moreover, even if being denied release following an arrest amounted to a "plus" violation of a constitutionally-protected right, the denial was pursuant to due process, since the ultimate decision to deny bond was made by a neutral decisionmaker (a judge), and Cooper was free to make his case for why he should be released, including that he was improperly designated as a gang member. Indeed, the decision made by the second judge to release Cooper from his restraints after finding that the gang designation was "not credible" shows that Cooper was able to do precisely that. See Rehberg v. Paulk, 611 F.3d 828, 853 (11th Cir. 2010), aff'd, 566 U.S. 356 (2012) (no stigma-plus claim where plaintiff was afforded "the constitutionally required procedures necessary to challenge his indictments and arrest" and was able to mount "successful challenges to the three indictments"). See also Buckley, 20 F.3d at 789-99.

function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Here, the fourth factor is determinative. CPD has a strong interest in maintaining information about gang affiliations. Even if CPD is unable to confirm a person's gang membership, keeping records about possible gang relationships can provide investigatory leads or help prevent violent gang-related crime before it starts. See Exhibit A hereto (CPD General Order G10-01, "Gang Violence Reduction Strategy"), at §§ VII, IX, X. For instance, when a gang-related shooting occurs, CPD tries to quickly locate and engage those who might be targets of retaliatory violence – i.e., members of rival gangs and their associates – and refer them to services in an effort to prevent future violence. See id. § IX. For this to be effective, CPD must maintain information about who it believes, but may not be able to prove beyond a reasonable doubt, are gang members. Indeed, good policework often calls for officers to note information, even if not conclusively established, that might be pertinent to a given arrest or to later efforts to investigate and combat crime.

Plaintiffs' theory would stop this in its tracks. At the outset, their proposal would prevent CPD from collecting any gang affiliation information that is based on less than proof beyond a reasonable doubt, which would prevent the collection of important gang-related information. And even when an officer in the field believes that proof beyond a reasonable doubt exists, a task as routine as filling out an arrest record would be delayed until the officer contacts two detectives to themselves determine and declare beyond a reasonable doubt that the person is a gang member, as well as obtain the Superintendent's approval. Then, after a designation is complete, CPD would have to notify the subject of the designation and provide a hearing to contest it, even though two detectives had already made the determination based on proof beyond a reasonable

doubt, and even though CPD may have strong law enforcement reasons for not wanting to let the subject know that CPD deems him a gang member. The repercussions of mandating these procedures for gang designations would be far-reaching: Under the logic of Plaintiffs' theory, the procedures would apply to any piece of information that a subject might believe to be unfounded or stigmatizing but that an officer in the field believes is important to fighting crime – such as an officer noting the subject's suspicious activity around a crime scene, or an officer taking down a victim's statement that the subject committed a serious crime. Cf. Safar, 859 F.3d at 247 ("To say that an affirmative duty attached here [to retract an arrest warrant] fails to emphasize the limits of such an obligation and how it might function in practice.").

The remaining Mathews factors also favor the City. As to the first, and as explained above, Plaintiffs do not have a constitutionally protected interest in CPD's collection of gang status information. And as to the second and third, whether a person's rights are violated turns not on CPD's collection of information, but how that information is actually *used* against a person. See supra at 7-10. Accordingly, due process does not require the additional procedures Plaintiffs demand in connection with an officer designating someone as a gang member.

For all of the above reasons, no Plaintiff states a claim for violation of due process, and Counts I, V, and VIII should be dismissed.

## IV. Plaintiffs' Equal Protection Claims Should Be Dismissed.

In Count II, Plaintiffs allege, on behalf of the organizations and putative class, that the City violated equal protection by using discriminatory policing tactics to target people for inclusion in CPD's database. See, e.g., Compl. ¶¶ 171, 176. And in Count VI, the Individual Plaintiffs claim that they were denied equal protection when they were personally injured as a result of their inclusion. See id. ¶ 208. To prevail on these claims, Plaintiffs must show that

Defendants' conduct (1) was motivated by a discriminatory purpose, and (2) had a discriminatory effect. See Alston, 853 F.3d at 906. Plaintiffs fail to show either.

### A. Plaintiffs fail to allege a discriminatory purpose.

Plaintiffs' allegations of racial and ethnic animus fail for two reasons. First, the allegations pertain only to the inclusion of gang membership data in CLEAR. See Compl. Section III B. Plaintiffs do not charge that the sharing or usage of that data has been motivated by a discriminatory purpose. But the decision to designate someone as a gang member, even if motivated by discriminatory intent, does not give rise to an equal protection claim because collecting information, standing alone, does not constitute "treatment" of Plaintiffs. Indeed, information as such "is a rather neutral entity." United States v. State of New Hampshire, 539 F.2d 277, 280 (1st Cir. 1976) (upholding requirement to provide racial and ethnic employee data to the government). Information "becomes meaningful" only once it is used, and its collection is not prohibited simply because it "might" be misused in the future; rather, judicial scrutiny is warranted only when the government takes "positive steps . . . based on the data." Id. See also Morales v. Daley, 116 F.Supp.2d 801, 814 (S.D. Tex. 2000) (rejecting equal protection challenge to collection of race and ethnicity information due to "the distinction between *collecting* . . . information [the government] believes at a given time it needs in order to govern, and government *use* of suspect classifications without a compelling interest") (emphasis added); Sussman v. Tanoue, 39 F. Supp. 2d 13, 25 (D.D.C. 1999) (explaining that equal protection claim must be based on "the uses" of the information rather than its collection), abrogation on other grounds recognized by Smith-Thompson v. District of Columbia, 657 F. Supp. 2d 123 (D.D.C. 2009). For this reason alone, Plaintiffs' equal protection claim should be dismissed.

Second, Plaintiffs' allegations of discriminatory intent are too general. Plaintiffs simply allege, in various ways, that some CPD officers harbor general racial or ethnic animus. Compl.

¶¶ 61-67, 177. These allegations do not suffice; rather, Plaintiffs must plead plausible allegations showing that the particular decisions to include them in the database were motivated by a discriminatory purpose. In <u>Chavez v. Illinois State Police</u>, the Seventh Circuit held that plaintiffs bringing a racial profiling claim could not prevail by pointing to general allegations of discriminatory animus harbored by law enforcement, but had to show that they were stopped because "the defendant officers involved in their stops" were motivated by a discriminatory intent. 251 F.3d 612, 646 (7th Cir. 2001). <u>See also</u> <u>McCleskey v. Kemp</u>, 481 U.S. 279, 292 (1987) (rejecting equal protection claim because the plaintiff failed to prove "that the decisionmakers in <i>his</i> case acted with discriminatory purpose."). The Individual Plaintiffs allege no specific basis to believe that the officers who designated them harbored, much less acted upon, discriminatory intent. Warner and Pedrote do nothing more than baldly assert that they were designated because of their race or ethnicity, <u>see</u> Compl. ¶¶ 111, 135, which is insufficient, <u>see</u> <u>Chavez</u>, 251 F.3d at 646 (holding that officer's reference to "you people" during a stop was too vague to establish discriminatory animus). <u>See also</u> <u>Iqbal</u>, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Cooper, for his part, alleges that he "does not know . . . how he was first" designated as a gang member, Compl. ¶ 126, and Lucas affirmatively alleges that he was labeled not because of his race, but because of his tattoo, <u>see</u> <u>id.</u> ¶ 94.

