**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGOANS FOR AN END TO THE GANG DATABASE, et. al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 18-CV-4242 |
| v. | ) ) | Hon. Andrea R. Wood |
| CITY OF CHICAGO, et. al., | ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS
<u>PLAINTIFFS' COMPLAINT</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

SUMMARY OF FACTUAL ALLEGATIONS ......................................................... 1

STANDARD OF REVIEW ........................................................................................ 3

ARGUMENT ............................................................................................................... 4

    I.    Plaintiffs Have Standing to Seek Injunctive Relief Against the City ............................... 4

        A.  The Individual Plaintiffs Face a Real and Immediate Threat of Future Harm. ..... 5

            1.    The City maintains a pattern and practice, akin to an explicit policy, of using, maintaing, and sharing CPD's discriminatory and arbitrary Gang Database ........................................................................................................... 7

            2.    Plaintiffs were not engaging in avoidable, illegal conduct ....................... 12

            3.    The CPD targets Black and Latinx individuals for inclusion in the Gang Databse ...................................................................................................... 13

        B.  The Organization Plaintiffs Have Standing to Seek Equitable Relief ................. 15

            1.    The Organization Plaintiffs have standing to sue for injuries incurred directly to each of their organizations ....................................................... 15

            2.    The Organizational Plaintiffs also have associational standing ................ 17

    II.   Plaintiffs Have Properly Alleged That Defendants Violated Their Due Process Rights Under the Stigma-Plus Doctrine ................................................................................. 22

        A.  Defendants Deprived Plaintiffs of a Protected Liberty Interest by Damaging Their Reputations ............................................................................................... 22

            1.    Defendants imposed a stigmatizing gang desingation on Plaintiffs and publicized that stigma ............................................................................... 23

i

        2.     Defendants deprived Plaintiffs of liberty interests that satisfy the "plus" prong ........................................................................................................ 24

    B.   Defendants Must Provide Basic Procedural Protections Prior to Publicizing Stigmatizing Designations ................................................................................... 28

III.    Plaintiffs Have Properly Alleged Equal Protection Claims ............................................. 32

    A.   Plaintiffs Have Properly Alleged a Discriminatory Purpose ............................ 32

    B.   Plaintiffs Have Properly Alleged a Discriminatory Effect ............................... 35

IV.    Plaintiffs Have Properly Alleged Fourth Amendment Claims ......................................... 36

V.    Plaintiffs Have Properly Stated a Basis for Liablity Against The City ........................... 37

VI.    The Officer Defendants Are Not Entitled to Qualified Immunity .................................... 40

VII.    Plaintiffs Have Properly Alleged an ICRA Claim ........................................................... 42

VIII.    Plaintiff Warner Has Properly Alleged a Malicious Prosecution Claim ......................... 43

IX.    Plaintiffs Have Properly Alleged Respondeat Superior and Indemnification Claims ...... 45

**CONCLUSION** ................................................................................................................... 46

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Adams v. City of Indianapolis,*
   742 F.3d 720 (7th Cir. 2014) ......................................................................................... 4

*Alexander v. McKinney,*
   629 F.3d 553 (7th Cir. 2012) ....................................................................................... 27

*Allee v. Medrano,*
   416 U.S. 802 (1974).................................................................................................. 5, 9

*Alsherbini v. Village of Worth,*
   No. 10 CV 6781, 2011 WL 1303427 (N.D. Ill. Mar. 31, 2011) ................................. 34

*Alston v. City of Madison,*
   853 F.3d 901 (7th Cir. 2017) ................................................................................. 22, 23

*Alvarado v. Litscher,*
   267 F.3d 648 (7th Cir. 2001) ....................................................................................... 42

*Anderson v. Cornejo,*
   No. 97 C 7556, 1999 WL 258501 (N.D. Ill. Apr. 21, 1999).................................... 13

*Anderson v. Cornejo,*
   284 F. Supp. 2d 1008 (N.D. Ill. 2003) ...................................................................... 10

*Apex Digital, Inc. v. Sears, Roebuck & Co.,*
   572 F.3d 440 (7th Cir. 2009) ....................................................................................... 3

*Armstrong v. Manzo,*
   380 U.S. 545 (1965)................................................................................................... 28

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).............................................................................................. 4, 36

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011)................................................................................................... 40

*Barrios v. City of Chicago,*
   No. 15 C 2648, 2016 WL 164414 (N.D. Ill. Jan. 14, 2016) .................................... 13

*Batson v. Kentucky*,
476 U.S. 79 (1986)..................................................................................................... 32

*Bell v. Twombly*,
550 U.S. 544 (2007).............................................................................................. 4, 36

*Casimir v. City of Chicago*,
No. 15 C 3771, 2018 WL 1695362 (N.D. Ill. Apr. 6, 2018)................................. 33, 36

*Castillo v. County of Los Angeles*,
959 F. Supp. 2d 1255 (C.D. Cal. 2013) ........................................ 24, 25, 29, 30, 31

*Chatman v. City of Chicago*,
No. 14 C 2945, 2015 WL 1090965 (N.D. Ill. Mar. 10, 2015)..................................... 4

*Chavez v. Ill. State Police*,
251 F.3d 612 (7th Cir. 2001) .............................................. 10, 32, 33, 35, 36

*Chi. Teachers Union, Local 1, Am. Fed'n of Teachers, AFL-CIO v. Bd. of Educ. of City of Chi.*,
No. 12 C 10311, 2013 WL 3337826 (N.D. Ill. July 2, 2013) ..................................... 3

*Chicago Urban League v. State*,
No. 08 CH 30490, 2009 WL 1632604 (Ill. Cir. Ct. Apr. 15, 2009) ......................... 43

*Church v. City of Huntsville*,
30 F.3d 1332 (11th Cir. 1994) ............................................................................. 14

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)......................................... 5, 6, 8, 9, 10, 11, 12, 13, 14

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)........................................................................................ 11, 12

*Cleveland-Perdue v. Brutsche*,
881 F.2d 427 (7th Cir. 1989) ............................................................................. 41

*Crawford v. Marion Cty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) *aff'd*, 553 U.S. 181 (2008) ....................................... 16

*Driscoll v. Juris Kins & Davis McGrath, L.L.C.*,
No. 16 C 9359, 2017 WL 4122715 (N.D. Ill. Sept. 18, 2017).............................. 3, 4

*Dunaway v. New York*,
442 U.S. 200 (1979)............................................................................................. 26

iv

*Dupuy v. Samuels*,
   397 F.3d 493 (7th Cir. 2005) ........................................................................ 24, 26

*Endicott v. Huddleston*,
   644 F.2d 1208, 1215 (7th Cir. 1980) ..................................................................... 23

*Equal Rights Ctr. v. Kohl's Corp.*,
   No. 14 C 8259, 2015 WL 3505179 (N.D. Ill. June 3, 2015) ............................... 16, 21

*Estate of Sims ex rel. Sims v. Cty. of Bureau*,
   506 F.3d 509 (7th Cir. 2007) ................................................................................ 38

*Fox v. Hayes*,
   600 F.3d 819 (7th Cir. 2010) ................................................................................ 37

*Flanagan v. Excel Staffing Solutions*, L.L.C.,
   No. 16-CV-05663, 2018 WL 558499 (N.D. Ill. Jan. 25, 2018) ............................... 43

*Floyd v. City of New York*,
   283 F.R.D. 153 (S.D.N.Y. 2012) ..................................................................... 10, 13

*Floyd v. City of New York*,
   959 F. Supp. 2d 540 (S.D.N.Y. 2013) ..................................................................... 34

*Franklin v. Chicago*,
   102 F.R.D. 944 (N.D. Ill. 1984) ............................................................................. 13

*Frederickson v. Landeros*,
   No. 11 C 3484, 2018 WL 1184730 (N.D. Ill. Mar. 7, 2018) ................................... 41

*Gardunio v. Town of Cicero*,
   674 F. Supp. 2d 976 (N.D. Ill. 2009) ......................................................... 36, 37, 44

*Gobel v. Maricopa Cty.*,
   867 F.2d 1201 (9th Cir. 1989) .............................................................................. 27

*Gonzalez v. City of Elgin*,
   578 F.3d 526 (7th Cir. 2009) .......................................................................... 37, 44

*Goss v. Lopez*,
   419 U.S. 565 (1975) ............................................................................................. 24

*Hall v. Marshall*,
   479 F. Supp. 2d 304 (E.D.N.Y. 2007) .................................................................... 28

*Hannemann v. S. Door Cty. Sch. Dist.*,
    673 F.3d 746 (7th Cir. 2012) ................................................................. 22, 25, 26

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................................... 15, 16

*Hernandez v. Cremer*,
    913 F.2d 230 (5th Cir. 1990) ............................................................................ 13

*Hobley v. Burge*,
    No. 03 C 3678, 2004 WL 2658075 (N.D. Ill. Oct. 13, 2004) ................................ 11

*Honig v. Doe*,
    484 U.S. 305 (1988) ......................................................................................... 14

*Houston v. Marod Supermarkets, Inc.*,
    733 F.3d 1323 (11th Cir. 2013) .......................................................................... 6

*Humphries v. County of Los Angeles.*,
    554 F.3d 1170 ............................................................................................ 25, 26

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ......................................................................................... 21

*Hvorcik v. Sheahan*,
    870 F. Supp. 864 (N.D. Ill. 1994) ...................................................................... 13

*Indianapolis v. Edmond*,
    531 U.S. 32 (2000) ............................................................................................. 5

*Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Brock*,
    477 U.S. 274 (1986) .................................................................................... 18, 20

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977) ......................................................................................... 10

*Jacobs v. City of Chicago*,
    215 F.3d 758 (7th Cir. 2000) ............................................................................ 42

*Khorrami v. Rolince*,
    493 F. Supp.2d 1061 (N.D. Ill. 2007) ................................................................ 42

*Kozlowski v. Fry*,
    238 F. Supp. 2d 996 (N.D. Ill. 2002) ................................................................. 10

*Larry v. Lawler*,
   605 F.2d 954 (7th Cir. 1978) ...................................................................... 23, 24, 26

*Latif v. Holder*,
   28 F. Supp. 3d 1134 (D. Or. 2014) ............................................................. 23, 24, 25

*LaPorta v. City of Chicago*,
   102 F. Supp. 3d 1014 (N.D. Ill. 2015) ............................................................... 39

*Laurens v. Volvo Cars of N. Am., L.L.C.*,
   868 F.3d 622 (7th Cir. 2017) ............................................................................... 4

*Lindsey v. Tews*,
   No. 09 C 1078, 2009 WL 2589524 (N.D. Ill. Aug. 19, 2009) .................................. 45

*Lira v. Dir. of Corrections*,
   No. C-00-0905 SI, 2008 WL 619017 (N.D. Cal. Mar. 4, 2008) ............................... 41

*Liska v. Dart*,
   60 F. Supp. 3d 889 (N.D. Ill. 2014) ................................................................... 27

*Libertarian Party of Ind. v. Packard*,
   741 F.2d 981 (7th Cir. 1998) ............................................................................... 5

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................... 5

*Martinez v. Vill. of Mt. Prospect*,
   92 F.Supp.2d 780 (N.D. Ill. 2000) ..................................................................... 35

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ................................................................... 28, 29, 30, 31, 41

*Manos v. Bd. of Educ. of Villa Grove Cmty. Unit Sch. District #302*,
   No. 2:15-CV-2220, 2017 WL 6371299 (C.D. Ill. Dec. 13, 2017) .............................. 3

*McFadden v. Bd. of Educ. for Ill. School Dist. U-46*,
   No. 05 C 0760, 2006 WL 6284486 (N.D. Ill. Oct.3, 2006) ..................................... 43

*McQueen v. City of Chicago*,
   803 F. Supp. 2d 892 (N.D. Ill. 2011) ................................................................. 43

*Md. State Conference of NAACP Branches v. Md. Dep't of State Police*,
   72 F. Supp. 2d 560 (D. Md. 1999) ..................................................................... 14

*Melendres v. Arpaio*,
  659 F.3d 990 (9th Cir. 2012) ................................................................. 5

*Migrant Council v. Pilliod*,
  540 F.2d 1062 (7th Cir. 1976) ........................................................ 6, 10

*Miller v. California*,
  355 F.3d 1172 (9th Cir. 2004) ............................................................ 22

*Milwaukee Police Ass'n v. Flynn*,
  863 F.3d 636 (7th Cir. 2017) ............................................................. 17

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978) ......................................................................... 38

*Morales v. Daley*,
  116 F.Supp.2d 801 (S.D. Tex. 2000) .................................................. 34

*Morrissey v. Brewer*,
  408 U.S. 471 (1972) .................................................................... 27, 28