Plaintiffs fare no better in alleging that the City's practices regarding gang designations are the source of discriminatory animus. Plaintiffs point to no facts showing that the City encourages or requires officers to racially profile people in deciding whether to designate them as gang members. <u>See</u> <u>Chavez</u>, 251 F.3d at 646 ("The allegations pertaining to the practices and procedures of the ISP do not demonstrate discriminatory intent in the stopping of the named

plaintiffs because plaintiffs have not shown that the ISP required or encouraged Valkyrie officers to racially profile.").  Indeed, Plaintiffs acknowledge that the City's gang designation criteria do not call for officers to consider race or ethnicity.  See Compl. ¶¶ 31-32.  If anything, Plaintiffs' allegations about the City's gang suppression tactics indicate that those efforts have been motivated by factors other than racial animus, such as "sensationalized media coverage of gang violence[,]" id. ¶ 38, a "sharp[]" increase in Chicago's homicide rate, id. ¶ 43, and the City's prioritization of "'hot spots' of criminal activity" and known gang boundaries, id. ¶¶ 40, 43.  In fact, Plaintiffs concede the City's prioritization of areas associated with high crime and gang activity is what makes it "more likely" that Black and Latinx are designated in CLEAR.  Id. ¶ 47.[12]  Thus, given the "obvious alternative explanation[s]" Plaintiffs provide for a disproportionate number of Black and Latinx persons being designated as gang members, and the dearth of allegations suggesting that the City or its officials encourage racial and ethnic profiling, invidious racial discrimination "is not a plausible conclusion" here.  See Iqbal, 556 U.S. at 682.

**B.  Plaintiffs fail to allege discriminatory impact.**

Plaintiffs' equal protection claims also fail because they do not establish disparate impact.  To do so, Plaintiffs must show that they are members of a protected class and that they were treated differently from people in an unprotected class who were similarly situated to them.  See Alston, 853 F.3d at 906.  Plaintiffs may do this either through statistics, or by identifying "a particular similarly situated member of the unprotected class who was treated differently from [them]."  Id.  Plaintiffs choose only the statistical route; they do not identify a particular white

---

[12] See also Iqbal, 556 U.S. at 682 (noting that because the September 11 attacks were perpetrated by Arab Muslims at the direction of an Arab Muslim with mostly Arab Muslim followers, it was no surprise "that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims.").

individual who the police suspected of being a gang member but nonetheless chose not to include in CLEAR because he was white.

As to the statistics, Plaintiffs cite the percentages of Black and Latinx people allegedly included as gang members in CLEAR.  See Compl., § III.A.  These show – at most – that minority groups are more frequently *identified* as gang members internally in CPD's database than are whites, but not that minorities suffer disparate rates of *adverse impact* by CPD officers (or other agencies) as a result of law enforcement acting on those designations.  "[P]arties may not prove discrimination merely by providing the court with statistical analyses;" rather, the statistics must "address the pertinent question."  Chavez, 251 F.3d at 638.  See also United States v. Nichols, 512 F.3d 789, 795-96 (6th Cir. 2008) ("bald accusations and irrelevant generalized statistics do not even come close to constituting what is necessary to establish a *prima facie* case of an equal protection violation.").

The statistics also fail on their own terms.  For instance, Plaintiffs contend that 95% of the people identified as gang members in CLEAR are Black or Latinx, whereas, on a nationwide basis, only 81% are.  Compl. ¶ 172.  The comparison to nationwide statistics does not help Plaintiffs, since national statistics encompass many geographic regions with distinct populations. Plaintiffs are silent as to actual gang membership rates by race and ethnicity in Chicago, and, since Chicago gangs may be especially concentrated in predominantly Black or Latinx neighborhoods, their rates of inclusion in CLEAR may accurately reflect actual rates of gang membership in Chicago.  Indeed, Plaintiffs themselves allege that "hot spots" for gang activity are "usually in poorer neighborhoods comprised predominantly of racial minorities." Id. ¶ 40. And while Plaintiffs claim that the CLEAR data "includes approximately 11 percent of Chicago's Black population, 4 percent of the Latinx population, and only 0.6 percent of the white

population," id. ¶ 174, they do not explain why general population numbers are an appropriate comparator. Indeed, in Chavez, the Seventh Circuit rejected a racial profiling claim where the plaintiff compared rates of minorities being pulled over while driving to their representation in the general population, since the latter did not address how often minorities in the general population drive on state roads. See 251 F.3d at 644-65. Similarly, in Alston, the Seventh Circuit rejected an equal protection challenge to a deterrence program for repeat offenders where 86 percent of the people in the program were Black, but Blacks accounted for only 4.5 percent of the city's population and 38 percent of arrests. The problem was that the statistics did not "address the pertinent question" – namely, how Black repeat offenders were treated as compared with white repeat offenders; comparing the percentage of Black repeat offenders with the percentage of Black arrestees or Blacks in the city's general population was insufficient. Alston, 853 F.3d at 907. See also Jackson v. Cerpa, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) (explaining that "[a] statistical analysis must cross a threshold of reliability before it can show even a prima facie case of disparate impact."). Plaintiffs' statistics here suffer from these same flaws, and they therefore fail to allege discriminatory impact. Counts II and V should therefore be dismissed.

**V.     Plaintiffs Fail To State A Fourth Amendment Claim.**

In Count III, Plaintiffs, on behalf of the organizations and a putative class, allege that CPD violates the Fourth Amendment by conducting searches and seizures that are unreasonable, because they are based solely on the fact that a person was designated as a gang member. And in Count VII, Warner brings an individual claim against Defendant Toldeo for false arrest under the Fourth Amendment. Warner alleges that Toledo arrested him for unlawful solicitation of business only because Toledo believed that Warner was a gang member. See Compl. ¶¶ 118-20, 213. These claims should be dismissed because they fail to allege a Fourth Amendment

26

violation. Even if Plaintiffs are correct that a person's gang designation induces officers to stop or search them, that does not mean that the Fourth Amendment is violated. Rather, under the objective standards that apply, a stop or search is lawful so long as any lawful basis existed for the action, regardless of the officer's particular motivations.

A warrantless arrest is valid so long as "there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). This standard is an objective one: "The court evaluates probable cause not on the facts as an omniscient observer would perceive them, but rather as they would have appeared to a reasonable person in the position of the arresting officer." Mustafa v. City of Chicago, 442 F.3d 544, 547 (7th Cir. 2006) (quotations omitted). As a result, an arrest will be upheld even if probable cause did not exist to arrest the offender for the offense charged, so long as the officer "would have had probable cause to arrest [plaintiff] for *any* offense," Williams v. Rodriguez, 509 F.3d 392, 399 (7th Cir. 2007) (emphasis added), see also id. at 401, and "even where the defendant officers allegedly acted upon a malicious motive." Mustafa, 442 F.3d at 547. See also Duncan v. Fapso, 216 Fed. Appx. 588, 590 (7th Cir. 2007) ("It simply does not matter that Fapso *announced* he was arresting Duncan for possession of drug paraphernalia so long as he had probable cause to arrest for *any* offense.") (emphasis in original). An objective standard also governs temporary stops subject to the reasonable suspicion test. See United States v. Barnett, 505 F.3d 637, 639-40 (7th Cir. 2007).

Here, Plaintiffs' threadbare allegations do not offer facts showing that probable cause or reasonable suspicion for any offense was lacking when officers stopped or arrested people designated as gang members. For instance, Warner does not allege that Toledo lacked probable cause to arrest him for any offense; he claims only that there was no probable cause for the

27

particular offense charged – unlawful solicitation of business.  Since lacking probable cause for the charged offense does not, by itself, mean that an arrest was unlawful, Warner fails to state a claim for violation of the Fourth Amendment.  Plaintiffs' organizational and class claims fail for the same reasons.  Accordingly, Counts III and VII should be dismissed.