*NAACP v. Alabama ex. rel. Patterson*,
  357 U.S. 449 (1958) .................................................................... 18, 19

*NAACP v. Button*,
  371 U.S. 415 (1963) ......................................................................... 18

*NAACP v. City of Kyle, Tex.*,
  No. A-05-CA-979 LY, 2006 WL 1751767 (W.D. Tex. June 16, 2006) ................... 21

*Naperville Smart Meter Awareness v. City of Naperville*,
  69 F. Supp. 3d 830 (N.D. Ill. 2014) ...................................................... 4

*Nat'l Cong. for Puerto Rican Rights v. City of New York*,
  75 F. Supp. 2d 154 (S.D.N.Y. 1999) ................................................ 10, 13

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ............................................................ 19

*Nat'l Rifle Ass'n of Am., Inc. v. City of Evanston*,
  No. 08 C 3693, 2009 WL 1139130 (N.D. Ill. Apr. 27, 2009) ........................ 20

*Neiman v. Vill. of Deerfield*,
  2015 WL 9315543 (N.D. Ill. Dec. 22, 2015) ......................................... 45

*Omosegbon v. Wells,*
   335 F.3d 668 (7th Cir. 2003) .................................................................. 22

*Paige v. Hudson,*
   341 F.3d 642 (7th Cir. 2003) .................................................................. 27

*Palmer v. Chicago,*
   755 F.2d 560 (7th Cir. 2000) .................................................................... 5

*Paul v. Davis,*
   424 U.S. 693 (1976) ...................................................................... 22, 40

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ............................................................................ 40

*Pers. Adm'r of Mass v. Feeney,*
   442 U.S. 256, 279 (1979) ..................................................................... 32

*Plotkin v. Ryan,*
   239 F.3d 882 (7th Cir. 2001) .................................................................. 17

*Retired Chi. Police Ass'n v. City of Chicago,*
   7 F.3d 584 (7th Cir. 1993) ............................................................... 21, 22

*Riley v. Cty. of Cook,*
   682 F. Supp. 2d 856 (N.D. Ill. 2010) ..................................................... 39

*Sanders v. Sheehan,*
   No. 09 C 7707, 2010 WL 2990121 (N.D. Ill. July 26, 2010) ...................... 40

*Santiago v. Walls,*
   599 F.3d 749 (7th Cir. 2010) .................................................................... 4

*Scherr v. Marriott Int'l, Inc.,*
   703 F.3d 1069 (7th Cir. 2013) .................................................................. 6

*Sierra Club v. Franklin Cty. Power of Ill., LLC,*
   546 F.3d 918 (7th Cir. 2008) ............................................................ 15, 17

*Smith v. City of Chicago,*
   143 F.Supp.3d 741 (N.D. Ill. 2015) ............................. 6, 12, 33, 36, 39

*Smith v. Wade,*
   461 U.S. 30 (1983) ............................................................................. 42

ix

*Sow v. Fortville Police Dept.*,
  636 F.3d 293 (7th Cir. 2011) ...................................................................... 35

*Spearman v. Elizondo*,
  230 F. Supp. 3d 888 (N.D. Ill. 2016) ......................................................... 39

*Stanfield v. Dart*,
  No. 10 C 6569, 2011 WL 1429172 (N.D. Ill. Apr. 14, 2011)...................... 43

*Starks v. City of Waukegan*,
  946 F. Supp. 2d 780 (N.D. Ill. 2013) .......................................................... 45

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009)..................................................................................... 19

*Susan B. Anthony List v. Driehaus*,
  134 S. Ct. 2334 (2014).................................................................................. 16

*Sussman v. Tanoue*,
  39 F. Supp. 2d 13, 25 (D.D.C. 1999) .......................................................... 34

*Swanigan v. City of Chicago*,
  881 F.3d 577 (7th Cir. 2018) ....................................................................... 13

*Swick v. Liautaud*,
  662 N.E.2d 1238 (Ill. 1996) ......................................................................... 44

*Tamayo v. Blagojevich*,
  526 F.3d 1074 (7th Cir. 2008) ....................................................................... 4

*Tapia v. Alameida*,
  No. 1:03-CV-5422-AWI-SMS, 2006 WL 842470 (E.D. Cal. Mar. 29, 2006) ......................... 41

*Terry v. Ohio*,
  392 U.S. 1 (1968)......................................................................................... 26

*Thomas v. County of Los Angeles*,
  978 F.2d 504 (9th Cir. 1992) ................................................... 7, 10, 13, 14, 15

*Townsend v. Vallas*,
  256 F.3d 661 (7th Cir. 2001) ....................................................................... 26

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*,
  517 U.S. 544 (1996)..................................................................................... 21

*United States v. State of New Hampshire*,
  539 F.2d 277 (5th Cir. 1976) ........................................................................ 34

*Uptown Tent City Organizers v. City of Chicago Department of Administrative Hearings*,
  No. 17 C 4518, 2018 WL 2709431 (N.D. Ill. June 5, 2018) .................................... 19

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 ............................................................................................. 32

*Warth v. Seldin*,
  422 U.S. 490 (1975) .................................................................................... 21

*Washington v. Davis*,
  426 U.S. 229 (1976) .................................................................................... 32

*Washington v. Summerville*,
  127 F.3d 552 (7th Cir. 1997) ........................................................................ 44

*Welton v. Anderson*,
  770 F.3d 670 (7th Cir. 2014) ........................................................................ 45

*Wilson v. Layne*,
  526 U.S. 603 (1999) .................................................................................... 40

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971) ...................................................................... 22, 23, 28, 31, 40

*Zimmerman v. Tribble*,
  226 F.3d 568 (7th Cir. 2000) .......................................................................... 4

## Statutes

California Assembly Bill-90 ............................................................................. 31

Firearm Concealed Carry Act, 430 ILCS 66/10 .................................................... 25

Illinois Civil Rights Act, 740 ILCS 23/5 ....................................................... 3, 42, 43

## Other Authorities

Rebecca Rader Brown, *The Gang's All Here: Evaluating the Need for National Gang
  Database,* 42 Colum. J.L. & Soc. Probs, 293, 300-02 (2009) .................................. 29

Joshua D. Wright, *The Constitutional Failure of Gang Databases,* 2 Stan. J.C.R. & C.L. 115, 119-20 (2005) ................................................................................................................... 30

Defendants have moved to dismiss Plaintiffs' Complaint, contending that Plaintiffs lack standing for injunctive relief, fail to state plausible claims for relief, and certain Defendants are protected by qualified immunity. Dkt. Nos. 35, 36-1. Defendants' motion should be denied.

## SUMMARY OF FACTUAL ALLEGATIONS

The Chicago Police Department ("CPD") uses, maintains, publishes, and shares a Gang Database of all suspected gang members in the City. Compl. ¶ 1. This Database evolved from Chicago policymakers' attempts to address alleged gang violence in the late 1980's and early 1990's. *Id*. ¶¶ 38-41. As of May 2018, there are over 128,000 adults in the Gang Database, and an estimated 28,000 to 68,000 juveniles (people under 18 years old) in the Database. *Id*. ¶ 6. Thus, an estimated 155,000 to 195,000 people are included in the Database. *Id*.

CPD officers possess unlimited discretion to include a person in the Gang Database, and they often use this discretion to falsely label people as gang members based solely on their race and neighborhood. *Id*. ¶ 3.

The CPD disproportionately targets Black and Latinx people for inclusion in the Gang Database. *Id*. ¶ 1. Ninety-five percent of the people in the Database are Black or Latinx, and it includes about 11 percent of the City's Black population, 4 percent of its Latinx population, but only 0.6 percent of its white population. *Id*. ¶¶ 1-2. This is much higher than the national average, as the National Gang Center reported that nationally, 81.5 percent of gang members are Black or Latinx, and 11.5 percent of gang members are white. *Id*. ¶¶ 51-52. The city-established Police Accountability Task Force ("Task Force") and the U.S. Department of Justice ("DOJ") have additionally recognized the long history of racial and ethnic animus that motivates CPD officers to target Black and Latinx people for inclusion in the Gang Database. *Id*. ¶¶ 61-67.

Individuals who are labeled gang members by CPD officers are not provided any due

process protections, including notice or an opportunity to contest the gang designation. *Id.* ¶ 4. Further, individuals remain in the Gang Database permanently, and there are no mechanisms by which they can request to be removed. *Id.* The CPD also does not conduct internal audits to guarantee that the information in the Gang Database is accurate. *Id.* This is particularly troubling considering that the Gang Database is riddled with errors, such as including several people listed to be 132 years old and 118 years old, identifying people as members of two rival gangs, and identifying people as the only member of their supposed gang. *Id.* ¶¶ 68-73.

In addition to the CPD's disproportionate targeting and false labeling of Black and Latinx people for inclusion in the Gang Database, CPD officers knowingly rely on their own wrongful gang designations to harass, falsely arrest, and falsely imprison class members. *Id.* ¶ 5. The CPD also shares its Gang Database with over 500 third party agencies, causing significant known and unknown harm to class members, including deprivations of employment, educational opportunities, licensures, bond, immigration relief, access to public housing, parole, and parental rights. *Id.* ¶¶ 5, 82, 85.

The four named Plaintiffs, Donta Lucas, Jonathan Warner, Lester Cooper, and Luis Pedrote-Salinas (the "Individual Plaintiffs"), have been harmed by CPD's unconstitutional policies and practices related to the Gang Database and face a real and immediate threat of future harm. *Id.* ¶¶ 17-20. They bring suit on behalf of a class of all person who currently are or will in the future be included in the Gang Database, including a sub-class of Black and Latinx individuals. *Id.* ¶ 151. The suit is also brought by Black Youth Project 100 Chicago, Blocks Together, Brighton Park Neighborhood Council, Latino Union, Mijente, and Organized Communities Against Deportation (the "Organizational Plaintiffs") (together with the Individual Plaintiffs, "Plaintiffs"), all of which actively engage with and provide services to Chicago

communities. They have had to divert resources from their missions as a result of CPD's unconstitutional use of the Gang Database. *Id.* ¶¶ 11-16. They also have constituents who have been or likely will be harmed by CPD's unconstitutional use of the Database. *Id.*

Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 for violations of their Fourth and Fourteenth Amendment rights, and under state law for violations of the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/5 and for common law claims. *Id.* ¶¶ 159-244. Plaintiffs seek prospective relief to end the CPD's unconstitutional policies and practices relating to the Gang Database, and to protect the Individual Plaintiffs, putative class, and organizational members from future rights violations. *Id.* at "Prayer for Relief." The Individual Plaintiffs also seek damages for the CPD's past misconduct. *Id.* ¶¶ 193-252.

## STANDARD OF REVIEW

"The Seventh Circuit has identified two types of standing challenges that a defendant may assert under Rule 12(b)(1): 'facial' challenges and 'factual' challenges." *Chi. Teachers Union, Local 1, Am. Fed'n of Teachers, AFL-CIO v. Bd. of Educ. of City of Chi.*, No. 12 C 10311, 2013 WL 3337826, at *1 (N.D. Ill. July 2, 2013) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009)). "A facial challenge argues that the plaintiff has not sufficiently '*alleged* a basis of subject matter jurisdiction' . . . . [whereas a] factual challenge contends that 'there is *in fact* no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Driscoll v. Juris Kins & Davis McGrath, L.L.C.*, No. 16 C 9359, 2017 WL 4122715, at *3 (N.D. Ill. Sept. 18, 2017) (quoting *Apex Digital*, 572 F.3d at 443-44). Defendants bring a clear facial challenge to Plaintiffs' standing, taking issue with the alleged paucity of allegations, rather than their factual underpinnings. *See* Defs. Mot. at 6 ("These one-off instances of past injury are, as a matter of law, insufficient to show a substantial

risk or certainty that any Plaintiff will be injured again in the future."); *id.* at 11 ("The Organization Plaintiffs' boilerplate allegations that funds were diverted from their missions are thus insufficient.").  In assessing a facial challenge, "allegations are taken as true and construed in a light most favorable to the complainant."  *Naperville Smart Meter Awareness v. City of Naperville*, 69 F. Supp. 3d 830, 837 (N.D. Ill. 2014) (citation omitted); *see also Laurens v. Volvo Cars of N. Am., L.L.C.*, 868 F.3d 622, 624 (7th Cir. 2017) ("At the pleading stage, it is normally not difficult to pass the standing bar").