## VI.      Plaintiffs Fail To State A Basis For Liability Against The City.

Even if Plaintiffs had standing to bring the claims against the City in Counts I, II, III, V and VI, and even if those counts state a claim, they should still be dismissed because the City cannot be held liable for the violations alleged in those counts.  Under section 1983, the City may not be held vicariously liable under a respondeat superior theory for the acts of its employees.  Rather, the City is liable only if Plaintiffs establish that the allegedly unconstitutional acts by individual police officers were committed pursuant to a City policy.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 694 (1978); Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986); Baskin v. City of Des Plaines, 138 F.3d 701, 704 (7th Cir. 1998).  A plaintiff can establish the requisite policy by showing either: (1) an express City policy; (2) a widespread municipal practice "so permanent and well settled as to constitute a custom or usage with the force of law"; or (3) the action of a person with "final policymaking authority."  Baskin, 138 F.3d at 704-05 (internal quotations omitted); see also Monell, 436 U.S. at 690-91.

As to the first two ways to show a policy, Plaintiffs do not, with one potential exception, identify an express City policy, or a decision by a person with final policymaking authority, that caused their gang designations to be used against them in a way that violated their rights.[13]  Nor

---

[13]  Plaintiffs allege that a CPD directive requires I-Bonds to be denied to verified gang members arrested for jailable offenses. See Compl. ¶ 85(h).  Assuming for purposes of this motion that the directive qualifies as a City "policy" under Monell, it would subject the City to potential liability only as to Cooper's claim.  And, as explained in section III.B. above, Cooper's claim based on denial of an I-Bond fails on the merits.

do Plaintiffs show that there is a custom and practice with the force of law of misusing gang information.  The City is liable only where there was "a substantial risk of harm" of misuse of gang designation information, and the City "was aware of such a risk."  Chatham v. Davis, 839 F.3d 679, 685 (7th Cir. 2016).  As explained above, see supra at 6-10, Plaintiffs fail to allege a substantial risk of harm resulting from gang designations, and, even if they had, Plaintiffs' conclusory allegations that CPD "is aware of the harms suffered" by class members, Compl. ¶ 165, does not suffice; plaintiffs must "'plead[] factual content that allows the court to draw the reasonable inference' that the City maintained a policy, custom, or practice" that deprived them of their constitutional rights.  McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  Here, Plaintiffs plead no basis for concluding that the City was sufficiently aware that street-level officers routinely rely upon erroneous gang designations in CLEAR as a basis for making decisions that result in the denial of constitutional rights.  See Latuszkin v. City of Chicago, 250 F.3d 502, 505 (7th Cir. 2001) (affirming dismissal of complaint where plaintiffs failed to allege facts showing that municipal policymakers were aware of alleged violations).  Indeed, even if the City was aware of all 9 of the specific instances of harm over 20 years alleged in the Complaint (an awareness that Plaintiffs do not assert), that number would be too small to show that the City had knowledge. See Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005) (holding that allegations of more than 200 incidents of misuse of pepper spray, standing alone, was insufficient to establish a widespread practice under Monell).

Similarly, while Plaintiffs contend that the City has acted with deliberate indifference to their rights, see Compl. ¶¶ 167, 178, 185, they provide no basis for that conclusion; the 9 alleged instances of violations are not enough.  See Palmer v. Marion Cnty., 327 F.3d 588, 596 (7th Cir.

29

2003) ("proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference").  The City's culpability is even further removed as to the decisions made by other governmental entities, such as federal immigration authorities or Cook County.  Plaintiffs plead no facts suggesting that CPD is aware of those decisions, and, in any event, the City is not causally responsible for them.  See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997) (explaining that "a plaintiff must . . . demonstrate a direct causal link between the municipal action and the deprivation of federal rights") (citation omitted); CSX Transp., Inc. v. McBride, 564 U.S. 685, 692 (2011) (explaining that causation is a standard element of liability for a constitutional tort).

Accordingly, Plaintiffs fail to meet the requirements for pleading a claim against the City, and the Court should therefore dismiss Counts I, II, III and VI in their entirety, as well as Count V to the extent that it is brought against the City.

## VII.    Qualified Immunity Bars Warner's Claims Against Defendants Golden, Toledo, and Tomaso.

Defendants Golden, Toledo, and Tomaso are defendants only as to Plaintiff Warner's claims that Golden and Tomaso violated due process when they designated him as a gang member (Count V), and that Toledo violated his Fourth Amendment rights when Toledo arrested him based on that designation (Count VII).  These claims should be dismissed because these defendants enjoy qualified immunity.  Qualified immunity shields police officers "who act in ways they reasonably believe to be lawful," and they are liable only if their conduct violates a constitutional or statutory right clearly established at the time of the alleged conduct.  Ewell v. Toney, 853 F.3d 911, 919 (7th Cir. 2017) (citations and internal quotation marks omitted).  In other words, "if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability."  Ziglar v. Abbasi, 137 S. Ct. 1843, 1867

30

(2017). Plaintiffs bear the burden of defeating qualified immunity, see Mannoia v. Farrow, 476 F.3d 453, 457 (7th Cir. 2007), which means that they must show that (1) they have alleged facts that establish a constitutional violation, and (2) case law existing at the time of Defendants' alleged conduct clearly established that their conduct violated the law. See Pearson v. Callahan, 555 U.S. 223, 232 (2009); Jacobs v. City of Chicago, 215 F.3d 758, 766 (7th Cir. 2000). The Court may consider these factors on a motion to dismiss under Rule 12(b)(6). See Iqbal, 556 U.S. 662; Ashcroft v. al-Kidd, 563 U.S. 731 (2011); Saucier v. Katz, 533 U.S. 194, 200 (2001) ("Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.").

Each of Warner's claims against the named officers fails at the first step of this inquiry. For the reasons discussed in sections III and V above, Warner does not state a due process or false arrest claim. The officer defendants are therefore entitled to qualified immunity for this reason alone.

Warner also fails at the second step of the qualified immunity inquiry with respect to Count V. Warner's due process claim against Defendants Tomaso and Golden is premised solely on the allegation that the officers "falsely labelled Plaintiffs as members of Chicago street gangs and included their identifying information in the CPD's Gang Database without justification." Compl. ¶¶ 196. As explained above, the law is clear that creating an inaccurate police record does not violate due process. Thus, even if the Court were to conclude in this case that the officers acted unreasonably in including information about Warner's suspected gang affiliation in CPD's investigative records (and they did not), they would still be shielded from liability because the law existing at the time of their conduct did not clearly establish that

31

maintaining inaccurate records about gang membership violates due process.  See supra § III.A.

See also, e.g., White v. Pauly, 137 S. Ct. 548, 551 (2017) ("existing precedent must have placed

the statutory or constitutional question beyond debate.") (internal quotation marks and citation

omitted).  As Plaintiffs cannot meet their burden of showing that Defendants violated clearly

established law, Count V should be dismissed.[14]

## VIII.  Plaintiffs Fail To State An ICRA Claim.

In Counts IV and X, Plaintiffs seek damages against the City under the Illinois Civil

Rights Act of 2003 ("ICRA"), 740 ILCS 23/5, on behalf of a sub-class and organization

members (Count IV) and on behalf the Individual Plaintiffs (Count X).  Should the Court

exercise supplemental jurisdiction over this state-law claim, the Court should dismiss it for

failure to state a claim under ICRA.[15]

ICRA provides that no unit of local government shall "utilize criteria or methods of

administration that have the effect of subjecting individuals to discrimination based on their race,

---

[14]  Further, Plaintiffs fail to adequately allege a basis for punitive damages against the officers.
Punitive damages may be assessed under § 1983 when a defendant's conduct is "motivated by
evil motive or intent, or when it involves reckless or callous indifference to the federally
protected rights of others."  Soderbeck v. Burnett Cnty., Wis., 752 F.2d 285, 290 (7th Cir. 1985)
(quoting Smith v. Wade, 461 U.S. 30, 55 (1983)).  See also Hendrickson v. Cooper, 589 F.3d
887, 894 (7th Cir. 2009).  Plaintiffs' allegations do not show this.  Plaintiffs attempt to support
their request for punitive damages by characterizing the officers' actions as "unreasonable" and
"undertaken intentionally, with malice and knowing disregard," Compl. ¶¶ 203, 214, or "with
malice, willfulness, and reckless indifference," Compl. ¶ 242, but these conclusory boilerplate
allegations do not suffice.  See Iqbal, 556 U.S. at 678.  Indeed, as discussed in sections III and V
supra, Plaintiffs' allegations do not show improper actions or motives of the officers.  The
request for punitive damages should therefore be dismissed.