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits."  *Chatman v. City of Chicago*, No. 14 C 2945, 2015 WL 1090965, at *4 (N.D. Ill. Mar. 10, 2015).  To survive a 12(b)(6) motion, a complaint must "state a claim that is plausible on its face."  *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell v. Twombly*, 550 U.S. 544, 570 (2007)).  The complainant's allegations must "give the defendant fair notice of what the claim is and the grounds upon which it rests, and . . . show that it is plausible, rather than merely speculative, that he is entitled to relief."  *Driscoll*, 2017 WL 4122715, at *3 (quoting *Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir. 2008)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  To determine whether Plaintiffs have met this standard, the Court must "tak[e] all well-pleaded allegations of the complaint as true and view[] them in the light most favorable to the plaintiff."  *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000)).

## ARGUMENT

## I.  Plaintiffs Have Standing to Seek Injunctive Relief Against the City

Federal district courts have equitable power to enjoin law enforcement agencies engaged in persistent misconduct. *Allee v. Medrano*, 416 U.S. 802, 815-16 (1974) (injunction against police intimidation of union organizing efforts was proper when there was a persistent pattern of police misconduct, rather than isolated misconduct).[1] Plaintiffs have pleaded sufficient allegations to establish their right to such relief under Article III. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (to establish standing, plaintiff must demonstrate (1) an injury in fact, (2) a causal connection between the injury and the challenged act of the defendant, and (3) a likelihood that the injury would be redressed by a favorable decision).[2]

### A. The Individual Plaintiffs Face a Real and Immediate Threat of Future Harm

Defendants challenge the Individual Plaintiffs' equitable standing, wrongly analogizing the facts of this case to those in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and contending that the Individual Plaintiffs have failed to sufficiently allege a risk of future injury stemming from the CPD's practices. **Defs. Mot.** at 6-7. Defendants conveniently sidestep the fact that Plaintiffs have brought a class action suit alleging a well-documented series of *Monell* claims. Unlike in *Lyons*, Plaintiffs provide detailed allegations concerning a persistent pattern of police misconduct, which gives rise to ongoing constitutional violations. Unlike in *Lyons*, the

---

[1] Defendants contend that mandatory injunctions against law enforcement agencies are uncommon, and require more than nine alleged instances of harm. Defs. Mot. at 4, 7. Precedent clearly suggests otherwise. *See, e.g.*, *Indianapolis v. Edmond*, 531 U.S. 32 (2000) (granting injunction against city's drug interdiction checkpoints; only two instances of harm alleged and only six roadblocks were instated prior to injunction); *Palmer v. Chicago*, 755 F.2d 560 (7th Cir. 2000) (granting injunction to preserve existing police files for persons of convicted felonies and to allow these persons an opportunity to review the content of their files); *Libertarian Party of Ind. v. Packard*, 741 F.2d 981 (7th Cir. 1998) (holding that individual Plaintiffs had standing to seek injunction despite only alleging one instance of harm as a result of Indiana's state-wide policy); *Melendres v. Arpaio*, 659 F.3d 990 (9th Cir. 2012) (Latinx motorists entitled to preliminary injunction prohibiting sheriff from detaining individuals for being unlawfully present).

[2] Defendants primarily challenge Plaintiffs' standing by arguing that Plaintiffs have not demonstrated an injury in fact. Defendants do not take issue with Plaintiffs' allegations concerning causality and redressability for either the Individual Plaintiffs or the Organizational Plaintiffs, and nor could they do so. For all class and organizational claims, the Complaint specifically alleges causation. Compl. ¶¶ 167, 179, 185, 192. The Complaint also describes how the requested relief would redress these claims. *Id.* at "Prayer for Relief."

Individual Plaintiffs were engaged in lawful conduct when they were harmed by their false gang designation. And unlike in *Lyons*, the Individual Plaintiffs and putative sub-class are at real and immediate risk of future harm that they cannot avoid, simply because of their race.[3]

"[T]o establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a 'real and immediate' threat of future violations of their rights." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (quoting *Lyons*, 461 U.S. at 102-03 (1983)). Determination of a "real and immediate threat" of future injury is a flexible, fact-specific analysis which allows courts to assess various factors. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1337 n.6 (11th Cir. 2013) ("District courts must consider the totality of all relevant facts to determine whether a plaintiff faces a real and immediate threat of future injury."). Such factors include: (1) whether the challenged conduct constituted a pervasive pattern akin to explicit policy; (2) whether the plaintiff was engaging in avoidable, illegal conduct; and (3) whether a minority or disadvantaged group was being targeted because of an immutable characteristic or involuntary condition. *See, e.g.*, *Ill. Migrant Council v. Pilliod*, 540 F.2d 1062, 1067 (7th Cir. 1976) ("Because plaintiffs have shown a specific pattern of conduct, akin to an explicit policy, they have demonstrated a reasonable likelihood of future harm, justifying their request for injunctive relief."); *Smith v. City of Chicago*, 143 F.Supp.3d 741, 752 (N.D. Ill. 2015) (plaintiffs had standing to seek prospective relief as they sufficiently alleged ongoing violations pursuant to a municipal policy or practice and they were engaging in lawful

---

[3] Defendants also argue that Plaintiffs' Complaint should be dismissed because they disagree with the proposed remedies set forth in Plaintiffs' prayer for relief. *See* Defs. Mot. at 4. This argument also fails. At this point in the proceedings, the only relevant issue is whether Plaintiffs have alleged sufficient facts to allow the case to proceed to an ultimate decision on Defendants' liability. Only after Defendants are found liable, will proceedings related to remedies commence. Defendants' objections to Plaintiffs' proposed remedies are irrelevant to their motion. These objections do, however, bolster Plaintiffs' position regarding the need for injunctive relief. Defendants' glib characterization of Plaintiffs' proposed remedies as an unwarranted infringement on their "police power" make clear that in the absence of an order from this Court, those violations will continue.

conduct prior to being subject to the pretextual stops); *Thomas v. County of Los Angeles*, 978 F.2d 504, 507-508 (9th Cir. 1992) (plaintiffs had standing as "the record before this court indicates that numerous instances of police misconduct have occurred in a small six by seven block area, some minority residents of the area have been mistreated by deputies more than once, and many victims purportedly did nothing to warrant detention or apprehension prior to the mistreatment"). Plaintiffs meet each of these factors.

> **1.  The City maintains a pattern and practice, akin to an explicit policy, of using, maintaining, and sharing CPD's discriminatory and arbitrary Gang Database**

The Individual Plaintiffs have alleged a non-speculative risk of future injury stemming from the CPD's pervasive pattern and practice of using, maintaining, and sharing its discriminatory and arbitrary Gang Database. Far from being premised on "one-off instances of past injury" or a "speculative" future harm that is "quite rare," Defs. Mot. at 6-7, Plaintiffs' *Monell* allegations are well-supported—by history, the Department of Justice and Police Accountability Task Force findings, statistical evidence evincing policing patterns, the City's own Gang Database policies, and, of course, by the experiences of the Plaintiffs.

Specifically, Plaintiffs allege that Chicago has a 40 year long history of unlawfully targeting Black and Latinx people with gang-related law enforcement strategies that continues to this day. Compl. ¶¶ 38-44. Plaintiffs additionally allege that CPD's targeting of Black and Latinx people for inclusion in the Gang Database is motivated by a custom of racial and ethnic animus within the CPD—this racial and ethnic animus is documented in both the city-established Task Force's 2016 report and the DOJ's 2017 report. *Id.* ¶¶ 61- 67.

Plaintiffs allege that CPD's policies grant officers wide discretion with little oversight to include individuals in the Gang Database, leading to false designations. *Id.* ¶ 29. Any officer

can designate an individual as a gang member if that individual either self-admitted or the officer can substantiate gang membership through loose criteria such as (1) emblems or tattoos; (2) the use of signals or symbols; (3) information provided from a reliable third party or another CPD officer; or (4) information contained in the Gang Database. *Id.* ¶¶ 30-32. In practice, CPD officers include individuals in the Gang Database without any justification or evidence proving that they are in fact gang members. *Id.* ¶ 35. Further, per policy and practice, CPD does not provide notice to individuals of their inclusion in the Gang Database, nor does CPD allow individuals to challenge their inclusion in the Database—there is no way for an individual to get off the Database; once they are included, they are included forever. *Id.* ¶¶ 36-37. Moreover, CPD shares false information in the Gang Database with third parties and relies on its own false designations. *Id.* ¶¶ 78-83.

Plaintiffs allege that in accordance with these policies and practices, the Individual Plaintiffs were wrongfully designated as gang members based solely on their race and the neighborhood where they were stopped, and were not afforded any due process protections before or after their inclusion in the Gang Database; as a result, their false gang designations were shared and continue to be shared with third parties who have access to the Gang Database. Consequently, the Individual Plaintiffs face a real and immediate threat of future harm because they can never be removed from the Gang Database and their false gang designations will forever be relied upon by the CPD and shared with certain third parties, resulting in their continued deprivation of their rights under the Fourteenth and Fourth Amendments.

Attempting to analogize this case to *Lyons*, Defendants argue that the "Individual Plaintiffs leap to the conclusions that they will be injured in the future due to their designations simply because they have allegedly been injured in past isolated instances," and that "[t]here is

8

no basis for this conclusion" because the "9 specific instances" that Plaintiffs identify where someone was harmed by their gang designation demonstrates that future injury "is quite rare." Defs. Mot at 7. Defendants clearly misunderstand Plaintiffs' claims and mistake Plaintiffs' burden. The *Lyons* Court offered alternative grounds on which a plaintiff could assert a justiciable controversy in a suit for injunctive relief. When alleging police misconduct, a plaintiff could plead either that the police engage in the challenged conduct with every individual who they encounter or that the police are ordered or authorized to act in such a manner. *See Lyons*, 461 U.S. at 105-06. Plaintiffs establish standing under the second *Lyons* prong. They allege harm incurred both as a result of de facto policies and practices related to the Gang Database, *see, e.g.*, Compl. ¶ 44 (CPD maintains its practice of placing more Black and Latinx people in the Gang Database through block-labelling each year); *id.* ¶ 36 (CPD does not provide notice to individuals of their inclusion in the Gang Database nor does CPD allow individuals to challenge their inclusion or appeal their gang designation); *id.* ¶¶ 80-81 (CPD invites other agencies to become "data sharing partners" for CLEAR and grants more than 500 data-sharing partners direct access to CLE AR and the Gang Database), and as a result of explicit policies that are constitutionally deficient, *see, e.g.*, *id.* ¶¶ 29-32 (CPD policies grant officers wide discretion to designate an individual as a gang member); *id.* ¶ 127 (Plaintiff Cooper was denied an I-Bond pursuant to CPD policy that states that I-Bonds are not to be issued for verified gang members). Defendants' assertion that Plaintiffs must detail in their complaint more than 9 specific instances of harm is misguided, particularly given the extensive *Monell* allegations.

To this point, courts have repeatedly found equitable standing in cases where, as here, there are well-pleaded and empirically-based allegations of a pattern of constitutional violations that put Plaintiffs at risk—regardless of the Plaintiffs' conduct. *See, e.g.*, *Allee*, 416 U.S. at 815;

*Thomas*, 978 F.2d at 508 (finding standing where record indicated that "numerous instances of police misconduct" had occurred in a six by seven block area); *Pilliod*, 540 F.2d at 1067 (plaintiffs demonstrated a reasonable likelihood of future harm by pleading "a specific pattern of conduct," repeated actions by INS officials in stopping persons solely on the basis of their race, and evidence that "hundreds have already been improperly accosted by the INS," so that "the risk of a member of the plaintiff class being stopped in violation of the Fourth Amendment is statistically much greater"); *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) ("[T]he frequency of alleged injuries inflicted by the practices at issue here creates a likelihood of future injury sufficient to address any standing concerns . . . . In the face of these widespread practices, [plaintiff's] risk of future injury is real and immediate, not conjectural or hypothetical, and [the plaintiff] satisfies Article III's standing requirements."); *Nat'l Cong. for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (distinguishing *Lyons* because of the "difference in the number of alleged constitutional violations resulting from the challenged policies" and finding standing where "defendants' policy, evidenced by a pervasive pattern of unconstitutional stops and frisks, has allegedly affected tens of thousands of New York City residents, most of whom have been black and Latino men").[4]  By virtue of the City's patterns and practices, Plaintiffs show a sufficient likelihood that they "will again be wronged in

---

[4]  The Supreme Court has long noted the importance of statistical analyses "in cases in which the existence of discrimination is a disputed issue," *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977), and courts in this district have regularly relied on statistical evidence as proof of patterns of discrimination.  *See, e.g.*, *Hobley v. Burge*, No. 03 C 3678, 2004 WL 2658075, at *12-13 (N.D. Ill. Oct. 13, 2004) (plaintiff was able to demonstrate both discriminatory effect and intent through statistical evidence showing racial disparities in who was subjected to CPD's practice of extracting false confessions); *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1038 (N.D. Ill. 2003) (Black women who were improperly searched in customs sufficiently demonstrated discriminatory effect by statistics showing selection for searches was twice the rate for similarly situated white women); *Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1015 (N.D. Ill. 2002) (denying summary judgment motion on plaintiffs' Title VII claim as statistical disparities between the advancement rates of men versus women in a public defender's office provided possible evidence of disparate impact); *see also Chavez v. Ill. State Police*, 251 F.3d 612, 638, 640 (7th Cir. 2001) (noting that the Supreme Court has "repeatedly relied on statistics" to prove discriminatory effect and that statistics alone can be sufficient to make such a showing).

a similar way[.]" *Lyons*, 461 U.S. at 111.