[15]  The City assumes here, but does not concede, that ICRA applies to policing strategies.  ICRA
was enacted with the express intent "to provide a state law remedy that was *identical* to the
federal disparate impact canon," Jackson v. Cerpa, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010)
(citing Ill. Native Am. Bar Ass'n v. Univ. of Ill., 856 N.E.2d 460, 466-67 (1st Dist. 2006)), but
federal disparate impact liability has traditionally been associated with employment and housing
policies, not policing strategies.

color, national origin, or gender." 740 ILCS 23/5(a)(2). To state a claim under ICRA, Plaintiffs

must "isolat[e] and identify[] the specific . . . practices" allegedly responsible for the

discrimination. Swan v. Bd. of Educ. of City of Chicago, No. 13 C 3623, 2013 WL 4401439, at

*19 (N.D. Ill. Aug. 15, 2013) (quoting Puffer v. Allstate Ins. Co., 675 F.3d 709, 717 (7th Cir.

2012)). "Simply pointing to a generalized policy" is not enough. Id. And even if Plaintiffs clear

this hurdle, they must also establish that the identified practice causes a disparate impact and

offer statistical evidence sufficient to show that the practice has injured Plaintiffs because of their

membership in a protected group. Id. at *19, *21.

Plaintiffs fail these requirements. First, Plaintiffs fail to identify a specific City practice.

See Welch v. Eli Lilly & Co., 585 F. App'x 911, 913 (7th Cir. 2014); Swan, 2013 WL 4401439,

at *19. Plaintiffs claim the City has a "policy and practice of including Black and Latinx

individuals who have not participated in any gang activity in the Gang Database for no justifiable

reason other than their race and national origin." Compl. ¶¶ 190, 232. See also id. ¶ 235. But

this allegation fails to identify any specific policy. At most, Plaintiffs challenge a multitude of

individual, day-to-day decisions by police officers to record gang affiliation or membership

information based on the facts available to them in a particular situation in the field. Indeed, far

from alleging a systemic policy, Plaintiffs allege that individual officers are afforded discretion

as to who to designate. See id. ¶ 3. And any racial or ethnic disparities that result may be

explained by any number of factors other than a specific City policy, such as the demographics

of gang membership, arrest patterns, which individuals choose to self-admit to gang

membership, and targeted investigations that focus on specific gangs. See Swan, 2013 WL

4401439, at *19 ("Failure to identify the specific practices could lead to [defendants] being held

liable for the myriad of innocent causes that may lead to statistical imbalances.") (quoting

33

<u>Puffer</u>, 675 F.3d at 717). Further, while Plaintiffs allege ways in which CPD officers might harbor or act on general racial or ethnic animus, none of these allegations are tied to a specific policy or practice with any relation to the collection of gang information. <u>See</u> Compl. ¶¶ 61-67. As Plaintiffs point to nothing more than a "generalized policy," rather than a specific practice, they fail to state an ICRA claim. <u>Swan</u>, 2013 WL 4401439, at *19.[16]

Second, even if Plaintiffs sufficiently alleged a specific policy, they fail to allege facts demonstrating that it results in a disparate impact. In order to state an ICRA claim, Plaintiffs must "show that they have been subjected to an adverse action" because of the policy at issue. <u>Swan</u>, 2013 WL 4401439, at *21. But, as explained above, even if Plaintiffs' statistical evidence showed disparate rates of <i>inclusion</i> of gang information in CPD records (and it does not), Plaintiffs allege no facts showing that such disparity in recordkeeping results in tangible, adverse effects on Black or Latinx individuals on a disparate basis. <u>See supra</u> § IV.B. Plaintiffs' ICRA claims fail for this reason as well. <u>See</u> <u>Farrell v. Butler Univ.</u>, 421 F.3d 609, 617 (7th Cir. 2005) ("To have standing to bring a disparate impact claim, a plaintiff must show that she was personally injured by the defendant's alleged discriminatory practice."); <u>Carpenter v. Bd. of Regents of Univ. of Wis. Sys.</u>, 728 F.2d 911, 915 (7th Cir. 1984) ("[Plaintiff] simply failed to prove that the practices of which he complained had the discriminatory effect of which he complained."). For all these reasons, Counts IV and X should be dismissed.

---

[16] Relatedly, Plaintiffs fail to allege that CPD utilizes a "criteria" or "method of administration," as required to show an ICRA violation. <u>See</u> 740 ILCS 23/5(a)(2). CPD officers deciding to include individuals as potential gang affiliates in internal records is not a criteria or method of administration, but simply information gathered as part of police investigations. Plaintiffs' use of the words "criteria" and "method" without any elaboration does nothing to overcome this deficiency. <u>See</u> Compl. ¶¶ 191, 233.

## IX.    Warner Fails To State A Claim For Malicious Prosecution.

In Count XI, Warner sues Defendant Toledo for malicious prosecution under state law.

Should the Court opt to rule on this state-law claim, it should be dismissed.  To establish this

claim, Warner must show that: (1) Toledo commenced an original criminal or civil proceeding;

(2) the proceeding terminated in Warner's favor, meaning that the termination indicates that the

defendant was innocent; (3) Toledo instituted the proceeding without probable cause; (4) Toledo

acted maliciously in initiating the proceeding; and (5) Warner was injured.  Washington v.

Summerville, 127 F.3d 552, 557 (7th Cir. 1997).  Warner's claim fails because he does not

establish the second and fourth elements.

As to the second element, Warner does not allege that the prosecution stemming from his

arrest was terminated in a manner indicative of his innocence.  He bears the burden of showing

this, see id., but he does nothing more than plead that the case against him was voluntarily

dismissed after a number of continuances.  See Compl. ¶ 214.  But a prosecutor's decision to

non-suit a case, without more, does not indicate the innocence of the accused.  See Summerville,

127 F.3d at 558 ("[a] bare nolle prose without more is not indicative of innocence."); Swick v.

Liautaud, 169 Ill. 2d 504, 514 (1996).  Nor does the Certified Statement of Conviction /

Disposition, which the Court may take judicial notice of, see Adebiyi v. Felgenhauer, 2010 WL

1644255, at *2 (N.D. Ill. 2010), set forth on its face any basis for concluding that the case was

non-suited because Warner was actually innocent.  See Exhibit B hereto.  And as to the fourth

element, Warner fails to allege facts indicating that Toledo maliciously initiated or continued the

criminal case against him.  Warner does no more than plead conclusory labels of malice.  See

Compl. ¶¶ 240, 242.  These are insufficient to state a malicious prosecution claim.  See Welton

v. Anderson, 770 F.3d 670, 674 (7th Cir. 2014), abrogated on other grounds by Manuel, 137 S.