Defendants also assert that "there are a number of links in the chain before a Plaintiff is injured by a prior gang designation" and therefore the harm they complain of is "inherently speculative." Defs. Mot. at 7-9. Once again, Defendants' assertion is misguided. Plaintiffs allege that they were first injured because they were targeted for inclusion in the Database based on their race and were denied any due process protections. And they were injured again when their false gang designations were shared and relied upon by CPD or a third party resulting in the further deprivation of their rights. The risk of future injury to the Individual Plaintiffs is not inherently speculative, but rather is very real and impending given that their gang designations are permanent and are constantly being shared and relied upon by third parties and CPD.

Despite Defendants' protestations to the contrary, this case is distinguishable from *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013). In *Clapper*, the plaintiffs alleged *inter alia* that they were injured because they faced "an objectively reasonable likelihood" of being subject to a governmental surveillance program. *Id.* at 401. But the plaintiffs there had no evidence that they had actually been surveilled or that the government had policies and practices that would result in their surveillance. And, importantly, the government could only engage in surveillance after receiving court approval. The Supreme Court found that the plaintiffs lacked standing because their alleged harm was speculative and would result from "the decisions of independent actors." *Id.* at. 410-14. *Clapper* is inapplicable here where the Individual Plaintiffs were already harmed and face a real and immediate threat of future injury, and that injury results directly from the actions of the CPD. Unlike in *Clapper*, there is no court charged with approving CPD's entries into the Gang Database, determining whether the entry is "reasonably designed" to further a legitimate law enforcement purpose, and enforcing strict limits on the

11

dissemination and retention of the designation. *Id.* at 405. Further, the *Clapper* plaintiffs had no evidence that the program there would target them. If the Gang Database had significant external checks and balances, if it was not permanent, and if Plaintiffs had not already suffered constitutional deprivations as a result of CPD's Gang Database related policies and practices, *Clapper* would be fatal to Plaintiffs' claims. But it is not because Plaintiffs' risk of future injury is inherent and unavoidable due to the permanent and stigmatizing nature of the gang designation and results directly from CPD's own actions.

### 2. Plaintiffs were not engaging in avoidable, illegal conduct

Further differentiating this case—and of particular importance to the Court's standing inquiry—is that the Individual Plaintiffs were acting lawfully prior to being harmed by the gang designation. First, entry into the Gang Database does not require unlawful conduct or gang-related conduct. The Individual Plaintiffs were designated as gang members because of their race. Compl. ¶ 171. Second, the Individual Plaintiffs were not engaging in unlawful conduct or gang-related activity when they were harmed because of their inclusion in the Database. Plaintiff Lucas was applying for a concealed carry license, and was denied. *Id.* ¶ 100. Plaintiff Warner was just walking to pick his younger brother up from school when he was wrongfully arrested, and he has frequently been stopped and harassed by CPD officers for simply hanging out in his neighborhood. *Id.* ¶¶ 112-13. Plaintiff Cooper got in a car accident, and was denied an I-Bond and placed under house arrest. *Id.* ¶¶ 127-28. And Plaintiff Pedrote was sitting in his parked car waiting for his friend when an officer unlawfully searched his car. *Id.* ¶¶ 140-47.

Courts routinely confer equitable standing on plaintiffs who are harmed while abiding the law. *See Smith*, 143 F. Supp. 3d at 752 ("Plaintiffs' allegations are distinguishable from *Lyons* because Plaintiffs have alleged that they were engaging in innocent, lawful conduct . . . prior to

the alleged suspicionless stops and/or frisks, such as walking home from the grocery store, standing in front of their own homes or the homes of friends, or taking digital photographs for a college course."); *Barrios v. City of Chicago*, No. 15 C 2648, 2016 WL 164414 (N.D. Ill. Jan. 14, 2016) (distinguishing *Lyons* in forfeiture case where plaintiffs, whose cars were impounded based on mere suspicion of illegal activity, "were ultimately vindicated by the criminal justice system"); *Anderson v. Cornejo*, No. 97 C 7556, 1999 WL 258501, at *2 (N.D. Ill. Apr. 21, 1999) (women improperly searched in customs had standing in part because they had not engaged in any illegal conduct prior to the search); *Hvorcik v. Sheahan*, 870 F. Supp. 864, 867 (N.D. Ill. 1994) (finding standing in class action challenging Sheriff's failure to minimize invalid arrest warrants in system because "further criminal activity (or even asserted criminal activity) . . . is not at all necessary for the peril posed by the Sheriff's unconstitutional conduct to be converted into reality"); *Franklin v. Chicago*, 102 F.R.D. 944, 948 (N.D. Ill. 1984) (plaintiff, arrested without probable cause, faced a realistic threat of again being arrested and transported even if he acted lawfully). Other circuits are in accord.[5]

Hence, Defendants' reliance on *Swanigan v. City of Chicago*, where the court denied standing to a plaintiff seeking injunctive relief against the Chicago Police Department's policy of holding arrestees for longer than 48 hours because the plaintiff could avoid future injury if he merely followed the law, is off-point. 881 F.3d 577, 583 (7th Cir. 2018).

### 3. The CPD targets Blacks and Latinx individuals for inclusion in the Gang Database

---

[5] *See, e.g.*, *Thomas*, 978 F.2d at 508 ("In contrast [to *Lyons*] . . . many victims purportedly did nothing to warrant detention or apprehension prior to the mistreatment."); *Hernandez v. Cremer*, 913 F.2d 230, 234-35 (5th Cir. 1990) (finding standing where INS stop inflicted an injury that "did not result from an individual's disobedience of official instructions and [plaintiff] was not engaged in any form of misconduct"); *Floyd*, 283 F.R.D. 169-70 ("Unlike the plaintiffs in *Lyons*…[the plaintiff's] risk of future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law."); *Nat'l Congress*, 75 F. Supp. 2d at 161 ("The fact that plaintiffs were stopped while engaging in everyday tasks further illustrates a realistic risk of future harm.").

The CPD disproportionately targets Black and Latinx people for inclusion in the Gang Database. Compl. ¶ 1. As a result of such racially discriminatory conduct, the Individual Plaintiffs and sub-class of Black and Latinx individuals are particularly likely to be subjected to future harm. Plaintiffs who are likely to suffer constitutional violations as a result of possessing certain immutable characteristics are entitled to seek injunctive relief. *See, e.g.*, *Honig v. Doe*, 484 U.S. 305, 320-22 (1988) (distinguishing *Lyons* where plaintiff was an emotionally handicapped individual who could not conform his behavior to socially acceptable norms); *Thomas*, 978 F.2d at 508 (plaintiffs pled sufficient facts to establish standing based partly on their allegation that the defendant's "misconduct is purposefully aimed at minorities and that such misconduct was condoned and tacitly authorized by department policy makers."); *Church v. City of Huntsville*, 30 F.3d 1332, 1338 (11th Cir. 1994) (homeless plaintiffs had standing to seek injunctive relief against city's policy of removing homeless persons from public places because, as a result of "the allegedly involuntary nature of their condition, the plaintiffs cannot avoid future 'exposure to the challenged course of conduct' in which the City allegedly engages"); *Md. State Conference of NAACP Branches v. Md. Dep't of State Police*, 72 F. Supp. 2d 560, 565 (D. Md. 1999) (distinguishing *Lyons* where "the plaintiffs' likelihood of injury depends only on their status as a member of a minority group and their need to travel on I-95").

Empirical evidence of discrimination supports the plausible inference of future injury for standing purposes. Approximately 95 percent of people included in CPD's Gang Database are Black or Latinx—70 percent are Black, 25 percent are Latinx, and less than 5 percent are white. Compl. ¶¶ 51-52. While the CPD identifies a substantially higher percentage of Black and Latinx people as gang members than the national average (81.5%), it identifies a substantially lower percentage of white people as gang members than the national average (11.5%). *Id.* The

Database includes approximately 11 percent of Chicago's Black population and 4 percent of its Latinx population, as compared to only 0.6 percent of the white population. *Id.* ¶ 53. Black and Latinx people are more likely to receive a specific gang designation in the Gang Database than white people as a result of block-labelling. *Id.* ¶ 47. Black and Latinx people are also more likely than white people to be added to the Gang Database when they are simply stopped by CPD officers in any neighborhood. *Id.* ¶¶ 58-60. Furthermore, Black and Latinx people are likely to be stopped by police after their initial placement in the Gang Database, and as a result are more likely to suffer harms including police harassment, unreasonable searches and seizures, and false arrest and imprisonment. *Id.* ¶¶ 88-89.

This statistical evidence, combined with the CPD's history of racial and ethnic animus, *id.* ¶¶ 61-67, creates the plausible inference that future injury to the Plaintiffs and the sub-class is "real and imminent." *Cf. Thomas*, 978 F.2d at 508 ("Repeated instances of violence and retaliatory confrontations are 'continuing present adverse affects' and cause the threatened injury to be 'sufficiently real and immediate to show an existing controversy.'" (citation omitted)).

Accordingly, the Individual Plaintiffs have pleaded sufficient allegations to establish their standing to seek injunctive relief.

### B. The Organization Plaintiffs Have Standing to Seek Equitable Relief

An organization may assert standing to bring a lawsuit on behalf of itself, on behalf of its members, or on behalf of both. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 924 (7th Cir. 2008). The Organizational Plaintiffs' well-pleaded factual allegations establish their right to seek prospective relief under organizational and associational theories of standing.

### 1. The Organization Plaintiffs have standing to sue for injuries incurred directly to each of their organizations

15

As with an individual plaintiff, an organization seeking to sue on its own behalf must show that it has (1) suffered an injury in fact, (2) which is casually connected to the challenged conduct, and (3) which is likely to be redressed by a favorable court decision. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2339-41 (2014). The fact that an organization has had to divert resources from a core purpose in order to address the unlawful conduct will suffice to show cognizable injury. *See Havens*, 455 U.S. at 379 (non-profit that counseled and provided housing referrals to low-income homeseekers had standing to challenge landlord's racial steering practices, which constituted "demonstrable injury to the organization's activities—with the consequent drain on the organization's resources"); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951-52 (7th Cir. 2007) (Democratic Party had standing to seek injunctive relief against enforcement of unconstitutional state voting laws as law "compel[s] the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"), *aff'd*, 553 U.S. 181 (2008); *Equal Rights Ctr. v. Kohl's Corp.*, No. 14 C 8259, 2015 WL 3505179, at *2 (N.D. Ill. June 3, 2015) (allegations that organization "diverted a portion of its scarce resources" to address "[d]efendants' discriminatory policies and practices" instead of "providing . . . services to its members and the community" sufficient to show organizational standing (citations omitted)).

The Organizational Plaintiffs satisfy the Article III standing requirements under the *Havens* standard. They sufficiently allege that CPD's unconstitutional use of its Gang Database has forced each to expend time and money addressing the effects of the abuses. Compl. ¶¶ 11-16. These resources would otherwise have been spent promoting their core missions, which include education, housing, immigration, workers' rights, racial, economic, and climate justice, and gender issues. *Id.* Contrary to Defendants' arguments, the Organizational Plaintiffs do

16

provide specific information about their usual missions, uniquely alleged for each Organizational

Plaintiff, and how CPD's Gang Database caused them to divert resources from those usual

missions. The Organizational Plaintiffs make clear that these additional expenditures to respond

to unconstitutional practices related to the Gang Database were undoubtedly not part of the

organizations' usual missions and were not routine. The Organizational Plaintiffs' allegations

regarding the injury each organization has suffered are far from "boilerplate" as the Defendants

suggest, and are far more individualized and detailed than the allegations in the cases Defendants

rely on for this misguided suggestion. *See* Defs. Mot. at 11 (citing *Milwaukee Police Ass'n v.*

*Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) (holding that an organization did not have standing

where the organization only alleged that it "possesses a tangible interest in knowing the law as it

may impact its members, as well as ensuring that its members are afforded due process"); *Plotkin*

*v. Ryan*, 239 F.3d 882, 884 (7th Cir. 2001) (holding that an organization did not have standing

where expenditures that the organization made were part of its normal purpose)).