Ct. 911; <u>Tully v. Barada</u>, 599 F.3d 591, 594-95 (7th Cir. 2010).  For both of these reasons, the Court should dismiss Count XI.

**X.  Plaintiffs' Respondeat Superior and Indemnification Claims Should Be Dismissed.**

Count XII seeks to hold the City liable for the acts of the Individual Defendants under a respondeat superior theory, and Count XIII seeks to hold the City liable for compensatory damages that may be awarded against the Individual Defendants for acts within the scope of their employment, under a theory of indemnification.  Both claims are viable only if the Individual Defendants are liable for wrongdoing in their individual capacities, and, for the reasons set forth above, they are not.  Counts XII and XIII should therefore be dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Counts I, II, III, IV, VI, VII, VIII, X, XI, XII, and XIII should be dismissed in their entirety, and Count V as against the named defendants, and grant Defendants such further relief as the Court deems just and appropriate.

Respectfully submitted,

EDWARD N. SISKEL,
Corporation Counsel for the City of Chicago


By:      /s/ Andrew Worseck
             Chief Assistant Corporation Counsel

Andrew W. Worseck
Tara D. Kennedy
Jordan Rosen
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-7129 / 744-9028 / 744-9018

36

# Exhibit A

| | Chicago Police Department | General Order   G10-01 |
|---|---|---|
| | **GANG VIOLENCE REDUCTION STRATEGY** | |

| ISSUE DATE: | 31 December 2015 | EFFECTIVE DATE: | 01 January 2016 |
|---|---|---|---|
| RESCINDS: | 13 October 2015 Version | | |
| INDEX CATEGORY: | Gang and Narcotic Abatement | | |

**I.    PURPOSE**

This directive:

A.    establishes the Chicago Police Department Gang Violence Reduction Strategy (GVRS) to combat gang-related murders, shootings, and general violence related to gang activity.

B.    continues the:

1.    Chicago Police Department Gang Audit.

2.    CLEAR Arrestee Debriefing Module.

3.    CLEAR Firearm (CAGE) Report.

C.    delineates specific duties and responsibilities for Department members in the implementation of GVRS.

D.    *updates terms relative to the Investigatory Stop System.*

**II.    GANG VIOLENCE REDUCTION STRATEGY**

The Department GVRS:

A.    is comprised of multiple components: information gathering, analysis, dissemination of intelligence, linking of gangs to their factions, social network mapping, and a variety of mission-specific operations focused on targeted gang members and their associates.

B.    actively promotes inter-bureau efforts to work in a concerted manner to develop information and intelligence to combat gang violence and violent crime.

C.    establishes the expectation that the intelligence collected and disseminated will be utilized to proactively prevent escalating gang violence and associated retaliations.

**III.    PRINCIPLES OF THE GANG VIOLENCE REDUCTION STRATEGY**

A.    The Department's commitment to professionalism, obligation, leadership, integrity, courage, and excellence has driven many meaningful public safety achievements.  The Chicago Police Department conducts training and establishes procedures consistent with the concept of Legitimacy and Procedural Justice, with the goal of strengthening our relationship with the community and ultimately improving officer safety and efficiency. The concept of Legitimacy and Procedural Justice consists of the following four principles:

1.    Giving others a voice (listening);

2.    Neutrality in decision making;

3.    Respectful treatment; and

4.    Trustworthiness.

B.    By fostering an environment where procedural justice principles become standard practice, the Department can create an organizational culture that fosters a true partnership with the public and leads to safer and more prosperous communities.

IV.  **TECHNOLOGICAL COMPONENTS OF GVRS**

    A.  Gang Audit

        1.  The cornerstone of the Gang Violence Reduction Strategy is the Gang Audit. The Gang Audit is designed to gather the following intelligence from each district: gang name, gang faction name, territorial borders, faction size, alliances, conflicts, organizational level, and propensity for violence. The Gang Audit is the foundation of gang intelligence in each district and will be regularly reviewed and updated.

        2.  District commanders are responsible for the performance of a Gang Audit in their respective districts at least once a year, but more if necessary, according to the procedures described in the Department directive entitled "**Gang Audits.**"

    B.  Strategic Subject List (SSL)

    The SSL is based on the concept of two degrees of separation: This model looks at individuals with criminal records who are ranked according to their probability of being involved in a shooting or murder, either as a victim or an offender, known as a "Party to Violence" (PTV). The software looks at attributes of a persons criminal record, including the record of violence among criminal associates, the degree to which his criminal activities are on the rise, and the types of intensity of criminal history.

    C.  The District Intelligence Bulletin (DIBS)

        1.  DIBS reports, produced by the Information Services Division (ISD) for each district, contain gang intelligence that is specific to each district.

        2.  DIBS reports are accessible on the Department intranet and on portable data terminals (PDTs).

    D.  Major Incident Notification (MIN) application

        1.  The MIN application provides a short description of major incidents and is available to all Department members.

        2.  The MIN application is available after logging into CLEAR Applications.

V.  **PROSECUTORIAL CONSIDERATIONS**

    The following programs will be used to combat gang violence and aid in the prosecution of violent gang members:

    A.  The Gang Intervention Probation Program (GIPP)

        1.  Consistent with the Department directive entitled "**Gang Intervention Probation Program**," the GIPP is a collaborative effort of the Department, the Cook County State's Attorney's Office (CCSAO), and the Cook County Adult Probation Department.

        2.  The GIPP deters individuals placed in the program from criminal gang activity using conditions of probation. Gang members that are convicted of felonies and sentenced to probation will also be sentenced to gang probation.

        3.  District commanders will ensure that a list of gang members that are enrolled in the GIPP program is disseminated to district personnel.

        4.  Enforcement action will be taken against gang members that violate their gang probation as follows:

            a.  mandatory curfew hours;

            b.  residency requirement;

            c.  prohibition against associating with gang members; and

            d.  proscription against participating in gang activity.

B. The Targeted Repeat Offender Apprehension and Prosecution (TRAP) Program

    1. TRAP offenders will normally be selected by District Commanders using the below listed criteria:

        a. Gang Affiliation,

        b. U.U.W. Arrest History,

        c. Convicted Felon,

        d. Victim of a Shooting,

        e. Role within the Gang,

        f. On Parole,

        g. Violent Crime History,

        h. Propensity for Violence,

        i. Strategic Subject List Membership,

        j. Affiliation with Other Gang Members.

    2. The TRAP Program, consistent with the Department directive entitled, "**Targeted Repeat-Offender Apprehension and Prosecution (T.R.A.P.) Program**" developed with the cooperation of the Cook County State's Attorney's Office, allows the Department and the State's Attorney's Office to work together to identify repeat offenders with a high propensity toward violent, gang-related crime.

C. The Racketeer Influenced and Corrupt Organizations (RICO) Act

The Department is committed to collaborating with the Cook County State's Attorney's Office and the United State's Attorney's Office for prosecutions that fall within the purview of the RICO Act.

D. Instant Update Unit, Records Division

The Instant Update Unit will review all rap sheets and identify arrestees that are on parole, probation, have pending felony charges, or out on bond for misdemeanor charges that have not been adjudicated.

# VI. FOCUSED DETERRENCE

A. The Department's focused deterrence approach is based on the finding that a significant percentage of violent incidents is closely associated with groups of high-rate repeat offenders.

B. Focused deterrence involves a partnership between law enforcement officials, social service providers, and community members.

C. The goal of focused deterrence is to change the behavior of both individual groups and the local network of groups.

D. Focused deterrence proceeds as follows:

    1. Violent groups, the individuals within those groups, and the relationship between the groups are identified.

    2. "Call-in" sessions with representatives of the groups are convened to deliver a focused deterrence message to the group.