### 2. The Organizational Plaintiffs also have associational standing

The Organizational Plaintiffs also seek to sue on behalf of their members for the same

types of harms suffered by the Individual Plaintiffs. An organization has associational standing

if "(1) at least one of its members would otherwise have standing; (2) the interests at stake in the

litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the

relief requested requires an individual member's participation on the lawsuit." *Sierra Club*, 546

F.3d at 924. Defendants disputes all three of these requirements, but Defendants' argument for

the first requirement and their limited arguments for the second and third requirements are

unsupported by case law or other authority. *See* Defs. Mot. at 11-13.

Organizations like the Organizational Plaintiffs may be the best parties to bring suits to

protect the rights of their members, as opposed to the individual members themselves. *See NAACP v. Alabama ex. rel. Patterson*, 357 U.S. 449, 458-59 (1958) (supporting associational standing in holding that the NAACP had standing to sue to prevent the state of Alabama from compelling disclosure of its membership lists because the association and its members "are in every practical sense identical" and the NAACP was "the medium through which its individual members seek to make more effective the expression of their own views"); *NAACP v. Button*, 371 U.S. 415, 430 (1963) ("we have affirmed the right 'to engage in association for the advancement of beliefs and ideas'" (quoting *NAACP*, 357 U.S. at 460)). Further, organizations provide people with the resources that they might otherwise lack individually to "vindicat[e] interests that they share with others." *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986). Thus, the fact that the Organizational Plaintiffs "serve as the medium through which [their] individual members" effectively express their views and possess the resources to effectuate those views, means that the Organizational Plaintiffs are the best parties to bring suit to protect the rights of their individual members related to the CPD's unconstitutional use of the Gang Database, and supports the Organizational Plaintiffs' associational standing. *See NAACP*, 357 U.S. at 459.

Defendants first argue that the Organizational Plaintiffs fail to identify specific members of their organizations who have been harmed. Defs. Mot. at 12. However, the Complaint makes clear that it is plausible, particularly given the communities the organizations represent as well as the secrecy and unreliability of the Database and the known demographics of the Database, that all of the Organizational Plaintiffs' members have been or are likely to be subjected to wrongful inclusion in the Gang Database and to consequences stemming from CPD's unconstitutional use of the Database. *See* Compl. ¶¶ 1, 4-6, 11-16. Therefore, the Organizational Plaintiffs properly

allege that their individual members have been or are likely to be harmed. In civil rights cases such as these, that is all that is required for associational standing. *See NAACP*, 357 U.S. at 459 (finding associational standing where all organization members were affected by release of membership lists); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (where it is clear "that one or more members have been or will be adversely affected by a defendant's actions, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured"). *Summers v. Earth Island Institute*, which Defendants erroneously rely on, involved environmental claims, which are different than the civil rights claims that the Organizational Plaintiffs assert. 555 U.S. 488 (2009). Further, in *Summers*, while the Court held that a plaintiff organization must assert specific allegations that establish "that at least one identified member had suffered or would suffer harm," it held that this requirement does not apply where, as is the case for the Organizational Plaintiffs, "*all* members of an organization are affected by the challenged activity." *Id.* at 498-99 (citing *NAACP*, 357 U.S. at 459); *see also Nat'l Council of La Raza*, 800 F.3d at 1041 ("We are not convinced that *Summers*, an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization."). Defendants also erroneously rely on *Uptown Tent City Organizers v. City of Chicago Department of Administrative Hearings*, which is distinguishable from the case at hand because there, it was not conceivable that all members of the organization plaintiff (UTCO) were injured or were likely to be injured. No. 17 C 4518, 2018 WL 2709431, at *6 (N.D. Ill. June 5, 2018). Importantly, while the court in *Uptown* relied on *Sumner* to require the organization

plaintiff to identify specific members that were injured, it noted that the "[t]he Seventh Circuit has not addressed the issue of associational standing where the plaintiffs do not identify any member of the plaintiff organization who allegedly suffered an injury in fact." *Id.*

Defendants next argue that the Complaint fails to establish that the interests the Organizational Plaintiffs seek to protect are "germane" to their purpose. Defs. Mot. at 12-13. However, the Organizational Plaintiffs allege that they seek to protect their respective members' rights related to justice and freedom that are adversely affected by wrongful inclusion or likely wrongful inclusion in the CPD's Gang Database. *See* Compl. ¶¶ 11-16. These interests are undoubtedly germane to the organizations' purposes of addressing issues relating to education, housing, racial, gender, and economic justice, protection of workers' and immigrants' rights, violence, including police violence, discriminatory policing, and criminalization of youth and minority communities. *See id*; *see also Brock*, 477 U.S. at 286 (1986) (finding that "there is little question that the interests that the UAW seeks to protect in this suit are 'germane to the organization's purpose' because one of its goals is to secure unemployment benefits for its workers); *Nat'l Rifle Ass'n of Am., Inc. v. City of Evanston*, No. 08 C 3693, 2009 WL 1139130, at *6 (N.D. Ill. Apr. 27, 2009) (holding that the NRA's complaint identified interests germane to the lawsuit's issues regarding possession and transportation of handguns where it stated that the organizations purposes included "the protection of the right of citizens to acquire, possess, collect, transport and carry firearms for . . . lawful purposes," "the promotion of 'public safety and law and order,' and 'hunting and hunter safety,'" and "the 'fostering of shooting sports'"). Further, while the Organizational Plaintiffs sufficiently allege that the interests they seek to protect related to the Gang Database are germane to each organization's purpose, the protection of these interests, as explained above, nonetheless causes the Organizational Plaintiffs to divert

20

resources from their core purposes in order to address CPD's unlawful conduct. *See* Compl. ¶¶ 11-16; *Equal Rights Ctr.*, 2015 WL 3505179, at *2 (organization successfully alleged both organizational and associational standing); *NAACP v. City of Kyle, Tex.*, No. A-05-CA-979 LY, 2006 WL 1751767, at *5-6 (W.D. Tex. June 16, 2006) (organizations sufficiently alleged both organizational and associational standing).

Once the first two requirements for associational standing are satisfied, "it is difficult to see a constitutional necessity for anything more." *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 556 (1996). Regardless, the Organizational Plaintiffs meet the third requirement of establishing that the case can be litigated without participation of individual members, despite Defendants' unsupported contentions to the contrary. *See* Defs. Mot. at 13. The Organizational Plaintiffs seek declaratory and injunctive relief, and the Supreme Court has repeatedly held that litigation inherently does not require individual participation of members "when an association seeks prospective or injunctive relief for its members." *United Food and Commercial Workers Union*, 517 U.S. at 551; *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Warth v. Seldin*, 422 U.S. 490 (1975). Litigating claims on behalf of the organizations' members would not require, as the Defendants mistakenly suggest, fact-specific inquires that necessitate that the individual members themselves participate. *See, e.g., Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 602-03 (7th Cir. 1993) ("Declaratory, injunctive, or other prospective relief will usually inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary" (citing *Warth*, 422 U.S. at 515)); *Equal Rights Ctr.*, 2015 WL 3505179, at *2 (holding that an organization met the third requirement for associational standing, and noting the Supreme Court never "intended to limit representational standing to cases in which it would *not*

be necessary to take any evidence from individual members of an association'" (quoting *Retired Chi. Police Ass'n*, 7 F.3d at 602)).

## II. Plaintiffs Have Properly Alleged That Defendants Violated Their Due Process Rights Under the Stigma-Plus Doctrine

Defendants seek dismissal of Counts I, V, and VIII of the Complaint, contending that Plaintiffs have failed to state due process claims. Defs. Mot. at 13-21. Defendants' argument is unavailing because it simply fails to account for Plaintiffs' actual theory of liability.

### A. Defendants Deprived Plaintiffs of a Protected Liberty Interest by Damaging Their Reputations

Plaintiffs have clearly stated a claim for deprivation of a protected liberty interest without adequate due process. "A plaintiff may prove a deprivation of a protected liberty interest by showing damage to his 'good name, reputation, honor, or integrity.'" *Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 753 (7th Cir. 2012) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). This "stigmatic harm," however, must "extend beyond mere reputational interests," for procedural safeguards to come into play. *Id.* (quoting *Omosegbon v. Wells*, 335 F.3d 668, 675 (7th Cir. 2003)). Under what is commonly known as the "stigma-plus doctrine," procedural due process rights are implicated when (1) the government publically stigmatizes an individual, and (2) the individual suffers the loss of an additional liberty or property interest as a result. *See Paul v. Davis*, 424 U.S. 693, 707-712 (1976); *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir. 2004). To constitute sufficient loss of liberty, the stigmatizing statement must "alter or eliminate 'a right or status previously recognized by state law.'" *Hannemann*, 673 F.3d at 753 (quoting *Paul*, 424 U.S. at 711); *see also Alston v. City of Madison*, 853 F.3d 901, 909 (7th Cir. 2017) ("the action must also alter a previously recognized legal status or right").

Plaintiffs have sufficiently pleaded both elements of the stigma-plus claim.[6]

### 1. Defendants imposed a stigmatizing gang designation on Plaintiffs and publicized that stigma

Plaintiffs easily meet the first prong of the stigma-plus analysis because Defendants gave the Individual Plaintiffs an erroneous stigmatic label, which they then publicized. Being labelled a gang member is undoubtedly stigmatizing because it implies criminal conduct. *See, e.g.*, *Alston*, 853 F.3d 901, 909 ("Without question, being classified as a 'repeat violent offender' harms one's reputation."); *Latif v. Holder*, 28 F. Supp. 3d. 1134, 1150 (D. Or. 2014) ("placement on the No-Fly List satisfies the 'stigma' prong because it carries with it the stigma of being a suspected terrorist"). Indeed, courts have found that a plaintiff's reputation can be damaged in much less stigmatizing circumstances. *See, e.g.*, *Wisconsin*, 400 U.S. at 437 (finding that being listed as an excessive drinker on a notice in retail liquor outlets could produce a "stigma or badge of disgrace"); *Manos v. Bd. of Educ. of Villa Grove Cmty. Unit Sch. District #302*, No. 2:15-CV-2220, 2017 WL 6371299, at *11 (C.D. Ill. Dec. 13, 2017) ("The statement that Plaintiff 'threatened, intimidated, and coerced staff members,' . . . could be sufficiently stigmatizing to someone in the education administration profession."); *Endicott v. Huddleston*, 644 F.2d 1208, 1215 (7th Cir. 1980) (finding that allegations of conflicts of interest, deceptive practices, and failure to disclose tax increases sufficiently stigmatized a County Board member).

Further, Defendants publicized Plaintiffs' stigmatizing labels by sharing the Gang Database with various third parties, including federal and local government agencies, courts and prosecutors' offices, municipalities, other police departments, and licensing review boards. *See* Compl. ¶¶ 78-83; *Larry v. Lawler*, 605 F.2d 954, 958 (7th Cir. 1978) (holding that the Civil

---

[6] Defendants cite numerous cases for the proposition that there exists no due process right to accurate police records in an effort to defeat Plaintiffs' due process claims. Defs. Mot. at 14-15. Not one case cited is relevant to the stigma-plus analysis and therefore each case cited is wholly inapplicable to the relevant analysis here.

Service Commission's sharing of plaintiff's stigmatizing rejection with federal agencies on a "need to know basis" was sufficiently public); *Latif*, 28 F.Supp.3d at 1150 (finding that the plaintiffs' "No-Fly" status was made sufficiently public when it was only disclosed to airline employees and any travelers that may be in earshot of the ticket counter); *Castillo v. County of Los Angeles*, 959 F. Supp. 2d 1255, 1261-62 (C.D. Cal. 2013) (finding that plaintiff's inclusion in the Child Welfare Services Case Management System (CWS/CMS) database was made sufficiently public because even though information in the database "is not publicly available, . . . information included in CWS/CMS is available . . . to numerous in-state and out-of state governmental entities and agencies"). As demonstrated by these cited cases, for purposes of the public stigma, it is enough that Defendants shared Plaintiff's stigmatizing label internally in CPD as well as with various state and federal entities and agencies.