        **NOTE:** Individuals on probation or under parole supervision can be legally mandated to attend call-in sessions.

        a. The general message conveyed is "We will help you if you will let us, but we will stop you if you make us." There will be a clear message that the group will be dismantled if they do not comply.

b. Additional messages are designed so that group members perceive they have a face-saving exit from a violent lifestyle if they so choose.

3. During the call-in sessions, a clear and consistent message of nonviolence is delivered by law enforcement officials, social service providers, and community members.

a. Law enforcement personnel will inform group members of focused scrutiny on violent incidents. The next violent incident will result in swift, targeted enforcement—using any legal means available—of the entire group that is affiliated with the individual responsible for the violence. Only the offender will be held accountable for the violent incident itself, but any and all criminal activities of other group members (such as probation and parole violations, drug dealing, open cases, and warrants) will receive increased scrutiny by law enforcement personnel.

b. Social service providers will present alternatives to violence by offering job referrals as well as educational and social services to those individuals who want them.

c. Community members will demand an end to the violence, articulating the damage it produces and invalidating any excuses for the violent behavior.

4. Following the first law enforcement action focused on a violent group, the call-in session will be reconvened.

E. **The success of focused deterrence rests on the relentless delivery of the promises made during the call-in sessions.**

1. Law enforcement personnel will respond swiftly to subsequent violent incidents and intelligence is organized to aid in this effort.

2. Social service providers will meet the individualized needs of those who choose to transition to a life of nonviolence and intake processes are streamlined to facilitate this process.

3. Community members will continue to deliver the message of nonviolence subsequent to the call-in, presenting a united front with law enforcement personnel.

F. Custom Notification is a process that identifies potential criminal actors and victims associated with the continuum of violence. Once identified, the individual is notified of the risk and consequences that will result should they engage in criminal conduct or continue in violent activity.

1. The goal is to ensure the individual is not only informed of the law enforcement consequences for deciding to engage or continue in gun violence, but also of the devastating impact of gun violence within their community. Opportunities for seeking assistance will also be provided during the custom notification. However, it is ultimately the decision of the individual to choose not to engage in criminal activity.

2. Custom notifications will be conducted consistent with the Department directive entitled "**Custom Notifications in Chicago**."

## VII. PROACTIVELY POLICING GANG FACTIONS

District commanders will:

A. identify and prioritize the gang factions within their districts with the highest propensity for violence.

B. ensure the prioritized list of gang factions is distributed to all beat officers, tactical teams, and area saturation teams within their districts.

C. coordinate deployment strategies with the tactical and saturation team supervisors based on the prioritized list.

D. ensure district tactical and saturation teams continuously focus enforcement activities on the most violent gang factions identified on the list.

E. review, select, and update the prioritized list on a continual basis.

**VIII.    BUREAU OF PATROL RESPONSIBILITIES**

District commanders will:

A.    ensure beat assignment integrity is maintained.

    1.    Beat assignment integrity is defined as a strategy that enables police officers and supervisory personnel to become familiar with crime conditions and issues of concern to the community on their beat or within their sector. This strategy is attained through the consistent assignment of officers and supervisory personnel to regularly assigned beats and sectors.

    2.    District supervisory personnel have final authority regarding the dispatch of assignments and will monitor all calls and take appropriate action to ensure that the integrity of beat assignments is maintained.

B.    appoint a member to serve as the district intelligence officer. The responsibilities of the district intelligence officer are described in the Department directive entitled "**District Intelligence Officer.**"

C.    ensure targeted vehicle enforcement missions are conducted.

    1.    A goal of targeted vehicle enforcement missions is to reduce gang violence, shootings, and drive-by shootings by enforcing the appropriate statutes and ordinances.

    2.    Members assigned to a targeted vehicle enforcement mission will focus their efforts on impounding vehicles for the following offenses: an assault weapon or narcotics in the vehicle, a revoked or suspended driver's license, playing music too loud, possession of spray paint by a minor in the vehicle, possession of an altered handicap permit, displaying a false temporary registration permit, soliciting a prostitute, fireworks in the vehicle, fleeing a police vehicle, and other appropriate ordinances that allows impounding a vehicle.

        **NOTE:**    Members will impound vehicles consistent with the Department directive entitled "**Impoundment of Vehicles for Municipal Code Violations.**"

    3.    Additional targeted vehicle enforcement will include conducting seat belt missions, red light missions, school safety zone missions, license plate reader enforcement, moving violation enforcement, and the issuance of parking citations.

D.    ensure the Gang Intervention Probation Program (GIPP) is used to combat gang violence consistent with Item V-A of this directive.

E.    ensure the Targeted Repeat-Offender Apprehension and Prosecution (TRAP) Program is used to combat gang violence consistent with Item V-B of this directive.

F.    ensure that I-Bonds **are NOT** issued for verified gang members that are charged with jailable offenses, consistent with the Department directives entitled "**Bond Procedures**" and "**Court Call Schedule**."

    1.    The following criteria will be used to determine criminal street gang membership:

        a.    The individual's admission to membership;

        b.    The wearing of distinctive emblems, tattoos, or similar markings indicative of a specific street gang;

            **NOTE:**    Membership in a gang will not be established solely because an individual is wearing clothes available for sale to the general public.

        c.    The use of signals or symbols distinctive of a specific criminal street gang; and/or

        d.    The identification of the individual as a member of a specific street gang through any database or information contained in the CLEAR system.

2.    An individual's gang-membership status and the criteria used to determine membership in a gang must be documented in the Arrest Report and a CLEAR Gang Arrest Card must be completed.

G.    consult with the Commander, Narcotics Division, relative to the use of a Narcotics Division Team as a support source within the district. After the successful completion of a street corner conspiracy mission, district commanders will:

1.    deploy resources to prevent violent street gangs from reestablishing their presence at that location.

2.    utilize city service requests to ensure the location receives "360 degrees" of city services.

**NOTE:**    The Commander, Narcotics Division, will ensure each district is assigned a Narcotics Division Team.

H.    ensure the following procedures are followed for all "shots fired" calls:

1.    The assigned unit immediately responds to the call and determines if the call is bona fide. If bona fide:

a.    make every effort to determine where the shots fired originated from;

b.    conduct a canvass and interview citizens at or near the location to gather information;

c.    utilize "shot-spotter'' technology when applicable;

d.    send a flash message of all available information, including offender descriptions, vehicle information, gang affiliation, and intended targets.

e.    request assistance from tactical teams when appropriate.

2.    Supervisors assigned to field duties will make every effort to respond to bona fide calls of shots fired and assist in information gathering.

I.    ensure tactical teams are not assigned outside of the district unless exigent circumstances exist or approval has been obtained by the Superintendent or the First Deputy Superintendent.

J.    ensure arresting officers:

1.    enter every arrestee's information into the search function of the CLEAR Gang Arrest Card application and document the results in the narrative portion of the Arrest Report.

2.    complete the automated Arrestee Debriefing Module for every arrestee.

**EXCEPTION:**    Bureau of Patrol members will not complete the automated Arrestee Debriefing Module when the arrestee is charged with any of the following: Murder, Shooting, Robbery, Arson, Justifiable Homicide, or Criminal Sexual Assault. The appropriate Bureau of Detectives personnel will conduct the follow-up investigation and complete the debriefing of the arrestee.

a.    The automated Arrestee Debriefing Module will be approved by a supervisor and automatically forwarded to CPIC for validation and dissemination.

b.    The completion of the Arrestee Debriefing Module does not relieve Department members of making timely notifications consistent with the Department directives entitled "**Information Report System**," "**Preliminary Investigations: Required Immediate Notifications,**" and "Supplementary Report General Directions (CPD-63.461)."