### 2. Defendants deprived Plaintiffs of liberty interests that satisfy the "plus" prong

Plaintiffs also have sufficiently pleaded facts to satisfy the second prong of the stigma-plus doctrine. In considering the "plus" prong of the stigma-plus doctrine, courts have found deprivations of liberty interests in a wide range of contexts, including employment, licensure, education, and travel. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574-76 (1975) (holding that students facing temporary suspension from public school for up to ten days based on charges of misconduct were entitled to protection under the due process clause); *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (finding that where "child care workers effectively are barred from future employment in the child care field once an indicated finding of child abuse or neglect against them is disclosed to, and used by, licensing agencies and present or prospective employers . . . [s]uch circumstances squarely implicate a protected liberty interest"); *Larry*, 605 F.2d at 956 (finding a liberty interest in employment where plaintiff was barred from "obtaining

24

employment in any capacity with the federal government for a period of up to three years"); *Latif*, 28 F. Supp. 3d at 1150 (finding that plaintiffs "satisfied the 'plus' prong because being on the No-Fly List means Plaintiffs are legally barred from traveling by air at least to and from the United States and over United States airspace, which they would be able to do but for their inclusion on the No-Fly List"); *Castillo*, 959 F. Supp. 2d at 1261-62 (holding that the "plus" prong was met where plaintiff's inclusion in the Child Welfare Services database had "serious implications" for his ability to adopt his half-brother, get licensures, and volunteer with children).

Here, the Individual Plaintiffs have alleged a number of harms suffered by them, each of which satisfies the plus prong. Plaintiff Lucas alleges that despite meeting all the eligibility requirements, he was denied a Concealed Carry License because of the false gang designation. Illinois law affords the right to a Concealed Carry License to anyone who meets the statutory requirements. 430 ILCS 66/10. Therefore, the gang designation altered or eliminated "a right or status previously recognized by state law" by affecting Lucas' ability to get a Concealed Carry License. *Hannemann*, 673 F.3d at 753; *see also Humphries v. County of Los Angeles.*, 554 F.3d 1170, 1187-88 (holding that couple met the plus prong by alleging that placement on a child abuse list, which required licensing agencies to conduct an additional investigation, altered their legal rights or status in obtaining a license for child care even if they were not ultimately denied the license); *Castillo*, 959 F. Supp. 2d at 1261-62 (holding that the "plus" prong was met where plaintiff's inclusion in the Child Welfare Services database had "serious implications" for his ability to get licensures). Defendants demonstrate their misunderstanding of the stigma-plus doctrine by claiming that denial of the license did not violate Lucas' due process rights because the procedures afforded concealed carry applications for challenging denial of a license satisfy

due process. Defs. Mot. at 16. Defendants' argument misses the mark because the stigma-plus doctrine requires due process at the front end before the stigmatic label is shared with third parties and has the potential to alter or eliminate a legal right. Therefore, Lucas has sufficiently demonstrated a due process violation under the stigma plus doctrine by alleging that he received no due process before he was permanently labeled a gang member or before the gang label was shared with the licensing board. The mere fact that he might have been afforded due process during an appeals process by the licensing board is irrelevant. *See Humphries*, 554 F. 3d at 1188.

In addition to being denied a Concealed Carry License, Lucas' gang designation will prevent him from advancing his career within the security field and becoming a parole officer. Compl. ¶¶ 103-104. Thus, Lucas is effectively barred from future employment within his chosen field, further satisfying the plus prong. *See Dupuy,* 397 F.3d at 503; *Townsend v. Vallas,* 256 F.3d 661, 669 (7th Cir. 2001) ("[T]o implicate a liberty interest, such charges of defamation must be coupled with the alteration of a legal status, such as the loss of an employment position."); *Larry*, 605 F.2d at 956.

Plaintiff Warner alleges that he has been subjected to frequent stops and harassment by officers because of his false gang label. Compl. ¶ 112. He was also arrested without probable cause for allegedly soliciting unlawful business and detained in jail for two days because of his gang label. *Id.* ¶¶ 117-121. Warner clearly has a Fourth Amendment right to be free from unreasonable searches and seizures. *See Dunaway v. New York,* 442 U.S. 200, 211-13 (1979) (holding that seizing a person without probable cause violated the individual's Fourth Amendment rights); *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Therefore, Warner's Fourth Amendment rights were altered or eliminated due to the stigmatizing gang label, satisfying the plus prong. *See Hannemann*, 673 F.3d at 753. Defendants erroneously argue that Warner does

26

not have a claim under due process because "the Fourth Amendment, not the due process clause, is the proper basis for challenging the lawfulness of an arrest." Defs. Mot. at 17-18 (quoting *Alexander v. McKinney*, 629 F.3d 553, 558 (7th Cir. 2012)). However, none of the cases cited by Defendants involve stigma-plus due process claims. Although Warner can and has alleged a claim under the Fourth Amendment (Count VII), he is not prohibited from also bringing a claim under the stigma-plus doctrine for a violation of his Fourteenth Amendment due process rights as long as he can properly show, as he has done here, that the stigmatizing gang label altered or extinguished a preexisting legal right. *See Gobel v. Maricopa Cty.*, 867 F.2d 1201, 1205 (9th Cir. 1989) (holding that plaintiff stated a stigma-plus claim where the plus prong was a false arrest).

Plaintiff Cooper alleges that he was denied an I-Bond for routine traffic violations and taken to jail, where he was held for two days, per an explicit CPD policy that automatically prohibits alleged gang members from being eligible for I-Bonds. Compl. ¶ 127. Cooper was then subsequently placed on house arrest and electronic monitoring for ten days because of his false gang label. *Id.* ¶¶ 128-29. If not for the false gang designation, Cooper would have received an I-Bond and been able to live at home free from such restrictions while awaiting traffic court. Procedural due process rights are implicated whenever an individual's freedom of movement is restricted. *See Morrissey v. Brewer,* 408 U.S. 471, 481-82 (1972) (procedural due process required before the state can revoke a parolee's parole because of alleged violations of the conditions of parole); *Paige v. Hudson*, 341 F.3d 642, 643 (7th Cir. 2003) (procedural due process required before a probationer can be transferred from home detention to jail); *Liska v. Dart*, 60 F. Supp. 3d 889, 898 (N.D. Ill. 2014) (procedural due process required before a pretrial detainee under home confinement can be removed to jail). Cooper was deprived of any due

process during his denial of an I-Bond based solely on his false gang label and thus he has sufficiently pleaded a procedural due process claim (Count VIII). Additionally, the denial of his Fourteenth Amendment procedural due process rights also serves as the plus factor for his stigma-plus due process claim—the false gang label altered or extinguished his preexisting legal right. *See, e.g.*, *Hall v. Marshall*, 479 F. Supp. 2d 304, 314 (E.D.N.Y. 2007 (finding that plaintiff met requirements of stigma plus doctrine where he alleged that his pre-sentence report (PSR) "contained a description of his offense that was factually false and damaging to his reputation" and that "he was denied parole based on an inaccurate PSR").

In conclusion, Plaintiffs have sufficiently pleaded facts to satisfy both prongs of the stigma-plus doctrine and therefore have established a constitutionally-protected liberty interest in their reputations.

### B. Defendants Must Provide Basic Procedural Protections Prior to Publicizing Stigmatizing Designations

Given that Plaintiffs have a constitutionally-protected liberty interest in their reputations, Defendants have to provide basic procedural protections before sharing their gang designations with third parties. *See Wisconsin*, 400 U.S. 433 at 510 ("Where a person's good name, honor, and reputation are at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481. When evaluating the sufficiency of procedural protections, courts generally balance three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the

28

procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

The first factor clearly weighs in Plaintiffs' favor because, as discussed in detail above, Plaintiffs have liberty interests that were and are threatened by the stigmatizing effect of their gang labels. *See Castillo*, 959 F. Supp. 2d at 1263 ("Castillo's argument in support of his private interest at stake is analogous to his argument in support of his liberty interest" and thus the first *Mathews* factor "clearly weighs in favor of Castillo"). As to the second factor, the Defendants had zero procedural protections in place before designating Plaintiffs or anyone else a gang member in the Database; therefore, this factor also weighs in their favor.

As to the third factor, Defendants argue that "CPD has a strong interest in maintaining information about gang affiliations" to "help prevent violent gang-related crime before it starts." Defs. Mot. at 20. But there is simply no legitimate law enforcement interest in maintaining or conveying false information about people who are gang-affiliated. The Gang Database is filled with errors and is arguably both over-inclusive—many people, like the Individual Plaintiffs, are included in the Database who are not in fact gang members—and under-inclusive—it is likely people who are actually gang members are not in the Database. Research shows that gang databases nationwide are not effective law enforcement tools—partly because of their unreliability—and offer little to no benefit in reducing crime. Compl. ¶ 48 (citing Rebecca R. Brown, *The Gang's All Here: Evaluating the Need for National Gang Database*, 42 Colum. J.L. & Soc. Probs. 293, 300-02 (2009) (discussing the lack of value in gang databases as a tool for crime suppression, in part because "it is not clear that documented gang members commit

more crimes, or more serious crimes, than their non-documented counterparts"); Joshua D.

Wright, *The Constitutional Failure of Gang Databases*, 2 Stan. J.C.R. & C.L. 115, 119-20

(2005) (discussing the unreliability of gang databases, stating that "research suggests gang

databases are of little incremental value in reducing gang crime," and arguing that procedural

protections would further the State's interest by increasing accuracy)).  Thus, the current, flawed

iteration of the CPD's Gang Database has little, if any, value in preventing gang-related crime.

*See Castillo*, 959 F. Supp. 2d at 1263 ("But if this system contains either incorrect or outright

false information, the system's effectiveness and accuracy are lessened, and California's interest

in maintaining the system is severely diminished.").

 Defendants further contend that Plaintiffs' proposed procedural protections are

"unworkable and would undermine CPD's ability to gather important information."  Defs. Mot.

at 19-20.[7]  Here too, Defendants fundamentally misunderstand Plaintiffs' legal claims.  No

process of any sort would be required were CPD to designate an individual a "gang member" and

keep that designation confidential.  Instead, the need for process only attaches when CPD shares

the designation with third parties who will rely on that information without question, and in so

doing put a person's liberty interest at risk.  In short, an easy fix will address the Defendants'

concern that due process requirements would be overly burdensome: CPD could (1) abandon the

use of gang designations (as explained above these designations have been shown to have limited

law enforcement utility); or (2) refuse to share the gang designations with third parties.

 However, if CPD refuses to implement such changes, then it is required by law to create a

process to ensure that people have notice and an opportunity to correct false information before

CPD shares information that could place liberty interests in jeopardy.  *See Mathews*, 424 U.S. at

---

[7]  Plaintiffs reiterate that Defendants' objections to Plaintiffs' proposed remedies are improperly argued at this stage.
The relevant issue here is simply whether Plaintiffs have alleged sufficient facts to establish a due process violation.

348; *Wisconsin*, 400 U.S. 433 at 510. Furthermore, implementing basic procedural protections, including notice and an opportunity to be heard, are unlikely to overburden the CPD. The cost to Defendants of implementing notice and some type of hearing would be minimal, particularly because of the flexibility of the due process requirements. *See Castillo*, 959 F. Supp. 2d at 1263 ("Granting individuals listed in CWS/CMS an additional procedure by which they can challenge their listing will no doubt impose additional administrative and fiscal burdens on California, but these burdens are generally 'the sort of administrative costs that we expect our government to shoulder.'" (citation omitted)).

In decrying the necessity of procedural protections here, Defendants also ignore the changing landscape of the gang database issue nationwide, including legislative reform of "CalGang," California's gang database. California's reform includes a review and appeal process for a person to challenge his or her inclusion in the gang database, provisions for audits and purging of incorrect records, and the prevention of sharing gang database information with federal immigration authorities. *See* California AB-90 ("Criminal gangs"), approved by the Governor on Oct. 20, 2017. While Plaintiffs do not contend that Defendants must follow California's model, it does provide a template for remedying the issues at stake in Plaintiffs' case. It also underscores the fact that states with even larger criminal justice systems than those in Illinois have found a way to protect the rights of the people targeted by those systems.

CPD's interest would not be harmed by implementing a system that seeks to clear those falsely accused of being a gang member from the Gang Database. Therefore, the balance of the *Mathews* factors weighs in Plaintiffs' favor and Plaintiffs are entitled to basic due process protections. *See Castillo*, 959 F. Supp. 2d at 1264 ("Under the totality of the circumstances, the risk of including false positives in the CWS/CMS database and distributing that information to

31

other agencies (even if not the public) is too great for the County to deny the individuals
included in the database their constitutional right to due process.").

## III.     Plaintiffs Have Properly Alleged Equal Protection Claims

To prevail on their Equal Protection claims, Plaintiffs must show that Defendants'
conduct in targeting Plaintiffs and members of the Plaintiff sub-class for inclusion in the Gang
Database was motivated by a discriminatory purpose and had a discriminatory effect. *Chavez v.
Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). Plaintiffs have sufficiently pleaded both
elements and thus Counts II and IV should not be dismissed.