3.      when inventorying a firearm for a UUW violation, complete a CLEAR Firearm (CAGE) Report.

> **NOTE:**      The Firearm (CAGE) Report cannot be completed until the firearm inventory is approved by a supervisor. Once approved, the supervisor will instruct the inventorying officer to complete the report.

## IX.    IMMEDIATE POST-SHOOTING PROCEDURES

A.    Upon being assigned to a shooting, the first sworn Department member (regardless of rank) arriving on the scene will:

1.      verify that a person has been shot.

2.      immediately issue a flash message transmitted via radio, providing descriptions or other pertinent information on wanted persons and/or motor vehicles related to this specific shooting.

3.      ascertain and immediately notify CPIC of the following:

    a.      The victim's name and date of birth, if known;

    b.      The victim's gang affiliation, if any;

    c.      Any information known of the offender, such as name, gang affiliation, and/or associates;

    d.      Any gang conflicts occurring at or near the location of the shooting; and

    e.      The name and radio call number of the district supervisor assigned to the shooting.

B.    The assigned Bureau of Patrol field supervisor will:

1.      ensure that the Department members remaining on-scene are **only** those with assigned duties.

2.      ensure notification to the Crime Prevention and Information Center (CPIC) of any information and request a gang profile is completed for the victim, offender, associates, and location.

> **NOTE:**      The gang profile will include gang affiliation, arrests, associates, _Investigatory Stop Reports_, known conflicts, and possible retaliation information.

3.      upon receipt of the gang profile, consult with tactical team supervisors or, if unavailable, other district field supervisors to form a plan to prevent immediate retaliation for the shooting.

4.      notify the Gang Enforcement Division via CPIC.

C.    The beat officer assigned the original shooting will document in a General Offense Case Report the actions taken by district officers and who was assigned to conduct the follow-up Gang Violence Reduction Strategy. If the shooting does not appear to be gang related, the officer assigned to the shooting will indicate the following in the narrative of the case report: "Based on the facts available at this time, this incident does not appear to be gang related."

D.    The officers assigned to conduct the follow-up Gang Violence Reduction Strategy will submit an Information Report outlining the information gathered on a possible retaliation and what steps were taken to prevent the retaliation by the end of their tours of duty.

> **NOTE:**      At the discretion of the station supervisor, the plan may be carried over and assigned to on-coming watch/tactical personnel if the information gathered warrants further investigation. Each officer/tactical team assigned to conduct a follow up investigation regarding a gang-related shooting will submit an Information Report documenting the actions taken to prevent retaliation.

E.    The Bureau of Detectives Area will notify CPIC of the assigned supervisor and detective(s) for each shooting and/or murder. CPIC will include the assigned supervisor and detective(s) as part of any "CPIC Updates" for the incident.

F.    Gang Enforcement Division

    1.    When the shooting occurs during the duty hours and in the geographical location where GED is assigned, members of the Gang Enforcement Division will:

        a.    respond to the scene of the shooting and assist district personnel in their investigation;

        b.    determine the most likely locations for retaliatory violence;

        c.    proceed to the determined location and conduct all necessary GVRS enforcement;

        d.    seek out witnesses and interview victims; and

        e.    respond to area hospitals and interview victims and other witnesses.

    2.    When notified of a shooting, the designated members of the Gang Enforcement Division will:

        a.    monitor social media outlets with the goal of garnering real-time gang intelligence and preventing retaliatory gang-related violence, including identifying:

            (1)    current discussions or "chatter" concerning the incident.

            (2)    the "blamed" offender or offending group to assist in identifying potential retaliatory acts of violence.

            (3)    current or future gathering locations.

            (4)    related photographs or videos.

        b.    if critical gang intelligence is gathered, notify the CPIC for further evaluation and distribution to the district commander whose area is affected by the intelligence.

            **NOTE:**    If the nature of the gang intelligence requires immediacy, the intelligence will be broadcast over the appropriate radio zones.

        c.    if critical gang intelligence is gathered and serves an investigative purpose, forward the information to the appropriate area detective division.

G.    The Office of Emergency Management and Communications (OEMC) will:

    1.    maintain continual communication with the on-scene assigned field supervisor.

    2.    provide, via portable data terminal (PDT), the gang-related shooting information to any and all field units likely to be affected by retaliatory violence.

H.    CPIC will complete a gang profile and:

    1.    forward the gang profile to the district station supervisor via Department e-mail.

        **NOTE:**    Immediately upon receipt, the station supervisor will ensure the appropriate field supervisor receives the gang profile.

    2.    notify the station supervisor that the gang profile has been sent.

        **NOTE:**    Gang profiles will also be sent to the appropriate BOP, BOD, and BOC deputy chiefs, all appropriate supervisors assigned to the BOD area(s), and all appropriate supervisors assigned to the GED and GID.

    3.    relay all relevant victim information, gang affiliation, and gang rival information via PDT to the affected OEMC radio zone dispatcher(s).

4.  conduct a post-shooting link analysis and forward it to the affected districts and the Gang Enforcement Division.

5.  relay the assigned Area Detective Supervisor and Beat, along with the Area Detective(s) and Beat(s) for each shooting and/or murder as part of any "CPIC Updates" for the incident.

## X.   BUREAU OF ORGANIZED CRIME RESPONSIBILITIES

A.   Office of the Chief

The Chief, Bureau of Organized Crime, will ensure bureau members collaborate with the Cook County State's Attorney's Office and the United States Attorney's Office in the charging and prosection of RICO Act violators, consistent with Item V-C of this directive.

B.   Narcotics Division

1.  The Commander, Narcotics Division, will ensure the following programs are used to combat gang violence:

a.   Street corner conspiracy missions

A street corner conspiracy mission is a collaborative effort between Narcotics Division officers and the Cook County State's Attorney's Office targeting violent criminal street gangs who are operating open-air drug markets or are otherwise involved in violent criminal activity.

b.   Narcotics-associated violence interdiction missions (NAVIMS)

c.   Search warrant missions

d.   Buy-bust operations

NOTE:    In consultation with district commanders, the Narcotics Division Team will be used to conduct buy-bust operations in locations with violent gang conflicts.

e.   Covert surveillance

f.   Long-term investigations.

2.  The Commander, Narcotics Division, will coordinate and confer with district commanders to identify gang-related open air drug markets and ensure that the appropriate enforcement initiatives are implemented.

3.  Once a narcotics issue has been addressed, district commanders will ensure that a specific, comprehensive strategy is in place to prevent such issues from re-occurring at those designated locations.

4.  The Narcotics Division supervisor assigned to a specific district will confer with district personnel in order to discuss and evaluate narcotics-related issues affecting that district. The Narcotics Division supervisor will then coordinate with the Narcotics Division commanding officer for the affected area in order to ensure that the appropriate response is implemented.

C.   The Gang Enforcement Division

The Commander, Gang Enforcement Division, will ensure the following programs are used to combat gang violence:

1.  Gang School Safety Teams (GSST)

a.   The GSST is a collaborative effort comprised of Department Gang Enforcement Division officers, Chicago Public School officials, and Cook County Juvenile Probation. The goal of GSST is to prevent gang crime through proactive measures and the suppression of gang violence through the implementation of communicative and conflict resolution strategies.

b.   After an incident of school-related gang violence, GSST officers conduct interventions with the involved students in the presence of a parent or school representative. During these meetings the officers and students discuss some of the negative consequences of gang membership: death, prison, and/ or catastrophic injury.

c.   Whenever GSST officers conduct an intervention in response to school-related gang violence, they will additionally monitor social media outlets with the goal of garnering real-time gang intelligence and preventing retaliatory gang-related violence. If GSST officers gather critical gang intelligence, they will:

   (1)   notify the CPIC for distribution to the district commander whose area is affected by the intelligence.