### A.     Plaintiffs Have Properly Alleged a Discriminatory Purpose

To demonstrate discriminatory purpose, Plaintiffs must show that the Defendants
"selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse
effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).
Plaintiffs only need to show that a discriminatory purpose was a "motivating factor" for the
Defendants' actions, not that discriminatory intent was the "dominant or primary one." *Vill. of
Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265. Courts should "consider all
relevant circumstances" to assess discriminatory purpose given the rarity of direct evidence.
*Batson v. Kentucky*, 476 U.S. 79, 96 (1986); *see also Washington v. Davis,* 426 U.S. 229, 242
(1976) ("an invidious discriminatory purpose may often be inferred from the totality of the
relevant facts").

Far from being general, as the Defendants suggest, Defs. Mot at 22-23, Plaintiffs'
allegations are more than sufficient for the court to plausibly infer discriminatory intent.
Plaintiffs allege that the Individual Plaintiffs were designated as gang members because of their
race, Compl. ¶¶ 111,135, 171; CPD has a history of targeting its gang suppression efforts against

people of color, *id.* ¶¶ 62, 40; there is a disproportionate number of Black and Latinx people in the Gang Database, *id.* ¶ 1; white gangs are underrepresented in the database, *id.* ¶¶ 52, 55; under McCarthy, CPD escalated its practice of adding Black and Latinx people to the database through block-labeling, *id.* ¶¶ 44, 54; Blacks and Latinx individuals are more likely to be stopped by police, and more likely to be added to the Database as a result of a stop, *id.* ¶¶ 58-60, 89; in 2016, the City-established Task Force documented CPD's animus towards people of color, *id.* ¶¶ 61-63; Mayor Rahm Emmanuel as well as Superintendent Johnson acknowledged that racism infests CPD, *id.* ¶ 64; in January 2017, the DOJ's investigation of CPD confirmed CPD's deeply embedded racial animus, *id.* ¶ 65; CPD officers regularly use racial slurs and epithets, *id.*; and people consistently file complaints against CPD describing verbal abuse on the basis of race or ethnicity to no avail, *id.* ¶ 66. Defendants wish to subject Plaintiffs to a higher pleading standard by citing to *Chavez*, but their reliance on *Chavez* is misplaced given that case was decided on summary judgment, not a motion to dismiss. *See Smith v. City of Chicago*, 143 F. Supp. 3d 741, 755 (N.D. Ill. 2015) (explaining that a complaint need not make out a prima facie case of discrimination). Plaintiffs have alleged more than enough evidence to sufficiently plead discriminatory purpose. *See Casimir v. City of Chicago*, No. 15 C 3771, 2018 WL 1695362, at *7-8 (N.D. Ill. Apr. 6, 2018) (finding that plaintiffs properly alleged equal protection claim against officers where complaint included both general and specific allegations concerning racial profiling, including cites to the Task Force and the DOJ reports); *Smith*, 143 F. Supp. 3d at 756 (finding that plaintiffs sufficiently alleged discriminatory purpose where plaintiffs included "allegations concerning the history of suspicionless stops and frisks in Chicago leading to the plausible inference that the City's policymakers reaffirmed this particular course of action and its adverse effect on African-American and Hispanic men in minority neighborhoods").

33

Defendants attempt to counter Plaintiffs' strong evidence of discriminatory purpose by arguing that Plaintiffs concede that the City's prioritization of "high crime" areas make it "more likely" that Black and Latinx people are included in the Database. Defs. Mot. at 24. Rather than being an "obvious alternative explanation" as Defendants suggest, the fact that CPD only targeted predominantly minority areas for gang suppression tactics is further proof of discriminatory intent and results in a "self-perpetuating cycle." *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 667 (S.D.N.Y. 2013) ("[T]he targeting of certain races *within* the universe of suspicious individuals is especially insidious, because it will increase the likelihood of further enforcement actions against members of those races as compared to other races, which will then increase their representation in crime statistics."); *Alsherbini v. Village of Worth*, No. 10 CV 6781, 2011 WL 1303427, at *4 (N.D. Ill. Mar. 31, 2011) (rejecting defendants' argument that plaintiff "cannot prove discriminatory intent because in his complaint he alleges a race-neutral reason for their conduct: that he committed municipal code violations" because he also alleged that the violations "were a sham to carry out [the defendant's] policy of ridding the village of Middle Eastern owned businesses).

Lastly, the case law cited by Defendants about the neutrality and acceptability of data collection is a red herring. In fact, these cases concern data collection practices within the employment context as required by statute to achieve equal employment standards. *See United States v. State of New Hampshire*, 539 F.2d 277, 280 (5th Cir. 1976) (noting that EEO-4 reports are required by local governments to furnish race, national origin, and sex of employees); *Morales v. Daley*, 116 F. Supp. 2d 801, 814 (S.D. Tex. 2000) (striking down an equal protection claim based on the government's collection of demographic data in the 2000 Census); *Sussman v. Tanoue*, 39 F. Supp. 2d 13, 25 (D.D.C. 1999) (explaining action taken by the FDIC to collect

34

data and gender information its employees). These cases hold no relevance to thorny issues of police discretion, and they shed no light on the proclivities of CPD officers employing race as a proxy for gang affiliation. CPD is not simply collecting information, but engaging in racial profiling to target Black and Latinx individuals for inclusion in the Database and all the negative consequences that stem for that inclusion. *See Sow v. Fortville Police Dept.*, 636 F.3d 293, 303 (7th Cir. 2011) ("Racial profiling, or selective enforcement of the law, is a violation of the Equal Protection Clause."); *Martinez v. Vill. of Mt. Prospect*, 92 F.Supp.2d 780, 782 (N.D. Ill. 2000) ("Racial profiling of any kind is anathema to our criminal justice system because it eviscerates the core integrity that is necessary to operate that system effectively in our diverse democracy.").

### B.  Plaintiffs Have Properly Alleged a Discriminatory Effect

To demonstrate discriminatory effect, "plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Chavez,* 251 F.3d at 636. Statistics on their own are "sufficient to establish discriminatory effect." *Id.* at 640.

Plaintiffs' allegations, which include statistical evidence, are more than sufficient for the Court to plausibly infer discriminatory effect. Plaintiffs provide a range of pertinent data, including: 95% of people included in the Gang Database are Black or Latinx, which is higher than the national average (81.5%), and less than 5% are white, which is lower than the national average (11.5%), Compl. ¶¶ 51-52; the Database includes 11% of Chicago's Black population, 4 percent of the Latinx population, and only 0.6% of the white population, *id.* ¶ 53; the comparative rate at which Black and Latinx people are given a specific gang designation compared to whites, *id.* ¶ 47; statistics showing that none of the people who were added to the

Database when they were 11 or 12 were white, compared to national surveys indicating that 40%
of youth who identify as gang members are white, *id.* ¶¶ 56-57; statistics showing that even in
neighborhoods where white people are stopped at relatively high rates, they were still far less
likely to be added to the Database (including a demographic breakdown of specific
neighborhood data from 2014-2015), *id.* ¶¶ 58-60; and statistics demonstrating CPD's stop and
frisk practices disproportionately affect Black and Latinx individuals, *id.* ¶ 89. Plaintiffs further
allege that because CPD disproportionately and falsely designates Blacks and Latinx as gang
members, Blacks and Latinx disproportionately must contend with the consequences of this false
and discriminatory label. *Id.* ¶¶ 85, 88. Defendants once again seek to hold Plaintiffs to the
standard courts utilize during summary judgment, Defs. Mot. at 25-26, however, Plaintiffs'
allegations are more than sufficient for the pleading stage to establish discriminatory effect. *See
Casimir*, 2018 WL 1695362, at *9 (refusing to dismiss plaintiffs' equal protection claim because
the plaintiffs met "the *Twombly* and *Iqbal* standard by giving fair notice to defendants of the
grounds on which plaintiffs' equal protect claim rests" and "the questions of which inferences
can, or should, be drawn from the statistical evidence and the evidence of plaintiffs' treatment
are better suited for summary judgement or a full evidentiary hearing"); *Smith*, 143 F. Supp. 3d
at 756 (finding that "Plaintiffs have sufficiently alleged the *Chavez* discriminatory effect test
because they assert that they are members of a protected class, namely, African-American and
Hispanic men, who Chicago police officers disproportionally stop and frisk—compared to their
white counterparts—pursuant to an unlawful practice and policy").

## IV. Plaintiffs Have Properly Alleged Fourth Amendment Claims

To state a Fourth Amendment false arrest claim, "a plaintiff must plead that the defendant
lacked probable cause for the arrest." *Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976 (N.D.

36

Ill. 2009) (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)); *see also Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010) ("an arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that some criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect").

Defendants argue that Counts III and IV should be dismissed because Plaintiffs "do not offer facts showing that probable cause or reasonable suspicion for any offense was lacking when officers stopped or arrest people designated as gang members." Defs. Mot. at 27. Defendants further assert that Plaintiff Warner does not allege that Defendant Toledo lacked probable cause to arrest him "for any offense" and only claims that there was no probable cause for the particular offense charged. *Id.* at 27-28. Defendants are plainly wrong. Plaintiff Warner clearly alleges Defendant Toledo falsely detained and arrested him without reasonable suspicion or probable cause. Compl. ¶ 213. Plaintiff Warner makes clear that Defendant Toledo lacked probable cause to arrest him for any offense. He alleges that was merely on his way to pick his younger brother up from school when Defendant Toledo began following him and eventually arrested him solely because of his false gang designation. *Id.* ¶¶ 113-20. Similarly, Plaintiffs allege in Count IV that officers target Plaintiffs and members of the class for unreasonable searches and seizures by falsely manufacturing reasonable suspicion based solely on the gang designations. *Id.* ¶¶ 183-84. Plaintiffs have alleged all that is required at this stage and therefore Counts III and IV should not be dismissed. *See Gardunio*, 674 F. Supp. 2d at 986 (denying defendants' motion to dismiss plaintiff's false arrest claim "because Plaintiff has adequately alleged that the Defendant Officers . . . arrested him without probable cause").

## V.     Plaintiffs Have Properly Stated a Basis for Liability Against The City

Defendants seek dismissal of Counts I, II, III, V, and VI, contending that Plaintiffs have

failed to assert any factual allegations demonstrating that the City maintained a policy, custom, or practice that deprived Plaintiffs of their constitutional rights. Defs. Mot. at 28-30. Defendants' argument lacks merit.

To state a Section 1983 claim against the City under *Monell*, Plaintiffs must allege that they suffered an injury caused by the City's official policies or customs. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007). Plaintiffs can demonstrate an official policy or custom in three ways: (1) by establishing the existence of an express policy that causes a constitutional deprivation when enforced; (2) by establishing the existence of a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) by showing that the constitutional injury was caused by a person with final policymaking authority. *Estate of Sims*, 506 F.3d at 515.

Plaintiffs have alleged facts that plausibly suggest the existence of widespread municipal practices that caused Plaintiffs' injuries. Plaintiffs allege that the City, through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated de facto policies, practices, and customs that include, *inter alia*, maintaining a discriminatory and error-ridden Gang Database, including individuals in the Database without any justification or evidence proving that they are in fact gang members, failing to inform individuals that they are in the Database, failing to have a process by which individuals can challenge their inclusion in the Database, failing to have any process by which the information contained in the Database is analyzed for accuracy, refusing to remove individuals in the Database who have been wrongfully included, sharing information contained in the Database with third parties, failing to train and supervise officers on how to use the Database in a manner that does not violate constitutional rights, using discriminatory policing tactics to target Plaintiffs and class members for inclusion in

38

the Database based solely on their race, and relying on the Database to target Plaintiffs and class members for unreasonable searches and seizures.  Compl. ¶¶ 161, 171, 183.

Plaintiffs also allege that these policies, practices, and customs were well-known within CPD and that CPD is aware of the harms suffered by Plaintiffs and class members that it intentionally causes.  *Id.* ¶¶ 162-65, 176, 184.  Plaintiffs provide a detailed history of CPD's discriminatory policing and gang suppression tactics and allege that the Gang Database was intentionally built to be shared with other agencies.  *Id.* ¶¶ 38-47, 61-67, 79-83, 88-89.  Plaintiffs further allege that the City has implemented, enforced, encouraged, and sanctioned CPD's policies, practices, and customs and remains deliberately indifferent to the harms caused by those policies.  *Id.* ¶¶ 166-67, 171, 178, 183-85.  At this stage of the proceedings, Plaintiffs' allegations are sufficient to state *Monell* claims.  *See Spearman v. Elizondo*, 230 F. Supp. 3d 888, 893-94 (N.D. Ill. 2016) (finding that any ambiguity in plaintiff's complaint regarding which policy caused plaintiff's injury was not fatal to *Monell* claim and that plaintiff sufficiently alleged that the City was aware of and condoned a code of silence with the CPD); *Smith*, 143 F. Supp. 3d at 753 (finding that plaintiffs "alleged enough factual details regarding their failure to train claim under the federal pleading standards, [and] they have alleged sufficient facts that the City and Defendant McCarthy acted with deliberate indifference"); *LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014, 1021 (N.D. Ill. 2015) (rejecting the City's arguments that plaintiff's allegations were "too conclusory and speculative to survive a motion to dismiss" and finding that plaintiff has plausibly alleged a widespread practice of "failing to investigate, discipline, or otherwise hold accountable its police officers"); *Riley v. Cty. of Cook*, 682 F. Supp. 2d 856, 861 (N.D. Ill. 2010) ("[A]n official capacity claim can survive even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged

39

wrongdoing."); *Sanders v. Sheehan*, No. 09 C 7707, 2010 WL 2990121, at *3-5 (N.D. Ill. July 26, 2010) (denying motion to dismiss *Monell* claim where plaintiff's conclusory allegations were "sufficient to give the City notice of the specific policies against which it must defend").