       **NOTE:**     The district commander, with the support of the area deputy chief, will ensure proper resources are deployed to prevent any retaliatory gang-related violence.

   (2)   if the nature of the gang intelligence requires immediacy, broadcast the intelligence over the appropriate radio zones.

2.   Parolee Compliance Checks

   Consistent with the Department directive entitled "**Parole Compliance Program**," GED officers partner with BOP officers to support the Illinois Department of Corrections parolee compliance checks (home visits) and conduct surveillance on gang-involved parolees and recent parolees that are high-profile and high-ranking gang members.

3.   Gang Missions

   The Gang Enforcement Division conducts aggressive patrol and violence suppression missions in areas where gang conflicts exist.

4.   Comprehensive Anti-Gang Initiative (CAGI)

   The Gang Enforcement Division, in collaboration with the United State's Attorney's Office and the Illinois Department of Corrections, focuses enforcement action on recent parolees associated with violent street gangs.

5.   Joint Missions

   The Gang Enforcement Division regularly conducts joint missions with outside agencies, including the Illinois State Police, Illinois Department of Corrections, United States Marshals Service, and local law enforcement agencies to target offenders wanted for gang- related offenses.

6.   Retaliatory Violence Associated with Gang Funerals

   Gang Enforcement Division officers will partner with Gang Investigations Division officers to cover high-risk, gang-related funerals that involve active gang investigations, high-ranking gang leaders, or present a high probability of retaliation.

   **NOTE:**     Uniformed district officers will be assigned to pay special attention to the funeral homes and churches conducting the funeral services as well as the immediate areas.

D.   Gang Investigations Division

   The Gang Investigations Division conducts complex mid- and long-term investigations targeting hierarchal criminal gang organizations and gang leaders. Additionally, the division coordinates gang-related murder investigations with the appropriate Bureau of Detectives area personnel.

The Commander, Gang Investigations Division, will ensure the following programs are used to combat gang violence:

1.     Chicago Anti-Gun Enforcement (CAGE) Teams

       CAGE Teams will:

       a.     provide assistance upon recovery of firearms associated with murders and shootings, conducting investigations of the firearm recovered and providing any information to the investigative authority.

       b.     review and respond appropriately to all Arrestee Debriefing Modules involving recovered firearms received from CPIC.

2.     Federal Task Forces

       Members assigned to federal task forces (such as the FBI or ATF) will ascertain if there is any information from confidential sources related to murders and shootings which may be of assistance in determining the parties involved; make inquiries relative to retaliation and disseminate this information to CPIC; and target areas with a high level of violence associated with gangs.

3.     Gang Member Identification

       Members will coordinate with area detectives, the Bureau of Patrol, and the Gang Enforcement Division, providing intelligence and technical support to assist in identifying the catalyst for the violence; target gang members with a high propensity for violence; and initiate investigations into gang members suspected to be the catalyst for re-occurring gang violence.

4.     Liaison with Cook County Jail

       Members assigned to Cook County Jail will assist the Bureau of Detectives, the Bureau of Patrol, and the Bureau of Organized Crime by forwarding actionable intelligence related to shootings and murders attributed to gang violence and providing assistance to outside units in gathering intelligence on violence and information on retaliatory acts of violence, such as arranging interviews with inmates, monitoring inmate phone calls, and providing information on the hierarchies established based on interviews within Cook County Jail.

E.     *Vice and Asset Forfeiture Division*

1.     License Investigation Unit

       The License Investigation Unit's primary focus is the investigation of licensed and unlicensed business establishments within the City of Chicago. As part of their mission, they respond to and investigate all violent incidents in or near liquor establishments and other licensed premises and take appropriate enforcement action.

2.     Street Prostitution Enforcement

       Street prostitution enforcement teams concentrate on prostitution occurring directly on the street or in establishments such as bars and social clubs. Additionally, while working in high crime areas, they develop intelligence based on information gleaned from debriefing arrested individuals

## XI.    BUREAU OF DETECTIVES RESPONSIBILITIES

The Chief, Bureau of Detectives, will ensure the following programs are used to combat gang violence:

A.     The Area Mission and Shooting Teams

       The primary focus of the Area Mission and Shooting Teams is to investigate all firearm-related incidents.

B.    The Fugitive Apprehension Unit (FAU) and FBI Violent Crime Task Force will follow up on all homicide warrants and investigate alerts with probable cause. The FAU will investigate all aggravated battery investigative alerts with probable cause from the past three years.

C.    The appropriate Bureau of Detectives personnel will conduct the follow-up investigation and complete the automated Arrestee Debriefing Module of arrestees charged with any of the following: Murder, Shooting, Robbery, Arson, Justifiable Homicide, or Criminal Sexual Assault.

**XII.    COMPSTAT COMPONENT**

A.    CompStat initiatives will be used to measure the impact and effectiveness of gang violence reduction strategies.

B.    The CompStat process will allow district commanders to identify their gang violence problems, initiate plans to counteract the violence, and provide accountability for their actions in their areas of responsibility.

(Items indicated by *italics/double underline* have been revised or added)

Authenticated by: KC

John J. Escalante
Interim Superintendent of Police

15-185 CMF

**ADDENDA:**

1.    G10-01-01  -  Gang Audits
2.    G10-01-02  -  District Intelligence Officer

# Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 17120368101

JONATHAN     WARNER

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County/Local Prosecutor has filed a complaint
with the Clerk of the Circuit Court.

Charging the above named defendant with:

  10-8-515                         L     SOLICITING UNLAWFUL BUSINESS
The following disposition(s) was/were rendered before the Honorable Judge(s):

05/05/17 BOND SET BY RULE OF COURT              05/22/17 1223
05/22/17 MOTION DEFT - CONTINUANCE - MD         06/21/17 1223
      MILLER, STEPHANIE K.
06/21/17 APPEARANCE FILED
      MILLER, STEPHANIE K.
06/21/17 JURY DEMAND BY DEFENDANT
      MILLER, STEPHANIE K.
06/21/17 TRANSFERRED                            07/21/17 6146
      MILLER, STEPHANIE K.
07/21/17 CONTINUANCE BY AGREEMENT               08/02/17 6146
      BURCH, CLARENCE, LEWIS
08/02/17 APPEARANCE FILED
      BURCH, CLARENCE, LEWIS
08/02/17 CONTINUANCE BY AGREEMENT               09/07/17 6146
      CWX
      BURCH, CLARENCE, LEWIS
09/07/17 CONTINUANCE BY AGREEMENT               10/11/17 6146
      BURCH, CLARENCE, LEWIS
10/11/17 CONTINUANCE BY AGREEMENT               11/07/17 6146
      CWX
      BURCH, CLARENCE, LEWIS
11/07/17 CONTINUANCE BY AGREEMENT               11/22/17 6146
      SFJT
      BURCH, CLARENCE, LEWIS
11/22/17 DEF DEMAND FOR TRIAL
      BURCH, CLARENCE, LEWIS
11/22/17 NON-SUIT                        C001
      BURCH, CLARENCE, LEWIS

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 002

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 17120368101

JONATHAN     WARNER

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County/Local Prosecutor has filed a complaint
with the Clerk of the Circuit Court.

                              I hereby certify that the foregoing has
                              been entered of record on the above
                              captioned case.
                              Date 08/28/18

                              _____
                                        DOROTHY BROWN
                              CLERK OF THE CIRCUIT COURT OF COOK COUNTY