## VI.      The Officer Defendants Are Not Entitled to Qualified Immunity

Defendants seek dismissal of Counts V and VII, contending that Defendant Officers Tomaso, Golden, and Toledo and are entitled to qualified immunity because: (1) Plaintiff Warner has failed to state a claim against these Defendants for violation of due process or for false arrest; and (2) Plaintiff Warner cannot meet his burden of showing that Defendant Officers Tomaso and Golden violated clearly established law for Count V.  Defs. Mot. at 30-32.[8]

Defendants' first argument must be rejected because as explained in detail above, Plaintiff has sufficiently stated a due process and false arrest claim.  Defendants' second argument must also be rejected.  Qualified immunity only protects officers whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "Clearly established" for purposes of qualified immunity means that at the time of the challenged conduct, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999).  Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

As discussed in detail above, the stigma-plus doctrine is clearly established law. *See Paul*, 424 U.S. at 707-712; *Wisconsin,* 400 U.S. at 437.  It is well settled that the government cannot give an individual a stigmatizing label and then publicize that label without due process if

---

[8] Defendants do not contend that Defendant Officer Toledo is entitled to qualified immunity as to Plaintiff Warner's malicious prosecution claim (Count XI), and therefore, Plaintiff does not address that issue here.

the individual will be deprived of a liberty interest as a result. Further, it is well settled that due process requires, at a minimum, notice and an opportunity to be heard. *See Mathews*, 424 U.S. at 334. While there is no case directly analogous to the facts here, the constitutional question is beyond debate. Defendants Tomaso and Golden know that information contained in CPD's Gang Database is shared with other law enforcement agencies and that gang information can subject an individual to false arrests, unwarranted stops, and unnecessary harassment. Therefore, these Defendants knew or should have known that including Warner in the Database without affording him any due process to verify the accuracy of that information would violate his rights.

While there may be no case directly analogous to the facts here, as early as 1992, in the context of prison officials validating prisoners as associates of prison gangs, "the law was clearly established that due process required that [a] plaintiff be given notice and a meaningful opportunity to [be] heard *before* he was validated as a gang associate," and that some reliable evidence must exist to support the decision. *Lira v. Dir. of Corrections*, No. C-00-0905 SI, 2008 WL 619017, at *11 (N.D. Cal. Mar. 4, 2008); *see also Tapia v. Alameida*, No. 1:03-CV-5422-AWI-SMS, 2006 WL 842470, at *16-17 (E.D. Cal. Mar. 29, 2006) (denying qualified immunity in gang validation case where defendants validated a plaintiff without giving him notice and an opportunity to be heard). Because no controlling authority exists regarding due process violations directly analogous to CPD's Gang Database violations, this Court can examine all relevant case law to determine whether Defendants Tomaso and Golden were acting in accordance with clearly established law. *See Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989); *Frederickson v. Landeros*, No. 11 C 3484, 2018 WL 1184730, at *6 (N.D. Ill. Mar. 7, 2018). Thus, it can be reasoned that it was clearly established that due process required officers to give Plaintiff Warner and others included in CPD's Gang Database notice and

meaningful opportunity to be heard.

Regardless of Defendants' arguments, a determination of qualified immunity at this stage of the proceedings is premature, particularly given the lack of data and information about CPD's Gang Database. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (holding that "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds"); *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) (noting that "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal . . . and when defendants do assert immunity it is essential to consider facts in addition to those in the complaint"); *Khorrami v. Rolince*, 493 F.Supp.2d 1061, 1074 (N.D. Ill. 2007) (holding that defendants' qualified immunity "attacks on Plaintiff's complaint are premature"). [9]

## VII. Plaintiffs Have Properly Alleged an ICRA Claim

Defendants seek dismissal of Counts IV and X, challenging the sufficiency of Plaintiffs' ICRA allegations by claiming that Plaintiffs fail to identify a specific City practice and fail to demonstrate disparate impact. Defs. Mot. at 32-34. Both of Defendants' arguments are easily defeated. With respect to their first argument, as explained in detail above, *see supra* § V, Plaintiffs allegations plausibly suggest that the City's law enforcement practices constitute criteria and methods of administration with respect to maintaining a Gang Database and including Black and Latinx individuals who have not participated in any gang activity in the Database for no justifiable reason other than their race. *See* Compl. ¶¶ 171, 190-92, 232-34.

As to Defendants' second argument, again as explained fully above, *see supra* § III(B), Plaintiffs' allegations, which include statistical evidence, plausibly suggest that the City's

---

[9] In a footnote, Defendants argue that Plaintiffs have failed to adequately allege a basis for punitive damages against the Officer Defendants. This argument is unfounded as Plaintiffs have clearly alleged that the Officer Defendants targeted Warner because of his race and acted unreasonably and intentionally, with malice and knowing disregard for Plaintiffs' constitutional rights. Compl. ¶ 111, 203, 214; *see Smith v. Wade*, 461 U.S. 30, 56 (1983).

discriminatory law enforcement practices with respect to its Gang Database cause a disparate

impact on Black and Latinx individuals. *See* Compl. ¶¶ 191-92, 233-35; *Flanagan v. Excel*

*Staffing Solutions*, L.L.C., No. 16-CV-05663, 2018 WL 558499, at *4-5 (N.D. Ill. Jan. 25, 2018)

(finding that "calculated percentages or other statistics are not necessary to make [plaintiff's]

[disparate impact] claim plausible," where plaintiff alleged that employment agency's policy and

practice of assigning work to Hispanic laborers over African American laborers had a disparate

impact on African American laborers); *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 906

(N.D. Ill. 2011) (holding that plaintiffs' ICRA claim survived a motion to dismiss where they

alleged that a policy of not promoting police officers with recent disciplinary violations had a

disparate impact on African Americans, but did not have statistical evidence). Plaintiffs further

allege that the Individual Plaintiffs suffered injuries from the discriminatory effects of the City's

law enforcement practices. Plaintiffs' allegations are more than sufficient to state a claim under

the Act. *See Stanfield v. Dart*, No. 10 C 6569, 2011 WL 1429172, at *6 (N.D. Ill. Apr. 14, 2011)

(plaintiff stated ICRA claim by alleging that the challenged policies had the likely effect of

"discriminating against, depriving and tending to deprive equal employment" to the plaintiff

because of her gender); *McFadden v. Bd. of Educ. for Ill. School Dist. U-46*, No. 05 C 0760,

2006 WL 6284486, at *8 (N.D. Ill. Oct.3, 2006) (students' allegations that they were

discriminated against by the School Board based on their race and national origin were sufficient

to survive motion to dismiss); *Chicago Urban League v. State*, No. 08 CH 30490, 2009 WL

1632604, at *4 (Ill. Cir. Ct. Apr. 15, 2009) (plaintiffs had ICRA claim based on allegation that

state's funding scheme deprived minority students of educational opportunity).

## VIII.    Plaintiff Warner Has Properly Alleged a Malicious Prosecution Claim

To state an Illinois state law claim for malicious prosecution, Plaintiff Warner must

allege that (1) Defendant Toledo commenced criminal proceedings, (2) the proceedings terminated a manner indicative of Warner's innocence, (3) there was no probable cause for the proceedings, (4) Toledo acted maliciously, and (5) Warner was injured. *See Gonzalez*, 578 F.3d at 541 (citing *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). Defendants contest the second and fourth elements, however, their arguments lack merit.

Plaintiff Warner alleges that while he was walking to pick his younger brother up from school, Toledo arrested him for soliciting unlawful business without probable cause, and that nearly seven months after his arrest, the State voluntarily dismissed his case. Compl. ¶¶ 118, 124. Plaintiff alleges that the prosecution was terminated in Warner's favor and in a manner indicative of his innocence. *Id.* ¶ 243. Citing to *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997), Defendants argue that "a prosecutor's decision to non-suit a case, without more, does not indicate the innocence of the accused." Defs. Mot. at 35. However, Defendants once again seek to hold Plaintiff to a higher pleading standard as *Washington* was decided at the summary judgement stage. The court explained in *Washington* that at summary judgment, it was the plaintiff's burden to establish "that the nolle prosequi was entered for reasons consistent with his innocence." *Washington*, 127 F.3d at 557 ("The circumstances surrounding the cessation of the criminal proceedings must compel an inference that reasonable grounds to pursue the criminal prosecution were lacking."). However, at the motion to dismiss stage, "notice is what counts" and therefore it is sufficient for Plaintiff to plead that the proceedings terminated in a manner indicative of his innocence. *Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976, 987-88 (N.D. Ill. 2009) (where plaintiff's prosecution was terminated via a nolle prosequi and plaintiff alleged that the proceedings were terminated in a manner indicative of his innocence, finding that "[b]ecause it was not clear why the prosecutor elected not to prosecute Plaintiff for false

44

personation of a peace officer, it would be premature to dismiss Plaintiff's malicious prosecution claim at this time"); *see also Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 794 (N.D. Ill. 2013) (where plaintiff alleged nolle prosequi dismissals of his criminal proceedings, "taking the alleged facts as true, the inference that there existed a lack of reasonable grounds to pursue Starks's prosecution is compelled"); *Lindsey v. Tews*, No. 09 C 1078, 2009 WL 2589524, at \*2 (N.D. Ill. Aug. 19, 2009) (refusing to dismiss plaintiff's malicious prosecution claim because "[a]ccepting the allegations of [plaintiff's] Complaint as true and construing all reasonable inferences in a light most favorable to him, it cannot be now determined that [plaintiff] lacks all possibility of supporting his claim of favorable dismissal of the criminal proceedings").

As to the fourth element, "malice may be shown 'by evidence of personal animosity or inferred from a complete lack of probable cause or a failure to conduct an adequate investigation under the circumstances.'" *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014) (citation omitted). Plaintiff alleges that Toledo acted maliciously when he targeted Plaintiff because of his false gang designation and arrested him without probable cause and caused him to be improperly subjected to judicial proceedings without probable cause. Compl. ¶¶ 118-20, 239-42. These allegations are sufficient to properly plead malice. *See Neiman v. Vill. of Deerfield*, 2015 WL 9315543, at \*3 (N.D. Ill. Dec. 22, 2015) (finding that "[t]he complaint generally alleges that the Tenant Defendants acted with malice, which is sufficient under Rule 9(b)" and refusing to dismiss plaintiff's malicious prosecution claim).

## IX.    Plaintiffs Have Properly Alleged Respondeat Superior and Indemnification Claims

Defendants seek dismissal of Counts XII and XIII, contending that there cannot be claims for respondeat superior and indemnification if Plaintiffs fail to state any claim against the individual Defendants. Defs. Mot. at 36. As explained above, Plaintiffs have sufficiently

45

pleaded all their claims against the individual Defendants and therefore their respondeat superior and indemnification claims against the City must also remain.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to dismiss Plaintiffs' Complaint.

Respectfully submitted,

/s/ Vanessa del Valle
One of the Attorneys for Plaintiffs

| | |
|---|---|
| Sheila A. Bedi | Brendan Shiller |
| Vanessa del Valle | Chris Bergin |
| MacArthur Justice Center | Tia Haywood |
| Northwestern Pritzker School of Law | Shiller Preyar LLC |
| 375 E. Chicago Avenue | 601 S. California Avenue |
| Chicago, IL 60611 | Chicago, IL 60612 |
| (312) 503-2492 | (312) 226-4590 |
| | |
| Elizabeth A. Homsy | Joey L. Mogul |
| The Law Officers of Elizabeth A. Homsy | People's Law Office |
| 2506 N. Clark Street | 1180 N. Milwaukee Ave. |
| Suite 286 | Chicago, IL 60622 |
| Chicago, IL 60614 | (773) 235-0070 |
| (773) 988-3486 | |

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing document was electronically served on all counsel who have filed appearances in this case via the Court's CM/ECF system on January 11, 2019.

/s/ Vanessa del Valle